# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUN VALLEY ORCHARDS, LLC, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>U.S. DEPARTMENT OF LABOR, )<br>and MARTIN J. WALSH, in his )<br>official capacity as United States )<br>Secretary of Labor, )<br><br>*Defendants*. )<br>_____ ) | Case No. _____ |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND DEMAND FOR JURY TRIAL

---

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

*\* Pro hac motion to be filed*

Scott Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ  08865
Tel: (908) 454-3200
Fax: (908) 454-3322
Email: wilhelms@wwgrlaw.com

*Attorneys for Plaintiff Sun Valley Orchards, LLC*

## LOCAL RULE 10.1 STATEMENT

1.      The mailing addresses of the parties to this action are:

Sun Valley Orchards, LLC
29 Vestry Road
Swedesboro, NJ 08085

Department of Labor
200 Constitution Avenue N.W.
Washington, D.C. 20001

Martin J. Walsh, U.S. Secretary of Labor
200 Constitution Avenue N.W.
Washington, D.C. 20001

## INTRODUCTION

2.      Sun Valley Orchards, a family farm in New Jersey, has spent nearly five years in proceedings before agency judges, attempting to contest the U.S. Department of Labor's decision to subject the farm to over half a million dollars in liability. The bulk of that assessment—over $320,000—is related to a paperwork violation: When filling out paperwork to participate in a DOL visa program for migrant farm workers, the farm indicated that it would give workers access to a kitchen when, in fact, it offered a meal plan under which workers could purchase food at a cost of approximately $3.75 per meal. The farm was in its first year participating in the H-2A visa program when it made that mistake, and DOL's only complaint about the meal plan was that it was not accurately described in the farm's paperwork; in subsequent years, the farm has offered the same meal plan without DOL raising any objections.

3.      DOL in this case has appointed itself prosecutor, judge, and jury. The monetary award was first assessed by DOL inspectors, was then affirmed by a DOL administrative law judge after an administrative hearing, and was finally affirmed by an appellate panel of DOL judges. DOL wrote the governing regulations with only minimal congressional guidance, and

DOL invented an agency adjudicatory process with *no* congressional authorization. The agency made the law and found the facts, and then the agency decided the penalty.

4.      The Complaint in this case raises a claim under Article III of the U.S. Constitution. If an agency wants to impose this kind of financial liability, then the agency should be required to proceed before a real federal judge in a real federal court. At a minimum, an agency should not be able to take over the judicial function without a clear direction from Congress providing for adjudication in an agency court.

5.      The Complaint raises other claims as well. The award was imposed by agency judges who were appointed in violation of the Appointments Clause. And the imposition of hundreds of thousands of dollars in liability for a paperwork violation also separately violates the Excessive Fines Clause. Indeed, even under the Administrative Procedure Act's deferential standard of review, the DOL's award is unsupported by substantial evidence, an abuse of discretion, and not in accordance with law. Five years after this administrative odyssey began, the DOL's unconstitutional award should be set aside.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201, 2202 and 5 U.S.C. § 702.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(e). Sun Valley Orchards is located at 29 Vestry Road, Swedesboro, NJ 08085, which is within Gloucester County and the Camden vicinage of the United States District Court for the District of New Jersey. Plaintiff Sun Valley Orchards resides at that address, and a substantial part of the events giving rise to the governmental enforcement action at issue in this case also occurred at those premises.

## THE PARTIES

8.      Plaintiff Sun Valley Orchards, LLC is a family-owned limited liability company organized under the laws of New Jersey. Joseph Marino is the Managing Partner of Sun Valley Orchards, and he owns and operates the company together with his brother Russell Marino. Sun Valley Orchards operates a vegetable farm in southern New Jersey, growing crops including peppers, squash, eggplant, cucumbers, and asparagus.

9.      Defendant U.S. Department of Labor ("DOL") is the federal administrative agency responsible for bringing enforcement actions against employers for alleged violations of the rules and regulations of the H-2A visa program. The enforcement proceeding at issue in this case was initiated by DOL personnel, tried by DOL attorneys, heard and decided by a DOL judge, and then affirmed by a panel of DOL appellate judges.

10.     Defendant Martin J. Walsh is sued in his official capacity as the U.S. Secretary of Labor. In that capacity, he is responsible for the oversight, administration, and enforcement of the H-2A visa program.

## REGULATORY BACKGROUND

### The Statutory Framework

11.     The H-2A visa program was created by Congress in 1986, as part of the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat 3359. The H-2A program allows for employment of foreign nationals as temporary agricultural workers in circumstances where an employer's needs cannot be met out of the domestic labor pool. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a); 1188(a).

12.     Congress has enacted express provisions to govern the debarment of H-2A employers who allegedly violate H-2A regulations. Under these provisions, DOL may debar an

employer for up to three years if the employer "substantially violated a material term or condition of the labor certification with respect to the employment of domestic or nonimmigrant workers." 8 U.S.C. § 1188(b)(2). If an employer contests its debarment, the statute also expressly provides for "a de novo administrative hearing respecting the denial or revocation." *Id.* § 1188(e).

13.     By contrast, Congress has *not* authorized agency judges to impose monetary penalties for violations of the H-2A program through agency adjudication.

14.     DOL's statutory authority to impose monetary penalties for H-2A violations is found in a single, vague provision: "The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section." 8 U.S.C. § 1188(g)(2).

15.     Notably, while Section 1188(g)(2) authorizes the Secretary of Labor to impose "appropriate penalties," the statute says nothing at all about imposing such penalties in administrative proceedings before agency judges.

16.     To the contrary, Congress has specifically provided that "[w]henever a civil fine, penalty or pecuniary forfeiture is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action." 28 U.S.C. § 2461(a). When Congress authorized the Secretary of Labor to impose penalties for violations of H-2A violations, Congress thus authorized the Secretary of Labor to impose those penalties "in a civil action"—not an administrative proceeding before an administrative judge.

## DOL's System of Administrative Adjudication

17.     Despite the above lack of congressional authorization, the Secretary of Labor has promulgated regulations providing for the imposition of civil monetary penalties and back wages in administrative courts. Based solely on the vague statutory grant of authority in Section 1188(g)(2), DOL regulations subject employers to "appropriate administrative proceedings" to impose penalties including "recovery of unpaid wages" and "assessment of a civil money penalty." 29 C.F.R. § 501.16.

18.     Under DOL's regulations, the amount of a civil monetary penalty is determined in the first instance by the agency's enforcement personnel in the Wage and Hour Division, who "shall consider the type of violation committed and other relevant factors." 29 C.F.R. § 501.19(b). These "relevant factors" include, but "are not limited to," seven factors listed in the regulation: (1) the employer's previous history of violations; (2) the number of workers affected; (3) the gravity of the violation; (4) good faith efforts to comply; (5) the employer's explanation for the violation; (6) the employer's commitment to future compliance; and (7) the extent of the employer's financial gain or the worker's financial loss or injury. *Id.*

19.     Under DOL's regulations, a "civil money penalty for each violation of the work contract or a requirement of [the H-2A program] will not exceed $1,787 per violation." 29 C.F.R. § 501.19(c). In 2015, the time period at issue in this case, that amount was set at $1,500. *See* 81 Fed. Reg. 43429, 43435 (July 1, 2016).

20.     Under DOL's regulation, "[e]ach failure to pay an individual worker properly or to honor the terms or conditions of a worker's employment . . . or the regulations in this part constitutes a separate violation." 29 C.F.R. § 501.19(a).

21.     Once a penalty is assessed by DOL's enforcement personnel, that determination is reviewed at a hearing by DOL ALJs, who are employees of the agency.

22.     As DOL employees, ALJs are affected by the financial health of the agency as a whole. For instance, when DOL was forced to make budget cuts in 2013, the DOL's Office of Administrative Law Judges was forced to cut its budget by five percent and, as a result, furloughed DOL ALJs for multiple days.

23.     In litigation, DOL has also taken the position that the Secretary of Labor has "broad authority to remove ALJs" from their positions and that "Article II's mandate that inferior executive officers remain accountable to the President and their Department Heads through the removal power applies to ALJs." Brief for Federal Respondent at 30, 35, *K&R Contractors, LLC v. Keene*, No. 20-2021 (4th Cir. Feb. 4, 2021).

24.     After an ALJ issues a decision, DOL regulations then allow an employer to appeal that decision to an internal agency appellate court called the Administrative Review Board ("ARB"). 29 C.F.R. § 501.42.

25.     The ARB is nowhere authorized by any statute. Rather, the Secretary of Labor created the ARB by executive order in 1996. *See* Secretary's Order 02-96, 61 Fed. Reg. 19978 (May 3, 1996); *see also* Secretary's Order 02-2012, 77 Fed. Reg. 69378 (Nov. 16, 2012).

26.     The ARB consists of a maximum of five administrative judges appointed by the Secretary of Labor. 77 Fed. Reg. at 69379. The members of the ARB are appointed for a fixed term "of two years or less." *Id.*

27.     The Secretary of Labor's Orders creating the ARB direct that "[t]he Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations

which has been duly promulgated by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions." 61 Fed. Reg. at 19979; *see also* 77 Fed. Reg. at 69379.

### DOL's H-2A Enforcement Activity

28.     As recently as 2006, annual civil monetary penalties imposed by DOL for violations of the H-2A program totaled just $57,900. *See* David J. Bier, Cato Institute, Immigration Research and Policy Brief No. 17, *H-2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020) (Table B).[1]

29.     Annual civil monetary penalties for H-2A violations first crossed the million-dollar mark in 2012 and reached as high as $5.9 million in 2013. *Id.*

30.     Data on DOL's website shows that, from 2005 through August 2021, DOL has imposed three civil monetary penalties over $1 million; 52 penalties between $100,000 and $1 million; 482 penalties between $10,000 and $100,000; and 1,850 penalties under $10,000 for alleged violations of the H-2A program. *See* U.S. Dep't of Labor, Wage and Hour Compliance Action Data (hereinafter, "DOL Data").[2]

31.     In addition to imposing civil monetary penalties for H-2A violations, DOL's ALJs also assess back wages that are purportedly owed to employees of H-2A employers. Since 2005, DOL has assessed a total of $37.5 million in civil monetary penalties and $28.9 million in back wages in connection with the H-2A program. *See* DOL Data, *supra* ¶ 30.

32.     Back wages are technically owed to the employees, but in most cases involving the H-2A program they are collected by the agency. Employees must then claim the funds from the government. If the funds go unclaimed for three years, the government keeps the money.

---

[1] *Available at* https://www.cato.org/publications/immigration-research-policy-brief/h-2a-visas-agriculture-complex-process-farmers-hire.

[2] *Available at* https://enforcedata.dol.gov/views/data_summary.php.

33.     In 2015, the DOL's Office of Inspector General found that DOL "made minimal efforts to locate" employees who it was supposed to pay back wages. U.S. Dep't of Labor, Office of Inspector General, *Wage and Hour Division Needs to Strengthen Management Controls for Back Wage Distributions* (Mar. 2015).[3] As a result, between 2010 and 2014, the government kept $60 million in back wages that were collected by DOL and never paid to workers. *Id.*

34.     While the amount of money collected for alleged H-2A violations in administrative proceedings has significantly increased, the number of employers who are debarred for violations has remained relatively small. The number of debarments each year ranges from zero (in 2010) to 31 (in 2018). *See* Bier, *supra* ¶ 28.

35.     In 2015, the agency imposed $3.9 million in civil monetary penalties in 207 cases involving alleged violations of the H-2A program. *See* Bier, *supra* ¶ 28. In that same year, the agency debarred 30 employers. *Id.*

36.     In other words, the agency subjects more employers to its *unauthorized* administrative procedures for monetary penalties than it does to its *authorized* administrative procedures for debarment.

## FACTUAL BACKGROUND

### Sun Valley Orchards

37.     Sun Valley Orchards operates a family farm in southern New Jersey that grows a variety of vegetables, including peppers, squash, eggplant, cucumbers, and asparagus.

38.     Sun Valley Orchards is owned and operated by two brothers, Joseph and Russell Marino. They are fourth-generation farmers in New Jersey.

---

[3] *Available at* https://www.oig.dol.gov/public/reports/oa/2015/04-15-001-04-420.pdf.

39.     Vegetable farming is a labor-intensive business. Because vegetables are easily bruised and damaged, they cannot be harvested by machine and must be picked by hand. Many vegetables also must be hand-planted, and, in some instances, must be tied up to stakes while in the process of growing.

40.     As a result, Sun Valley Orchards depends on seasonal labor to grow and harvest its crops. It would be impossible to run the farm without those workers.

41.     During the times relevant to this case, Sun Valley Orchards' seasonal workers were supervised by Agustin Hernandez. Agustin's father also previously worked at Sun Valley Orchards, and Agustin's wife worked in the farm's kitchen cooking meals for the workers.

42.     Seasonal workers at Sun Valley Orchards are paid above minimum wage: In 2015, when the events at issue here occurred, the Marinos paid their workers $11.29 per hour, as compared to the then-prevailing state minimum wage of $8.38 per hour. Moreover, unlike for domestic workers, those wages are not subject to tax withholding.

43.     Seasonal workers at Sun Valley Orchards are also provided with free lodging at the farm in group dormitories with bunk beds.

44.     Working at a vegetable farm like Sun Valley Orchards is hard work, but it is also comparatively well paid. Given the wage rate and the provision of free lodging, workers can make a good amount of money over a season.

**The 2015 Growing Season**

45.     During the 2015 season, Sun Valley Orchards participated for the first time in the H-2A visa program.

46.     Before the 2015 season, Sun Valley Orchards had relied on seasonal workers who primarily came from Florida and Puerto Rico; the Marino brothers had avoided the H-2A visa

program in part because they had heard horror stories about other farms' regulatory tie-ups with DOL. But in 2015 the farm was increasingly unable to meet its needs out of the domestic labor pool, and the Marinos decided they had no real choice other than to enter the program.

47.     Because the H-2A program is complex and requires significant paperwork, the Marinos hired a contractor to help them navigate the program and fill out the necessary forms.

48.     Towards the beginning of the 2015 season, an inspector from DOL visited Sun Valley Orchards.

49.     When the inspector left, the Marinos asked if he had spotted any issues and if there were any changes the Marinos ought to make. The inspector assured the Marinos that everything was fine and did not suggest any changes.

**DOL's Half-Million Dollar Assessment**

50.     In early 2016, the DOL inspector returned—this time accompanied by officials from DOL's headquarters in Washington, D.C. These DOL officials handed Joseph and Russell a letter stating that they were being assessed over $550,000 for alleged H-2A violations— including a civil monetary penalty of over $200,000 and over $350,000 in back wages.

51.     In June 2016, DOL mailed a letter finalizing this assessment. A copy of that letter is attached as Exhibit A.

<u>The Meal Plan Paperwork</u>

52.     The majority of this assessment was based on a paperwork violation: Over $326,000 of the over-$550,000 assessment was imposed because Sun Valley Orchards' H-2A paperwork did not accurately describe the farm's meal plan for its workers.

53.     On that basis alone, DOL enforcement personnel assessed $198,450 in monetary penalties and $128,285 in back wages. DOL enforcement personnel calculated the penalty by

assessing a $1,350 penalty for each worker who was eligible to participate in the farm's meal plan (whether they were H-2A workers or not, and whether they actually chose to participate or not); and DOL enforcement personnel calculated the back wages by determining the full amount paid by all of Sun Valley Orchards' workers for the meal plan during the 2015 season (whether those amounts were paid by H-2A workers or not).

54.      It is entirely legal for an H-2A employer to offer employees a meal plan, and, in fact, federal regulations expressly allow H-2A employers to charge workers for meals. *See* 20 C.F.R. § 655.122(g).

55.      The amount that employers may charge for meals is set by regulation and is indexed to inflation. *See id.* § 655.173(a). In 2015, the agency set the maximum allowable meal charge at $11.86 per day, or $83.02 per week. *See* 80 Fed. Reg. 9482 (Feb. 23, 2015).

56.      The amount charged by Sun Valley Orchards was below the maximum allowable amount set by DOL's own regulations. Sun Valley Orchards' meal plan for 2015 charged workers $75 to $80 per week, or between $10.71 and $11.42 per day.

57.      DOL's only concern with Sun Valley Orchards' meal plan was that it was not accurately described on the farm's paperwork. Instead, the contractor who filled out Sun Valley Orchards' application erroneously stated that employees would have access to the kitchen so that they could cook their own meals.

58.      Even if employees *had* been given access to the kitchen, those employees still would have had to pay to purchase food. Indeed, given the cost of food in New Jersey, the high caloric needs of workers performing manual labor, and the fact that workers eating individually would not be able to buy in bulk, it would have been difficult for the workers to eat for much less than the cost of the meal plan even if the farm had provided them with kitchen access.

59.     Nothing in the H-2A program regulations required Sun Valley Orchards to provide its workers with free food, and Sun Valley Orchards never stated that it would do so. Yet, under DOL's assessment, Sun Valley Orchards was required to pay as "back wages" the *full* amount paid by all of its workers for its meal plan.

60.     In subsequent years, after the 2015 season, Sun Valley Orchards has continued to offer a meal plan for H-2A workers but has described the meal plan on its H-2A paperwork. DOL has not expressed any concern with Sun Valley Orchards' meal plan in those later years, confirming that DOL's sole concern with the meal plan in 2015 was that it was not fully described on the farm's paperwork.

<u>The Early Departure Paperwork</u>

61.     Most of the remainder of the assessment consisted of $142,728.20 in back wages (and $2,700 in penalties) related to the early departure of some of the farm's workers.

62.     DOL regulations include a "three-fourths guarantee" for H-2A workers, under which employers must "guarantee to offer the worker employment for a total number of work hours equal to at least three-fourths of the workdays" of the period for which the worker is hired. 20 C.F.R. § 655.122(i). A worker is not entitled to that guarantee, however, if the worker "voluntarily abandons employment before the end of the contract period" or if the worker "is terminated for cause." *Id.* § 655.122(n).

63.     During the 2015 season, nineteen of the farm's H-2A workers left early and, in doing so, signed paperwork stating that they were leaving voluntarily. The workers were asked to pick asparagus, which is particularly difficult physical work, and they left the farm after just a short time on the job because they did not like the work.

64.     DOL, however, claimed that this paperwork was inaccurate and that these workers were fired.

65.     Even if the Marinos *had* fired the workers, the workers would not have been entitled to the benefit of the three-fourths guarantee so long as the farm had filed paperwork informing DOL that the workers were being terminated for cause.

66.     The applicable job order stated that "cause" to fire the workers would include if a worker "fails . . . to perform the work as specified," "malingers or otherwise refuses without justified cause to perform as directed the work for which the Worker was recruited and hired," or otherwise "fails to meet applicable production standards or keep up with fellow workers."

67.     DOL's complaint was therefore not that the farm allegedly fired the workers, but, rather, that the farm allegedly did so without filing the necessary paperwork to establish that the termination was for cause.

68.     Because DOL believed the workers were fired without the proper paperwork to establish that the termination was for cause, DOL assessed back wages equal to the amount the workers would have been paid under the three-quarters guarantee.

<u>The Remainder of the Assessment</u>

69.     Beyond that, DOL assessed over $71,000 in back wages because Agustin Hernandez (the workers' supervisor) sold non-alcoholic beverages to the workers. Agustin would sell sodas for $1, energy drinks for $1.50, and bottled water for $0.75.

70.     DOL assessed back wages because Agustin purchased the beverages and sold them at a small up-charge; DOL believed that it was unlawful for Agustin to profit off such sales. However, in calculating the amount of back wages, DOL awarded the *full* amount paid by the workers, and not just the amount of Agustin's profit.

71.     It is not illegal to sell drinks to H-2A workers, and DOL would have had no problem if the farm had instead allowed an independent third party to come sell drinks to the workers (even if an independent vendor would have charged *more* for drinks). In fact, the farm has done just that in later years, and DOL has raised no objection.

72.     Similarly, DOL assessed $8,972.60 in back wages because Agustin sometimes bought beers in bulk and sold them to the workers at the dormitories. Again, it is not illegal to sell alcoholic beverages to H-2A workers, but DOL objected to these sales because they were made by the workers' supervisor. DOL would have raised no objection if the farm had allowed an independent third party to come sell beers to the workers.

73.     Finally, less than two percent of DOL's total assessment pertained to actual living and working conditions at the farm. DOL assessed $3,600 in civil monetary penalties related to living conditions, such as missing screens on some of the windows, as well as $7,500 in civil monetary penalties related to the provision of transportation to the fields.

74.     Since this fine was assessed, Sun Valley Orchards has continued to participate in the H-2A program. DOL has not sought to debar Sun Valley Orchards from the H-2A program, and DOL has not imposed any fines for later years.

75.     Sun Valley Orchards does not have $550,000 to pay to DOL, and if Sun Valley Orchards is forced to pay that amount it may very well destroy the business.

**AGENCY PROCEEDINGS**

**Before The Administrative Law Judge**

<u>The Assignment and Hearing</u>

76.     As required by DOL regulations, Sun Valley Orchards contested the agency's letter assessing penalties and back wages by requesting a hearing.

77.     The Administrator of DOL's Wage and Standards Division referred the case to the DOL's Chief ALJ, who, in turn, referred the case to DOL ALJ Theresa C. Timlin.

78.     ALJ Timlin has been employed by the DOL for almost the entirety of her career. ALJ Timlin completed her education in 1990. From 1991-2005, she worked as an attorney in the DOL's Office of the Regional Solicitor. From 2005-2008, she worked in the DOL's Office of Federal Contract Compliance Programs. And—after a one-year period working as an ALJ at the Social Security Administration—she worked as a DOL ALJ from 2009 through the present.

79.     On information and belief, because ALJ Timlin was hired as a DOL ALJ via a transfer from the Social Security Administration, ALJ Timlin's hiring as a DOL ALJ was effected without an appointment by the Secretary of Labor.

80.     ALJ Timlin held a four-day hearing for this case in July 2017. During the hearing, ALJ Timlin heard testimony from multiple witnesses, including Joseph Marino, Russell Marino, three former employees of Sun Valley Orchards, and a DOL inspector.

81.     On December 21, 2017, the Secretary of Labor ratified ALJ Timlin's appointment as an ALJ. The Secretary's letter stated that the ratification was "intended to address any claim that administrative proceedings pending before, or presided over by, administrative law judges of the U.S. Department of Labor violate the Appointments Clause."

82.     ALJ Timlin issued her decision on October 28, 2019. ALJ Timlin based her decision on evidence and testimony presented at the July 2017 hearing, which occurred prior to the Secretary of Labor's ratification of ALJ Timlin's appointment.

<u>The ALJ's Decision</u>

83.     The ALJ's decision affirmed the DOL's initial assessment in almost all material respects. A copy of the ALJ's decision is attached as Exhibit B.

84.     The ALJ affirmed the $198,450 civil monetary penalty for the meal plan violation. In doing so, the ALJ did not attempt to decide the appropriate penalty for the meal plan violation. Instead, the ALJ merely concluded that the penalty assessment made by DOL's enforcement personnel was "reasonable" and "rational."

85.     The ALJ therefore concluded that "[t]he Administrator's assessment of a $1,350 CMP for each worker was reasonable, because she reviewed each of the mitigation criteria at 29 C.F.R. § 501.19(b)" and "rationally considered all of the § 501.19(b) mitigation factors."

86.     Among other things, although Sun Valley Orchards argued that the workers did not suffer any significant harm as a result of the farm's paperwork error—as they would have had to pay for meals regardless, even if they had been afforded kitchen access—the ALJ found that DOL "rationally viewed the violation as serious."

87.     The ALJ also held that DOL's enforcement personnel "reasonably" multiplied the $1,350 monetary penalty by the number of workers eligible to participate in the meal plan. To justify this multiplier—which increased the penalty from $1,350 to $198,450—the ALJ stated simply: "District Director Rachor explained that the Administrator assessed the CMP in this way due to the seriousness of the violation and the 'large amount of workers affected.'"

88.     The ALJ also affirmed the assessment of $128,285 in back wages for the meal plan violation. While Sun Valley Orchards had argued that this assessment of back wages vastly overstated any harm to the employees—who would have had to purchase food even if they had been granted kitchen access—the ALJ deemed that to be irrelevant. The ALJ reasoned that "[a] material change to the terms of [the] contract necessarily provides 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself."

89.     The ALJ also affirmed the assessment of back wages for Agustin's beverage sales. Although there is no requirement anywhere in DOL's regulations for the H-2A program to provide free beverages to workers, the ALJ reasoned that the sales constituted an "unlawful deduction" from the workers' pay because Agustin made a profit from the sales.

90.     Although there was no evidence that Sun Valley Orchards in any way authorized Agustin's beverage sales, the ALJ held that Sun Valley Orchards could be held responsible for Agustin's beverage sales because Agustin acted as Sun Valley Orchards' agent.

91.     The ALJ, however, did reduce the award for the non-alcoholic beverage sales from $71,790.08 to $64,960 on the ground that the evidence did not support DOL enforcement personnel's calculations regarding the number of drinks consumed by the workers.

92.     The ALJ separately affirmed the award of $142,728.20 in back wages related to the early departure of a portion of the farm's employees. In doing so, the ALJ assessed the credibility of the witnesses and determined, on that basis, that the workers were fired: The ALJ found that "Joseph Marino's testimony, compared to the employees, lacks credibility."

93.     The ALJ made this decision even though none of the employees who testified at the hearing actually testified that they were fired. One worker was asked "[d]id anyone ever tell you [that] you were fired?" and answered "[n]o." Another worker testified that Russell Marino "told us that he didn't need us and that if we wanted to leave we could leave, so I decided to leave." This testimony was consistent with Sun Valley Orchards' position that the workers decided to quit because they did not like the work.

94.     The ALJ further affirmed the imposition of a $1,350 civil monetary penalty for the failure to pay these allegedly due back wages, as well as a $1,350 civil monetary penalty for the departure paperwork. The ALJ concluded that the DOL "reasonably considered all of the

mitigation factors." And the ALJ concluded that it was reasonable to impose a single penalty for each of these violations—rather than multiplying the penalties by the number of employees—based on Sun Valley Orchards' "limited experience with the H-2A program."

95.     Finally, the ALJ mostly affirmed the comparatively smaller assessment for the living conditions at the dormitory and the transportation to the fields. Here, however, the ALJ did modify the assessment in one small respect: The ALJ found that a $450 penalty for an unclean mattress was "not a reasonable penalty" because the record evidence did not actually support a finding that the mattress was unclean.

### Before the Administrative Review Board

96.     As required by DOL regulations, Sun Valley Orchards appealed the ALJ's opinion to DOL's Administrative Review Board ("ARB").

97.     On May 27, 2021, the ARB issued a decision affirming the ALJ in all respects. A copy of the ARB's decision is attached as Exhibit C.

98.     The ARB affirmed the $198,450 civil monetary penalty and $128,285 in back wages for the meal plan violation. The ARB found it irrelevant whether or not the failure to accurately describe the meal plan actually caused harm to the workers, as "[t]he deductions were unlawful because they were not disclosed, not because they provided a profit." The ARB likewise concluded that "whether providing a meal plan instead of cooking facilities would affect any of the workers' decisions to work for Respondent is irrelevant."

99.     The ARB also affirmed the decision to multiply the $1,350 penalty for the meal plan violation by the total number of workers at the farm. The ARB reasoned that Sun Valley Orchards had "failed to honor the terms of each worker's job contract," with the result that it was reasonable to impose a separate penalty for each worker.

100.    The ARB next affirmed the award of $64,960 in back wages for the sale of non-alcoholic beverages. The ARB "agree[d] that the regulations generally do not require H-2A employers to provide soft drinks to its workers" but found that the sales constituted unlawful deductions from the workers' wages because Agustin had "sold the beverages at a profit."

101.    The ARB also affirmed the award of $8,972.60 in back wages for the sale of alcoholic beverages. The ARB found that the ALJ had correctly awarded "back wages that were an approximation of [Agustin's] profits" under a burden shifting framework.

102.    Separately, the ARB affirmed the award of $142,728.20 in back wages and the $1,350 monetary penalty related to the early departure of some of the workers. The ARB explained that it "gives ALJ credibility determinations 'great deference' if they are not 'inherently incredible or patently unreasonable'" and found that the "ALJ's credibility determination is substantial evidence that Respondent made 'a rash, and perhaps illogical, decision' to fire the workers."

103.    The ALJ had separately adopted an alternative holding that, if the workers were not actually fired, then they were constructively discharged. But the ARB did not rely on—and did not review—that part of the ALJ's reasoning. Instead, the ARB rested this $142,728.20 award solely on the ALJ's credibility determination.

104.    Finally, the ARB rejected the argument that agency enforcement personnel "improperly failed to raise concerns about the meal plan charges and bring an enforcement action in a timely manner," explaining that there "is no case law that applies the doctrine of laches or estoppel to a government enforcement action" and "no regulatory requirement for the [agency's inspectors] to notify an employer the instant a violation is suspected."

105.   On August 10, 2021, DOL sent a letter to the attorneys who represented Sun

Valley Orchards in the administrative proceeding demanding "prompt payment" of the award

and asserting that "interest is currently accruing." The letter states that "[i]f Respondent does not

make full payment by September 10, 2021, the Administrator [of DOL's Wage and Hour

Division] intends to take appropriate steps, including referral for debt collection or litigation." A

copy of this demand letter is attached as Exhibit D.

## CLAIMS

### Count I:
### DOL's H-2A Enforcement Procedures Violate Article III
### (5 U.S.C. § 706(2)(B))

106.   The allegations of ¶¶ 11-36 and 76-105 are incorporated here in full.

107.   Article III, Section 1 of the U.S. Constitution states that the "judicial power of the

United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress

may from time to time ordain and establish." Article III further provides for various protections

for the judges of these Article III courts in order to guarantee judicial independence.

108.   Under Article III, this "judicial power shall extend to *all* cases, in Law and

Equity, arising under . . . the Laws of the United States."

109.   The Supreme Court has held that cases implicating an individual's "private

rights" must be tried before an Article III court. *See Stern v. Marshall*, 564 U.S. 462, 495 (2011).

110.   An order to pay money to the government—either in the form of a civil monetary

penalty or in the form of back wages—affects a person's private rights because it results in the

confiscation of their private property.

111.   Furthermore, the decision below awarded over one hundred thousand dollars in

back wages because the ALJ made a credibility determination and, based on that credibility

determination, found Sun Valley Orchards breached its contractual obligation by firing nineteen of its workers. That type of breach-of-contract claim is a prototypical case involving private rights, and, as such, must be tried in an Article III court.

112.    Because the proceeding here involved an attempt to force Sun Valley Orchards to pay money to the government, the proceeding implicated private rights and should have been brought before an Article III court.

113.    While the Supreme Court rejected a Seventh Amendment challenge to the imposition of monetary penalties by ALJs in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977), that case did not involve a claim under Article III. *Atlas Roofing* holds that *if* a case is properly tried before an agency judge, then a Seventh Amendment jury need not be provided, but it does not address the circumstances under which monetary penalties may appropriately be imposed by an agency court.

114.    Moreover, *Atlas Roofing* rested on the Supreme Court's conclusion that, "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency." 430 U.S. at 455. That holding does not apply here, as Congress nowhere indicated that these types of violations of H-2A regulations should be adjudicated before ALJs.

115.    DOL's procedures for agency adjudication of H-2A violations violate Article III insofar as the agency has assumed for itself the power to adjudicate cases affecting employers' private rights. Even assuming that Congress could permissibly assign such cases to agency judges under Article III (and it cannot), an executive agency cannot assume that judicial power for itself without express and specific direction from Congress.

116.     This violation is compounded by DOL's position that interest begins to accrue on its award as soon as ARB issues its decision. It violates Article III for an agency court to issue a decision that is treated as if it were the equivalent of a final judgment of an Article III court.

117.     Because DOL's adjudicatory procedures violate Article III, the decision below should be vacated and DOL should be enjoined from taking any action to enforce that decision.

**Count II:**
**The Agency Judges In This Case Were Not Constitutionally Appointed And Enjoy**
**Unconstitutional Protection Against Removal**
**(5 U.S.C. § 706(2)(B))**

118.     The allegations of ¶¶ 17-27, 76-82, 96-97 and 105 are incorporated here in full.

119.     ALJ Timlin qualifies as an inferior officer of the United States under the Appointments Clause. *See Lucia v. SEC*, 138 S. Ct. 2044 (2018).

120.     As a result, for ALJ Timlin to be constitutionally appointed, she must have been appointed either by the President, the Courts, or the Head of the Department.

121.     At the time ALJ Timlin held the hearing in this case, none of those things were true. She had not been appointed by the President, by the Courts, or by the Secretary of Labor.

122.     While the Secretary confirmed ALJ Timlin's appointment in December 2017, that re-appointment occurred *after* the hearing in this case. That post-hoc re-appointment does not change the fact that the hearing in this case was overseen by an improperly appointed official, as "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia*, 138 S. Ct. at 2055.

123.     To the extent that DOL does not enjoy "broad authority to remove ALJs," as it has claimed, *see supra* ¶ 23, restrictions on DOL's authority to remove ALJs also separately violate the requirement that executive officials be subject to removal under *Myers v. United States*, 272 U.S. 52 (1926).

124.    In addition, the ALJs who make up the ARB qualify as principal officers of the Untied States under the Appointments Clause. *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021). This is because the ARB's decisions are the final decisions of the DOL and are not subject to "review by a superior executive officer."

125.    Under the Appointments Clause, ARB judges must therefore be appointed by the President and confirmed by the Senate. However, ARB judges are not appointed by the President and are not confirmed by the Senate.

126.    The proper remedy for these Appointments Clause violations is to vacate the proceedings below and to remand to the agency for new proceedings before constitutionally appointed governmental officials.

127.    Notably, the remedy for an Appointments Clause violation (remand to the agency) is more limited than the remedy for a violation of Article III (a trial in an Article III court). If Sun Valley Orchards prevails on both the Appointments Clause claim *and* the Article III claim, then no remand to the agency would be necessary and instead Sun Valley Orchards would be entitled to a new trial in an Article III court.

### Count III:
### The Penalty Imposed In This Case Is An Excessive Fine
### (5 U.S.C. § 706(2)(B))

128.    The allegations of ¶¶ 37-60, 84-88, and 98-99 are incorporated here in full.

129.    The DOL in the proceeding below imposed a $198,450 civil monetary penalty and $128,285 in back wages for a paperwork violation involving failure to properly describe the farm's completely legal meal plan on the farm's H-2A paperwork.

130.    The DOL imposed this monetary award without any consideration for the actual amount of harm incurred by the employees. Instead, the ALJ reasoned that *any* departure from an

employer's H-2A paperwork constitutes "harm," and the ARB concluded that these penalties were necessary to ensure compliance with the H-2A program.

131.     In fact, to the extent that employees were harmed *at all* by this violation, any harm was minimal. Even if employees had been provided with kitchen access as was stated in the H-2A application, the employees still would have had to pay for their own food. If the employees had purchased their own food, they would not have been able to eat for substantially less than the meal plan's cost of approximately $3.75 per meal.

132.     Because the DOL justified the imposition of this monetary award on grounds of deterrence, this monetary award is punitive and therefore subject to review under the Excessive Fines Clause.

133.     The Supreme Court has held that monetary forfeitures are excessive if they are "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Moreover, the Supreme Court has held that punitive damages awards are generally excessive if they exceed the amount of the actual damages incurred. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497 (2008). In this case, the monetary award vastly exceeds any damages incurred by the workers and is, therefore, excessive.

134.     As a remedy for this violation of the Excessive Fines Clause, the Court should hold a hearing to determine the actual harm (if any) suffered by the employees and should reduce the size of the award to an amount no more than double the actual damages incurred as a result of the meal plan violation in this case.

**Count IV:**
**DOL's H-2A Enforcement Procedures Are Not Authorized By Statute**
**(5 U.S.C. § 706(2)(A), (C), (F))**

135.     The allegations of ¶¶ 11-36 and 45-105 are incorporated here in full.

136.     Congress has not authorized DOL ALJs to adjudicate cases involving alleged violations of H-2A regulations. Congress provided that "[t]he Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section." 8 U.S.C. § 1188(g)(2). But that statute does not say that that the Secretary may assess penalties or secure such other relief in proceedings before agency judges.

137.     Congress has specifically provided that "[w]henever a civil fine, penalty or pecuniary forfeiture is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action." 28 U.S.C. § 2461(a). Thus, because Congress has not expressly provided for agency adjudication of H-2A penalties, those penalties must be assessed in a civil action.

138.     The APA likewise contemplates that agency adjudication must be authorized by statute. The APA provides for "substantial evidence" review of agency decisions only if those decisions were made at "an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). Otherwise, the APA provides for "trial de novo by the reviewing court." *Id.* § 706(2)(F).

139.     Because Congress has not authorized adjudication of alleged H-2A violations by agency judges, Plaintiff is entitled to "trial de novo by the reviewing court." *Id.*

140.     As a remedy for this violation, Defendants should be enjoined from enforcing the agency decision below. If Defendants wish to impose this penalty on Sun Valley Orchards, they should be required to affirmatively press their claims in an Article III court. And if Defendants do choose to affirmatively press their claims, the case should be set for trial where the issues can be decided under a *de novo* standard of review.

141.    At the required *de novo* trial, Plaintiff would litigate all of the factual and legal issues decided by the agency courts in this case. Among other things, Sun Valley Orchards would seek a *de novo* determination of the appropriate penalty for the various meal plan and beverage-related violations; would seek a *de novo* determination of whether Sun Valley Orchards can be held responsible for the sales of beverages by the workers' supervisor; and would seek a *de novo* determination of whether the nineteen workers were fired or, instead, quit their jobs.

142.    If Defendants decide to press forward with the necessary *de novo* trial, Sun Valley Orchards also hereby invokes its right to trial by jury under the Seventh Amendment.

**Count V:**
**The Agency's Decision Is Not Supported By Substantial Evidence, Is An Abuse of Discretion, and Is Not In Accordance With Law**
**(5 U.S.C. § 706(2)(A), (E))**

143.    The allegations of ¶¶ 45-105 are incorporated here in full.

144.    Under the APA, agency action may be overturned if it is not supported by substantial evidence, if it is an abuse of discretion, or if it is otherwise not in accordance with law. As set forth above, Sun Valley Orchards disputes that any such standard should apply here. However, in the alternative, the agency decision in this case fails review even under that deferential standard.

145.    First, the award of $128,285 in back wages is not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance with law because the evidence did not support a finding that the employees were actually owed $128,285 in back wages. Even if the employees had been afforded kitchen access as the H-2A application stated, the employees would still have had to pay to purchase food, so the entire cost of the meal plan cannot be counted as a loss to the employees.

146.     Second, the $198,450 civil monetary penalty is not supported by substantial evidence, constitutes an abuse of discretion, and is not in accordance with law insofar as the penalty vastly exceeds the amount of any harm to the workers and is also duplicative of the award of back wages. The ALJ, after hearing all the evidence, failed to determine an appropriate penalty under the regulations and instead upheld the penalty because the agency "considered" the relevant factors under the governing DOL regulation and because the agency's analysis of those factors was "rational." Such near-total deference to agency enforcement personnel is not an appropriate basis for a penalty decision.

147.     The $198,450 civil monetary penalty also is not supported by substantial evidence, is an abuse of discretion, and is not in accordance with law insofar as DOL failed to proffer any colorable basis to multiply the penalty by the number of employees. Both the ARB and the ALJ tried to justify that decision by noting the number of employees affected, but that rationale would apply for *every* case and every penalty. The ALJ also said that this multiplication was warranted given the seriousness of the violation, but neither the ALJ nor anyone at DOL has proffered a reasonable explanation why this paperwork violation should be considered so serious that it warrants imposing hundreds of thousands of dollars in liability.

148.     Third, DOL's decision to impose $64,960 in back wages for the sale of non-alcoholic drinks was not supported by substantial evidence, an abuse of discretion, and not in accordance with law insofar as the penalty vastly exceeds the amount of any harm to the workers. There is no requirement to provide free beverages for H-2A workers, and, even if the drinks had been sold by an independent third party rather than the workers' supervisor, the workers still would not have obtained the drinks for free.

149.    Fourth, DOL's decision to impose $64,960 in back wages for the sale of non-alcoholic drinks and $8,972.60 for the sale of beer was not supported by substantial evidence, an abuse of discretion, and not in accordance with law insofar as the evidence did not support a determination that the farm ratified or approved of the supervisor's sale of those beverages.

150.    Fifth, DOL's decision to impose $142,728.20 in back wages and $2,700 civil monetary penalties in connection with the early departure of a portion of the farm's workers was not supported by substantial evidence, an abuse of discretion, and not in accordance with law, as the employees did not actually testify that they were fired.

**REQUEST FOR RELIEF**

In light of the foregoing, Plaintiff Sun Valley Orchards respectfully requests the following relief:

A.      An injunction enjoining the Defendants from enforcing the decision of the Administrative Review Board or commencing any action to collect the amounts claimed in the Notice of Determination from Sun Valley Orchards;

B.      A declaration that the Department's procedures for imposing civil monetary penalties and back wages for alleged violations of the H-2A program are not authorized by statute and also violate Article III;

C.      A declaration that the proceedings in this case violated the Appointments Clause insofar as the ALJ and the ARB were not appointed in a constitutionally adequate manner;

D.      A declaration that the monetary award in this case violated the Excessive Fines Clause of the U.S. Constitution;

E.      A declaration that the decision below was not supported by substantial evidence and was otherwise contrary to law;

F.  An award of Plaintiff's costs and expenses of this action, together with reasonable attorneys' fees, under the Equal Access to Justice Act or otherwise; and

G.  Any other legal or equitable relief to which Plaintiff may show itself to be justly entitled.

Dated: September 8, 2021                Respectfully submitted,

 /s/ Scott M. Wilhelm

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

    * Pro hac motion to be filed

Scott Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ  08865
Tel: (908) 454-3200
Fax:  (908) 454-3322
Email: wilhelms@wwgrlaw.com

*Attorneys for Plaintiff Sun Valley Orchards, LLC*

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, Plaintiff Sun Valley Orchards, LLC certifies that the

matter in controversy in this action is not the subject of any other action pending in any court or

of any pending arbitration or administrative proceeding.

Dated: September 8, 2021                 Respectfully submitted,

   /s/ Scott M. Wilhelm

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: rjohnson@ij.org

    *Pro hac motion to be filed*

Scott Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ  08865
Tel: (908) 454-3200
Fax:  (908) 454-3322
Email: wilhelms@wwgrlaw.com

*Attorneys for Plaintiff Sun Valley Orchards, LLC*

**VERIFICATION**

I, Joseph Marino, hereby verify that I am the Managing Partner of Sun Valley Orchards, LLC. I have reviewed the foregoing Complaint and I verify under penalty of perjury that the facts set forth in the Complaint are true and correct to the best of my knowledge.

Executed on September 7, 2021 in Swedesboro, NJ.

Joseph Marino