# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

SUN VALLEY ORCHARDS, LLC,

        *Plaintiff*,

    v.

Case No. 1:21-CV-16625-JHR-MJS

U.S. DEPARTMENT OF LABOR,
and MARTIN J. WALSH, in his
official capacity as United States
Secretary of Labor,

        *Defendants*.

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Scott M. Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ 08865
Tel: (908) 454-3200 Fax: (908) 454-3322
Email: wilhelms@wwgrlaw.com

*-and-*

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chargin Blvd., #256
Shaker Heights, OH 44120
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rjohnson@ij.org

Robert M. Belden*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rbelden@ij.org

**\***Admitted *pro hac vice*
*Attorneys for Plaintiff Sun Valley Orchards, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ..................................................................................................... 10

I.   The Adjudication Of These Claims In Agency Courts, Before Agency Judges, Violated Article III. ................................................................................. 11

    A.   The Agency Impermissibly Adjudicated Sun Valley's Private Rights ....................... 13

    B.   Congress Has Not Authorized The Agency Adjudication In This Case .................... 25

II.  The Agency's Award Must Be Vacated Because The ALJ Was Neither Appointed Nor Subject To Removal As Required By The Constitution. ........................... 27

    A.   The ALJ Was Not Constitutionally Appointed ......................................... 28

    B.   The ALJ Enjoyed Impermissible Protections Against Removal. .......................... 30

III. The Agency's Award Is Contrary To Law And Cannot Be Sustained Based On The Evidence In The Administrative Record. .................................................. 32

    A.   The Agency's Award For The Meal Plan And Beverages Issues Is An Abuse Of Discretion And Is Not Supported By Substantial Evidence. .......................... 32

    B.   The Agency's Award For Early Termination Is Not Supported By Substantial Evidence. ......................................................................... 36

    C.   The Agency's Award Of Back Pay Is Not Authorized By Statute. ....................... 38

IV.  The Agency's Award Violates The Excessive Fines Clause. ............................... 39

CONCLUSION ................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*AMG Capital Management LLC v. FTC*,
   141 S. Ct. 1341 (2021) ............................................................................................. 38

*Arlington v. FCC*,
   569 U.S. 290 (2013) .................................................................................................. 31

*Arreguin v. Sanchez*,
   398 F. Supp. 3d 1314 (S.D. Ga. 2019) ...................................................................... 22

*Atlas Roofing Co. v. OSHRC*,
   430 U.S. 442 (1977) ............................................................................................ 12, 21

*Austin v. United States*,
   509 U.S. 602 (1993) .................................................................................................. 39

*Benson v. Remington*,
   2 Mass. 113 (1806) ................................................................................................... 16

*Bowden v. Morris*,
   3 F. Cas. 1030 (C.C.E.D. Va. 1876) ......................................................................... 18

*Bracken v. Wm. & Mary Coll.*,
   5 Va. 161 (1797) ....................................................................................................... 16

*Butler v. Inhabitants of City of Plainfield*,
   135 A. 669 (N.J. 1927)............................................................................................... 16

*Buttfield v. Stranahan*,
   192 U.S. 470 (1904)................................................................................................... 20

*Carr v. Saul*,
   141 S. Ct. 1352 (2021).............................................................................................. 13

*CFTC v. Schor*,
   478 U.S. 833 (1986).................................................................................................. 21

*Chauffeurs v. Terry*,
   494 U.S. 558 (1990).............................................................................................. 15, 24

*Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*,
   948 F.3d 148 (3d Cir. 2020)................................................................................ 28, 38

*City of Ann Arbor v. DOL*,
   733 F.2d 429 (6th Cir. 1984) ................................................................ 35

*Cohen v. Wright*,
   22 Cal. 293 (1863) ................................................................................. 18

*Cotter v. Harris*,
   642 F.2d 700 (3d Cir. 1981)................................................................... 34

*Crowell v. Benson*,
   285 U.S. 22 (1932)............................................................................ 23, 24

*D.M. v. N.J. Dep't of Educ.*,
   801 F.3d 205 (3d Cir. 2015)................................................................... 13

*Decker Coal Co. v. Pehringer*,
   8 F.4th 1123 (9th Cir. 2021) ................................................................. 29

*Enron Power Mktg., Inc. v. Luzenac Am., Inc.*,
   2006 WL 2548453 (S.D.N.Y. Aug. 31, 2006).................................. 15, 25

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
   535 U.S. 743 (2002).............................................................................. 25

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010)............................................................ 13, 28, 30, 31, 32

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989)................................................................................ 21

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002).............................................................................. 38

*Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan*,
   24 F.3d 1491 (3d Cir. 1994)................................................................... 25

*Hepner v. United States*,
   213 U.S. 103 (1909).............................................................................. 17

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935).............................................................................. 31

*In re Oetting Harvesting, Inc.*,
   ALJ No. 2017-TAE-0007, ALJ Decision & Order (Mar. 4, 2020) ........................................... 24

*In re Renewable Energy Dev. Corp.*,
   792 F.3d 1274 (10th Cir. 2015) ................................................................................ 20

*Int'l Union v. Keystone Consol. Indus., Inc.*,
   793 F.2d 810 (7th Cir. 1986) ............................................................................. 15, 20

*Lees v. United States*,
   150 U.S. 476 (1893) ................................................................................................ 17

*Leiva v. Clute*,
   2020 WL 8514822, (N.D. Ind. Dec. 16, 2020),
   *R&R adopted,* 2021 WL 307302 (N.D. Ind. Jan. 29, 2021) .................................... 22

*Lloyd Sabaudo Societa v. Eltin,*
   287 U.S. 329 (1932) ................................................................................................ 20

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ............................................................................................ 28

*Marbury v. Madison*,
   5 U.S. 137 (1803) .................................................................................................... 19

*Massachusetts v. DOL*,
   ARB No. 2004-0170, ARB Order Staying Final Decision & Order (Oct. 26, 2005) ............... 24

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) ................................................................................................ 13

*McKart v. United States*,
   395 U.S. 185 (1969) ................................................................................................ 13

*Mead v. S3J Elecs. Acquisition Co.*,
   ALJ No. 2016-LCA-0017, ALJ Decision & Order (July 19, 2016) ........................................ 24

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................................... 32

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1856) ............................................................................................. 14, 20

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) ........................................................................................... *passim*

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) .......................................................................................... 13, 28

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013),
  *aff'd* 573 U.S. 513 (2014) ........................................................................................ 28

*Nollan v. Cal. Coastal Comm'n*,
  483 U.S. 825 (1987) .................................................................................................. 20

*Northrup v. Haynes*,
  15 Cal. App. 2d 665 (1936) ...................................................................................... 16

*Oceanic Steam Nav. Co. v. Stranahan*,
  214 U.S. 320 (1909) .................................................................................................. 20

*OFCCP v. WMS Sols., LLC*,
  ARB No. 2020-0057, ARB Decision & Order (Nov. 18, 2021) ................................ 24

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ........................................................... 12, 13, 14, 19, 21

*Phillips v. Comm'r*,
  283 U.S. 589 (1931) .................................................................................................. 20

*Pub. Utils. Comm'n v. United States*,
  355 U.S. 534 (1958) .................................................................................................. 13

*Richardson v. Tricom Pictures & Prods., Inc.*,
  334 F. Supp. 2d 1303 (S.D. Fla. 2004) .................................................................... 35

*Ryder v. United States*,
  515 U.S. 177 (1995) .................................................................................................. 28

*Salisbury v. United States*,
  368 F. App'x 310 (3d Cir. 2010) .............................................................................. 39

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
  2021 WL 5150464 (D.N.J. Nov. 5, 2021) ................................................................ 22

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018) ........................................................................................ 27, 39

*Sears, Roebuck & Co. v. NLRB*,
  349 F.3d 493 (7th Cir. 2003) .................................................................................... 37

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
  140 S. Ct. 2183 (2020) ........................................................................................ 28, 31

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ...................................................................................... 40

*Stearns v. United States*,
   22 F. Cas. 1188 (C.C.D. Vt. 1835) ............................................................... 17

*Stern v. Marshall*,
   564 U.S. 462 (2011) ............................................................................... *passim*

*Stockwell v. United States*,
   23 F. Cas. 116 (C.C.D. Me. 1870),
   *aff'd,* 80 U.S. 531 (1871) ............................................................................. 17

*Taylor v. Porter & Ford*,
   4 Hill 140 (N.Y. 1843) .................................................................................. 18

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) ...................................................................................... 21

*Tull v. United States*,
   481 U.S. 412 (1987) .............................................................. 11, 16, 17, 21, 24

*United States ex rel. Smith v. Gilbert Realty Co.*,
   840 F. Supp. 71 (E.D. Mich. 1993) ............................................................... 40

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) .................................................................................. 28

*United States v. Bajakajian*,
   524 U.S. 321 (1998) ...................................................................................... 40

*United States v. Chouteau*,
   102 U.S. 603 (1880) ...................................................................................... 17

*United States v. Gates*,
   25 F. Cas. 1263 (S.D.N.Y. 1845) .................................................................. 17

*United States v. Kruse*,
   101 F. Supp. 2d 410 (E.D. Va. 2000) ........................................................... 40

*United States v. Lessner*,
   498 F.3d 185 (3d Cir. 2007) .......................................................................... 39

*United States v. Mundell*,
   27 F. Cas. 23 (C.C. Va. 1795) ....................................................................... 17

*United States v. Perkins*,
   116 U.S. 483 (1886) .................................................................................................... 32

*Wellness Int'l Network v. Sharif*,
   575 U.S. 665 (2015) .................................................................................................... 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................................................... 25

**Constitutional Provisions**

U.S. Const. art. II, § 1 ...................................................................................................... 27

U.S. Const. art. II, § 2, cl 2 ......................................................................................... 28, 29

U.S. Const. art. III, § 1 ..................................................................................................... 11

**Statutes**

5 U.S.C. § 1202 ................................................................................................................ 30

5 U.S.C. § 3105 ........................................................................................................... 12, 29

5 U.S.C. § 5372 ................................................................................................................ 29

5 U.S.C. § 557 .................................................................................................................. 34

5 U.S.C. § 7521 ................................................................................................................ 30

8 U.S.C. § 1182 ................................................................................................................ 38

8 U.S.C. § 1188 ......................................................................................... 19, 25, 26, 38, 39

8 U.S.C. §§ 1324a ............................................................................................................ 27

8 U.S.C. § 1324b .......................................................................................................... 27, 38

8 U.S.C. § 1324c ............................................................................................................... 27

28 U.S.C. § 2461 .............................................................................................................. 26

29 U.S.C. § 1855 .............................................................................................................. 38

Judiciary Act of 1789, 1 Stat. 73 (Sept. 24, 1789) ......................................................... 17

**Regulations**

20 C.F.R. § 655.122 ........................................................................................... 4, 37

20 C.F.R. § 655.173 .............................................................................................. 4

29 C.F.R. § 501.0 ............................................................................................... 15

29 C.F.R. § 501.1 ............................................................................................... 25

29 C.F.R. § 501.01 ............................................................................................. 15

29 C.F.R. § 501.15 ............................................................................................. 15

29 C.F.R. § 501.16 ............................................................................................. 15

29 C.F.R. § 501.19 ..................................................................................... 8, 15, 33

29 C.F.R. § 501.30 .......................................................................................... 15, 25

29 C.F.R. § 501.31 ............................................................................................. 15

29 C.F.R. § 501.32 ............................................................................................. 15

29 C.F.R. § 501.34 ............................................................................................. 29

29 C.F.R. § 501.41 ..................................................................................... 15, 24, 31

29 C.F.R. § 501.42 ............................................................................................. 29

61 Fed. Reg. 19978 (May 3, 1996) ...................................................................... 10

80 Fed. Reg. 9482 (Feb. 23, 2015) .................................................................... 4, 35

85 Fed. Reg. 13186 (Mar. 6, 2020) ........................................................ 10, 13, 24, 38

**Administrative Documents**

DOL, *Secretary of Labor's Decision Ratifying of the Appointments
    of Incumbent Administrative Law Judges* at 41 (Dec. 20, 2017),
    https://perma.cc/64PZ-FVF8 ......................................................................... 8

DOL, Wage and Hour Compliance Action Data*,*
    https://perma.cc/U2PX-7AKM ...................................................................... 3

Office of Personnel Management, *Federal ALJs By Agency*,
https://perma.cc/2A7U-Y5S9 (data as of March 2017) ........................................................... 13

Office of the Solicitor General, *Guidance on Administrative
Law Judges* (2018), https://perma.cc/SF66-UFGP .................................................................... 12

**Other Authorities**

Kent Barnett, *Against Administrative Judges*,
49 U.C. Davis L. Rev. 1643 (2016) .................................................................................... 8, 12

David J. Bier, Cato Institute, Immigration Research and Policy Brief
No. 17, *H-2A Visas for Agriculture: The Complex Process for Farmers
to Hire Agricultural Guest Workers* (Mar. 10, 2020),
https://perma.cc/XZ4K-E7QD ............................................................................................... 3

Harvey J. Goldschmid, *An Evaluation of the Present and Potential Use
of Civil Money Penalties as a Sanction By Federal Administrative
Agencies*, in 2 Recommendations and Reports of the Administrative
Conference of the United States (1972) ..................................................................................... 17

William S. McKechnie, *Magna Carta: A Commentary on the Great
Charter of King John* (2d ed. 1914) .........................................................................................16

Morell E. Mullins, *Manual for Administrative Law Judges*,
23 J. Nat'l Ass'n Admin. L. Judges i. (2004) ............................................................................ 12

Caleb Nelson, *Adjudication in the Political Branches*,
107 Colum. L. Rev. 559 (2007) ................................................................................................ 18

Paul R. Verkuil et al., Administrative Conference of the
United States, *The Federal Administrative Judiciary* (1992) .................................................. 12

**INTRODUCTION**

The fundamental question posed by this case is whether a federal administrative agency can impose potentially ruinous liability (totaling over half a million dollars) on a family farm via administrative adjudication before non-Article III administrative judges. For five years, the Department of Labor ("DOL" or the "Agency") has forced Sun Valley Orchards to litigate in agency courts—first before an Administrative Law Judge ("ALJ") and later before the Agency's internal appellate court. Those proceedings ended with the Agency's judges subjecting the farm to $211,800 in civil monetary penalties and $344,945.83 in back wages—over half of which was imposed because of an error in the farm's paperwork for its first year participating in the H-2A visa program. The agency judges held that this paperwork was part of the contract between the farm and its workers and, as a result, the farm's paperwork error meant that it "failed to honor the terms of each worker's job contract." A.R. 4500.

The Agency proceedings violated Article III, which vests the "judicial power" in life-tenured Article III judges—not agency employees. The Supreme Court has instructed that cases implicating "private rights" must be litigated in the Article III courts, and a decision imposing hundreds of thousands of dollars in monetary liability on a breach-of-contract theory implicates "private" rights by any reasonable standard. Further, this conclusion is bolstered by the fact that Congress has not clearly authorized Agency judges to adjudicate this type of case, and Article III does not allow an agency unilaterally to declare itself prosecutor, judge, and jury.

At the same time, precisely because the Constitution does not envision such a thing as an agency "judge," the agency proceedings *also* violated structural constitutional provisions governing the executive branch. Namely, the ALJ was not constitutionally appointed and enjoyed protections from removal that (while less than those afforded Article III judges) are not

proper for an executive branch official. These constitutional defects mean that the proceedings below must be vacated, whatever the underlying merits.

Separately, the Agency judges' decision cannot stand even under the deferential standard of review typically applied to agency action. The Agency judges imposed over half a million dollars in liability, but the Agency record does not show that the alleged violations caused the workers to suffer any significant harm. The ALJ also made factual findings that are not supported by any evidence, much less substantial evidence.

Indeed, the decision below is so unfounded on the facts that it gives rise to an additional constitutional violation: The half-million dollars in liability assessed here violates the Excessive Fines Clause of the Eighth Amendment because it is grossly disproportionate to any actual harm that was caused by the farm's alleged violations.

At bottom, although these later claims delve into the record, there should be no need for the Court to do so in this case. For an agency to impose over half a million dollars in liability, particularly on a breach-of-contract theory, it should have to proceed in the first instance in Article III court, where factual issues may be determined by a Seventh Amendment jury.[1]

### BACKGROUND

#### A.      Sun Valley Orchards and the H-2A Visa Program

Sun Valley is a multi-generational family farm in Swedesboro, New Jersey, that today is owned and operated by two brothers—Joe and Russell Marino. *See* A.R. 211, 2523. The farm grows vegetables, including peppers, squash, cucumbers, and asparagus. A.R. 2450.

---

[1] In addition to the claims presented in this motion for partial summary judgment, the Complaint also includes separate allegations seeking *de novo* review of the Agency's factual determinations after trial. *See* Compl. ¶¶ 128-34 (seeking *de novo* hearing on Eighth Amendment claim), 135-42 (seeking *de novo* trial on other factual issues). Because Sun Valley cannot request summary judgment in its favor on those claims, they are not encompassed within this brief.

Vegetable farming is a labor-intensive process, as the crop must be picked by hand. *See* A.R. 2450-52. As a result, the farm employs seasonal agricultural workers to harvest the crop. A.R. 2450. Prior to 2015, the farm employed domestic migrant workers and avoided the H-2A program because the Marino brothers had heard horror stories about other farmers' participation in the program. A.R. 2529.

Indeed, while the H-2A program has existed since 1986, DOL in recent years has significantly ramped up the fines and penalties imposed under the program. As recently as 2006, annual civil monetary penalties imposed by DOL relating to the H-2A program totaled just $57,900, but the Agency crossed the million-dollar mark in 2012 and reached as high as $5.9 million in 2013.[2] From 2005 through August 2021, DOL imposed three civil monetary penalties over $1 million; 52 penalties between $100,000 and $1 million; and 482 penalties between $10,000 and $100,000 in cases relating to the H-2A program.[3]

Notwithstanding the Marinos' reluctance to enter the H-2A program, as they approached the 2015 growing season they decided they had no choice. The farm was finding it increasingly difficult to meet its labor needs in the domestic labor pool, *see* A.R. 2529, and the H-2A program was the only route legally to employ immigrant workers to meet their labor needs.

**B.      The 2015 Growing Season**

1.      The Marinos' H-2A Paperwork

The Marinos engaged a contractor to assist them in navigating DOL's program and applied to hire H-2A migrant workers for the 2015 season. A.R. 1531. As part of the H-2A

---

[2] *See* David J. Bier, Cato Institute, Immigration Research and Policy Brief No. 17, *H-2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020) (Table B), https://perma.cc/XZ4K-E7QD.

[3] *See* DOL, Wage and Hour Compliance Action Data, https://perma.cc/U2PX-7AKM.

paperwork, the Marinos had to describe how the employees would be fed. *See* A.R. 1504. There is no requirement to provide H-2A workers with free food; in fact, DOL regulations expressly allow an employer to charge employees for a meal plan. *See* 20 C.F.R. §§ 655.122(g), 655.173. The farm had previously done exactly that for its domestic employees: The workers' supervisor and his family cooked out of the kitchen adjacent to the crew quarters, and the supervisor charged the employees a flat rate for the food. *See* A.R. 1465-68, 2524-25. The farm followed that same approach in the 2015 growing season, with the supervisor charging $75-$80 per week for meals—less than the $83.02 weekly maximum set by DOL regulations at the time. *See* A.R. 497; 80 Fed. Reg. 9482 (Feb. 23, 2015).

In completing their paperwork, however, the Marinos made a mistake. Rather than disclosing this (entirely lawful) meal plan, their H-2A paperwork stated that the employees would be provided access to a kitchen on the premises of the farm. *See* A.R. 1504. In part, this appears to be because Russell (who filled out the paperwork) believed the supervisor would provide workers with kitchen access if they requested it. A.R. 2508-09. Ultimately, however, that was not the case, and, as Russell admitted, "the 2015 job order should have been worded differently." A.R. 2499. In Russell's words, "[i]t was an oversight." *Id.*

### 2. The Early Departure of Nineteen Employees

Early in the season, Sun Valley hired nineteen employees from a town in Mexico through the H-2A program. The contract with these workers provided—as per H-2A regulations—that they were entitled to work forty hours per week during the season (for a total of 1,040 hours). A.R. 1277, 1513; *see also* 20 C.F.R. § 655.122(i). However, the contract made two exceptions to that guarantee: if they left voluntarily or were fired for cause, then they would not be entitled to

4

those hours. A.R. 1513. "Cause" included a failure "to perform the work as specified," as well as failure "to meet applicable production standards." *See* A.R. 1516.

Soon after the workers arrived, it became clear that they were not happy with the job. In significant part, this was because they were asked to work picking asparagus, which is difficult, physically demanding work, and they were not able to work as quickly as their supervisor expected. *See* A.R. 1952-53, 1871-72. As one of the workers testified, "[y]ou had to bend over and pick them from the ground," and "it's not easy to be bent over all the time and it's heavy work." A.R. 1750. The workers felt that they "needed more time to learn how to harvest asparagus," but the supervisor "would want us to work faster." A.R. 1855, 1872.

The Marinos did not want to fire the employees. Asparagus must be picked when it ripens, or else it goes to waste, and without these workers the farm would lose the crop. A.R. 2465, 2467. As Russell Marino testified, "[w]e desperately needed men" because the "asparagus crop was coming into full swing." A.R. 2465. Russell testified that he "said, listen, guys, you can go out there and do your best, and even if you cut a third of what the rest of the crew cuts, at least they have to cut a third less." *Id.*; *see also* A.R. 2548-49.

Nonetheless, the workers were unhappy and asked to speak with Russell Marino. Then, following a heated conversation with Russell, the workers left the farm. A.R. 2459-66. As one worker testified, "I made the decision to leave Sun Valley because at the moment that I went to that meeting with my boss, he was overbearing, he was aggressive, and he told us that he didn't need us and that if we wanted to leave we could leave, so I decided to leave." A.R. 1773.

When the workers left Sun Valley, they had to complete paperwork saying why they were leaving. The contractor whom the Marinos had hired to guide them through the H-2A program advised that the workers would hamper their future employment opportunities if they

5

disclosed that they quit because they did not like the work, and that they should instead state they quit for personal reasons. A.R. 2468-69. That is what the workers did. A.R. 2470-71.

       3.      <u>The DOL Inspection</u>

In July 2015, an inspector from DOL visited the farm. A.R. 201. The inspector spent two days at the farm, inspecting the premises and interviewing the employees. A.R. 2043. However, the Agency did not raise any concerns regarding the Marinos' meal plan—or any other issues at the farm—until the following year. A.R. 0001 (assessment letter dated June 2016). When the Agency did finally raise these issues, the Agency assessed hundreds of thousands of dollars in penalties and accrued back pay.

*a. The Meal Plan*: Over half of the assessment—$198,450 in civil monetary penalties and $128,285 in back wages—pertained to the farm's meal plan. A.R. 0006, 4339. Although the meal plan was lawful—and the amount charged to the employees was below the maximum set by DOL's regulations—the Agency found that the Marinos had not disclosed the plan in their H-2A paperwork, which is incorporated as part of the contract with the workers. A.R. 0006. As a result, the Agency assessed a $1,350 civil monetary penalty for each employee at the farm (including domestic, non-H-2A employees and employees who chose not to participate in the meal plan) and assessed back wages equal to the full amount paid by the employees to participate in the meal plan. A.R. 0193. In other words, the Agency assessed over $326,000 because the Marinos made an error in their paperwork in their first year participating in the H-2A program.

*b. The Early Departure:* The next largest portion of the assessment pertained to the early departure of a portion of the farm's employees. The Agency assessed a $1,350 civil monetary penalty because the workers' departure paperwork gave false reasons for leaving. A.R. 0006, 0008. And the Agency assessed $142,728.22 in back wages (plus another $1,350 penalty) on the

theory that the workers were entitled to pay for all hours guaranteed under the contract. A.R. 4347.[4] Although the Marinos said the workers quit, the Agency believed they were fired.

  *c. Beverage Sales:* The Agency also assessed over $80,000 in back wages because the workers' supervisor sold them beverages. Of this, over $71,000 pertained to sales of non-alcoholic beverages, and over $8,000 to sales of beer. A.R. 4340-41. The workers' supervisor purchased beverages in bulk at Sam's Club and re-sold them to the workers. There was no suggestion that the prices were unreasonable; in fact, he sold sodas for $1 and energy drinks for $1.50 or $2.00. A.R. 0582-83, 0934. The Agency, however, determined that it was inappropriate for a supervisor to sell beverages to employees. The Agency calculated back wages for the non-alcoholic beverages based on the *full* amount paid for the beverages, but for the alcoholic beverages the Agency based the assessment on the supervisor's profits. A.R. 2349-51.

  *d. Farm Conditions:* Finally, less than two percent of the assessment pertained to living and working conditions at the farm. The Agency assessed $7,500 in civil monetary penalties related to the provision of transportation to the fields, primarily because the farm allowed the workers to drive to the fields without U.S. driver's licenses. A.R. 0193-95. The Agency also assessed $3,600 in civil monetary penalties related to conditions in the dormitories, such as torn screens on some of the windows. A.R. 0006.

  **C.    Proceedings Before the Administrative Law Judge**

  The letter assessing these penalties stated that, if the Marinos wanted to contest the penalties, then they had to request a hearing before an agency judge. A.R. 0002. So, in July 2016, the Marinos did just that, A.R. 0009, and the case was assigned to an Agency ALJ, A.R. 0032.

---

[4] While most of this amount pertained to the nineteen employees discussed above, a smaller portion—roughly $7,000—was based on the departure of six *other* employees later in the season. *See* A.R. 0789-90, 4347.

The ALJ was a DOL lifer: She began working at the Agency not long after law school, and, with the exception of a one-year stint working as an ALJ at the Social Security Administration, she has worked at the Agency the remainder of her career—nearly 30 years.[5]

The ALJ held a four-day hearing in July 2017. A.R. 1733-2712. During the hearing, the ALJ heard testimony from multiple witnesses, including Joseph Marino, Russell Marino, former Sun Valley employees, and a DOL inspector. A.R. 1736, 1902, 2082, 2391. Then, months *after* the hearing, the Secretary of Labor ratified the ALJ's appointment, explaining it was "intended to address any claim that administrative proceedings pending before, or presided over by, [ALJs] of the [DOL] violate the Appointments Clause."[6] On October 28, 2019, over two years after the hearing, the ALJ sustained the Agency's assessment in all material respects. A.R. 4300.

*a. The Meal Plan.* First, the ALJ affirmed the $198,450 civil monetary penalty for the meal plan violation. A.R. 4342. In doing so, the ALJ did not attempt to decide the appropriate penalty. Instead, she merely concluded that "[t]he Administrator's assessment of a $1,350 CMP for each worker was reasonable, because she reviewed each of the mitigation criteria at 29 C.F.R. § 501.19(b)" and "rationally considered all of the § 501.19(b) mitigation factors." *Id.*

The ALJ also upheld the assessment of $128,285 in back wages for the meal plan violation. While Sun Valley had argued that this assessment of back wages vastly overstated any harm to the employees—who would have had to purchase food even if they had been granted kitchen access—the ALJ found that irrelevant. The ALJ reasoned that "[a] material change to the

---

[5] *See* Resume of ALJ Timlin (at page 109), https://perma.cc/UD4J-UAWH. Agencies "often hire current SSA ALJs to avoid the [Office of Personnel Management] hiring process." Kent Barnett, *Against Administrative Judges*, 49 U.C. Davis L. Rev. 1643, 1674 n.205 (2016). Doing so "permits the hiring agency more control over hiring." *Id.*

[6] *See* DOL, *Secretary of Labor's Decision Ratifying of the Appointments of Incumbent Administrative Law Judges* at 41 (Dec. 20, 2017), https://perma.cc/64PZ-FVF8.

terms of [the] contract necessarily provides 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself," regardless of whether the workers were damaged. A.R. 4339.

b. *The Early Departure.* Second, the ALJ affirmed the award of $142,728.22 in back wages related to the early departure of some employees. In doing so, the ALJ assessed credibility and determined, on that basis, that the workers were fired: The ALJ found that "Joseph Marino's testimony, compared to the employees, lacks credibility." A.R. 4343.[7]

c. *Beverage Sales.* The ALJ also affirmed the award of back wages for the sales of alcoholic and non-alcoholic beverages. A.R. 4338-42.[8] Although there was no evidence that Sun Valley authorized the supervisor's beverage sales, the ALJ held the farm responsible because the supervisor acted as Sun Valley's agent. A.R. 4335-36. The ALJ also reasoned that Sun Valley "may have had to pay more to [the supervisor] absent the profits accrued from the non-alcoholic drinks he sold, thereby affecting [Sun Valley's] 'bottom-line.'" A.R. 4340.

d. *Farm Conditions.* Finally, the ALJ mostly affirmed the comparatively smaller assessment for living and transportation conditions. A.R. 4349. Here, however, the ALJ did modify the assessment in one respect: The ALJ found that a $450 penalty for an unclean mattress was "not a reasonable penalty" because the evidence did not actually support a finding that the mattress was unclean. A.R. 4350-51.

---

[7] As explained *infra* pp. 36-37, the ALJ reached this conclusion even though none of the employees who testified at the hearing clearly testified that they were fired.

[8] The ALJ, however, did reduce the award for the non-alcoholic beverage sales from $71,790.08 to $64,960 on the ground that the evidence did not support DOL enforcement personnel's calculations regarding the number of drinks consumed. A.R. 4340-41.

D.        **Proceedings Before The Administrative Review Board**

As instructed by the ALJ's decision, Sun Valley appealed to the Agency's internal appellate court—the Administrative Review Board. *See* A.R. 4354. The Secretary of Labor created the ARB by executive order. *See* Secretary's Order 02-96, 61 Fed. Reg. 19978 (May 3, 1996); Secretary's Order 01-2020, 85 Fed. Reg. 13186 (Mar. 6, 2020). The ARB judges, like the ALJ, are DOL employees, and they serve for four-year terms. *Id.*

The ARB affirmed the ALJ in all material respects. A.R. 4488. The ARB affirmed the award of penalties and back wages for the meal plan violation and the beverage sales, finding it irrelevant whether these alleged violations actually caused any harm to the workers. A.R. 4501 ("The deductions were unlawful because they were not disclosed, not because they provided a profit."), 4502 ("[W]hether providing a meal plan instead of cooking facilities would affect any of the workers' decisions to work for Respondent is irrelevant."), 4503 (affirming the award for the beverage sales even though "the regulations generally do not require H-2A employers to provide soft drinks to its workers"). The ARB likewise affirmed the award for the early departure of the workers, reasoning that the "ALJ's credibility determination is substantial evidence that Respondent made 'a rash, and perhaps illogical, decision' to fire the workers." A.R. 4505-06.[9]

## ARGUMENT

Part I explains that the Agency's adjudication of these claims in agency courts, with agency judges, violated the structural requirements of Article III. Part II explains that the Agency adjudication also violated structural provisions governing the executive branch. Part III explains that the Agency's decision cannot survive review even under the deferential standard that

---

[9] The ALJ had separately adopted an alternative holding that, if the workers were not actually fired, then they were constructively discharged. But the ARB did not rely on—and did not review—that part of the ALJ's reasoning. *See* A.R. 4343-45, 4506.

typically applies to agency action. Finally, Part IV explains that the liability imposed by DOL violates the Eighth Amendment's Excessive Fines Clause.

> **I.     The Adjudication Of These Claims In Agency Courts, Before Agency Judges, Violated Article III.**

The ALJ in this case presided over a multiple-day hearing, decided the admissibility of evidence, heard live testimony, made findings of fact and credibility determinations, and, finally, determined the appropriate remedies for the alleged contract violations. *See*, *e.g.*, A.R. 4301, 4305-19, 4333-54. And the ARB, in turn, exercised appellate review and affirmed the decision below. *See* A.R. 4508. Those judicial roles, however, are assigned by the Constitution to the Article III courts—not agency judges employed by the same executive agency that is seeking to impose liability. For that reason, the proceedings below must be vacated.

Article III establishes an independent judiciary as a "guardian of individual liberty and separation of powers." *Stern v. Marshall*, 564 U.S. 462, 495 (2011). The text provides that "[t]he judicial Power of the United States" is "vested" in the federal courts, and it secures tenure and salary protection for the judges of those courts. U.S. Const. art. III, § 1. These protections ensure the independence of the federal courts from the political branches, as "there is no liberty, if the power of judging be not separated from the legislative and executive powers." Federalist No. 78 (quoting Montesquieu, *Spirit of Laws*). Beyond that, these protections also serve to "promote public confidence in judicial determinations," "attract well-qualified persons to the federal bench," and "insulate[] the individual judge from improper influences." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 n.10 (1982) (plurality opinion) (citations omitted). The Article III courts are also charged by the Seventh Amendment to preserve the right to trial by jury, which serves as a further guarantee of independent decisionmaking. *See Tull v. United States*, 481 U.S. 412, 419 (1987).

Agency judges, by contrast, are employed by the executive branch—and thus contained within the very same governmental body that is charged with enforcing the law. Although ALJs enjoy some statutory protection against removal, *see* 5 U.S.C. § 3105, they do not enjoy the far greater protections of Article III judges.[10] A certain degree of agency influence is, in fact, part of an agency judge's job description, as "[i]t is the ALJ's *duty* to decide all cases in accordance with agency policy."[11] A landmark study found that 61% of ALJs across all agencies reported that agency interference was a problem, with 26% reporting that it was a frequent problem,[12] and more recent studies have found that agencies enjoy a considerably higher "win" rate before their in-house judges.[13] Further, the right to trial by jury does not extend to agency proceedings, *see Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 460 (1977), with the result that adjudication before an agency judge also eliminates the right to a jury trial on questions of fact.

Accordingly, the role of agency judges must be carefully circumscribed to avoid eroding Article III (and, by extension, the Seventh Amendment). Of course, agency judges do have an appropriate role to play in adjudicating questions of "public right," best understood to encompass matters "which from their nature do not require judicial determination," *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (citation omitted), and which "historically could have been determined exclusively by those [executive or legislative] departments," *N. Pipeline*, 458 U.S. at 67-68. That includes the "decision to grant a public

---

[10] Even the limited guarantees that ALJs enjoy are constitutionally problematic insofar as they are inconsistent with structural provisions governing the executive branch. *See infra* Part II.

[11] Morell E. Mullins, *Manual for Administrative Law Judges*, 23 J. Nat'l Ass'n Admin. L. Judges 136-37 (2004) (emphasis added). The Solicitor General has suggested that failure "to follow agency policies" constitutes good cause for removal of an ALJ. *See* Office of the Solicitor General, *Guidance on Administrative Law Judges* 9 (2018), https://perma.cc/SF66-UFGP.

[12] Paul R. Verkuil et al., ACUS, *The Federal Administrative Judiciary* 916-17 (1992).

[13] Barnett, *supra* n.5, at 1645-46 (citing and summarizing sources).

franchise," *Oil States*, 138 S. Ct. at 1373, as well as other matters concerning the award or distribution of public benefits. Indeed, the vast majority of federal ALJs deal with such public rights: Of 1,931 ALJs employed by the federal government, a full 1,655 are employed by the Social Security Administration to address benefits claims.[14] Such issues could be decided by executive officials without any need for adjudication, and the mere fact that an agency adopts adjudicative procedures to structure its internal decisionmaking does not trigger Article III.

The agency proceedings in this case, however, extended far beyond the appropriate constitutional role for an agency judge. The agency judges in this case adjudicated a question of "private" right—namely, whether a family farm could be assessed over half a million dollars in liability on a breach-of-contract theory. Moreover, the Agency assumed that judicial power without any clear authorization from Congress. As a result, the proceedings before the Agency violated Article III and must be vacated.[15]

A.       The Agency Impermissibly Adjudicated Sun Valley's Private Rights.

As explained above, there are some categories of cases, such as those involving public franchises or benefits, that can permissibly be adjudicated by agency judges—and, in fact, such

---

[14] *See* Office of Personnel Management, *Federal ALJs By Agency*, https://perma.cc/2A7U-Y5S9 (data as of March 2017).

[15] These constitutional arguments did not have to be exhausted before the Agency: First, "exhaustion has not been required where the challenge is to the adequacy of the agency procedure itself." *McCarthy v. Madigan*, 503 U.S. 140, 147-48 (1992). Moreover, there is doubt whether ALJs or the ARB can provide relief on these claims, *see id.*; 85 Fed. Reg. 13187 (Mar. 6, 2020) (stripping ARB of "jurisdiction to pass on the validity of any [regulations] . . . duly promulgated by the Department of Labor"); the "question presented is purely legal," *D.M. v. N.J. Dep't of Educ.*, 801 F.3d 205, 212 (3d Cir. 2015); and the Agency brings no "particular expertise" or "discretion" to bear on these issues, with the result that "judicial review would not be significantly aided" by raising the issues before the Agency, *McKart v. United States*, 395 U.S. 185, 198-99 (1969). More fundamentally, constitutional challenges to an agency's "administrative procedure" generally are not subject to administrative exhaustion requirements. *Pub. Utils. Comm'n v. United States*, 355 U.S. 534, 540 (1958); *see also Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021); *NLRB v. Noel Canning*, 573 U.S. 513, 521-22 (2014); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010).

cases make up the majority of what ALJs do. Agency adjudication, however, faces a hard limit: Only Article III judges can adjudicate cases involving private rights. *See N. Pipeline*, 458 U.S. at 69-70; *Stern*, 564 U.S. at 469; *Oil States*, 138 S. Ct. at 1373.

The Supreme Court has not "definitively explained" how to draw the outer bounds of the private rights category. *Oil States*, 138 S. Ct. at 1373 (quoting *N. Pipeline*, 458 U.S. at 69)). But at least two things are clear. First, the category includes "any matter which, from its nature, is the subject of a suit at the common law." *Stern*, 564 U.S. at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)); *see also id.* at 484 (citing and quoting *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring)). And, second, the category encompasses government action that historically would *not* have been exclusively undertaken by the executive branch, and that instead is "inherently . . . judicial." *N. Pipeline*, 458 U.S. at 68-70.

Applying these guideposts, this case involves Sun Valley's private rights. The liability imposed by DOL here would historically have been the subject of a common law action, and the role of imposing such liability is inherently judicial. Unlike the Agency's alternative remedy of a debarment proceeding, the imposition of such liability does not involve the distribution of a public right. And the Agency's role also cannot be justified on an "adjunct" theory, given the Agency's sweeping power to transfer private property rights.

### 1.    *The Issues Determined Here Would Historically Have Been The Subject Of An Action At Common Law And Are Inherently Judicial.*

This case implicates private rights because it involves claims that historically were the subject of an action at common law, and because imposing over half a million dollars in liability on a family farm (on a breach-of-contract theory) is an inherently judicial matter.

Almost the entirety of the Agency's case rests on a breach-of-contract theory. The claim for back wages for the early departure of some employees is a straightforward breach-of-contract

action for "the hours promised in their contract[s]," A.R. 4343, and the ALJ likewise concluded that the failure to provide kitchen access gave rise to "[a] material change to the terms of [the workers'] contract," A.R. 4339; *see also id.* at 4493 ("The ALJ explained that the assessment . . . provided them their contractual right to the wage promised in the job orders."). More broadly, the administrative hearing provisions under which the Agency proceeded are expressly labeled as provisions for the "Enforcement of *Contractual Obligations* for Temporary Alien Agricultural Workers." 29 C.F.R. Part 501 (emphasis added)).[16] Allowing agency judges to decide such claims "would improperly place the [Agency] into the role of impermissibly wielding Article III power in determining the contract rights between private parties"—specifically, the workers and their employer. *Int'l Union v. Keystone Consol. Indus., Inc.*, 793 F.2d 810, 817 (7th Cir. 1986); *see also Enron Power Mktg., Inc. v. Luzenac Am., Inc.*, 2006 WL 2548453, at *15 (S.D.N.Y. Aug. 31, 2006) (finding "a separation-of-powers issue" insofar as "contract claims traditionally have been resolved by jury trial in state courts or Article III courts"); *N. Pipeline*, 458 U.S. at 71-72 (describing breach-of-contract claims as matters that "obviously" require Article III adjudication); *Chauffeurs v. Terry*, 494 U.S. 558, 570-71 (1990) (holding that claim for back pay

---

[16] *See also* 29 C.F.R. §§ 501.0 ("The regulations in this part cover the enforcement of all contractual obligations . . . applicable to the employment of H-2A workers and workers in corresponding employment."), 501.01(c) ("work contract"), 501.15 ("work contract"), 501.16(a)(1) ("enforce[] the work contract"), 501.19(a) ("violation of the work contract"), 501.19(c) ("violation of the work contract"), 501.19(c)(1) ("willful violation of the work contract"), 501.19(c)(2) ("housing or transportation safety and health provision of the work contract"), 501.30 ("enforcement of provisions of the work contract"), 501.31 ("to enforce contractual obligations"), 501.32 ("to fulfill a contractual obligation"), 501.41(d) ("enforcement of other contractual obligations").

required a jury trial). Under any view of the law, claims for breach of contract lie at the core of the private rights category.[17]

The same is true of the civil monetary penalties awarded by the agency judges. The Agency justified those penalties under a breach-of-contract theory, explaining that the magnitude of penalties imposed was appropriate because Sun Valley "failed to honor the terms of each worker's job contract." A.R. 4500. In this sense, "the remedy of civil penalties is similar to the remedy of punitive damages, another legal remedy that is not a fixed fine." *Tull*, 481 U.S. at 422 n.7. Of course, an award of punitive damages on a breach-of-contract theory is also the subject of an action at the common law—and generally a jury trial. *See id.* (citing *Curtis v. Loether*, 415 U.S. 189, 189-90 (1974)). Both the back wages and the penalties awarded by the Agency here were justified on a breach-of-contract theory, and thus are at bottom contract claims and "the stuff of the traditional actions at common law." *Stern*, 564 U.S. at 484 (quoting *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring)).

Moreover, even apart from that breach-of-contract footing, actions by the government seeking to impose monetary penalties have historically been understood as requiring judicial determination. Thus, Magna Carta provided that monetary penalties (sometimes referred to as "amercements") had to be "fixed, not arbitrarily by the Crown," but rather by "honest men of the neighbourhood" (*i.e.*, a jury) following judicial proceedings. *See* William S. McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 287-88 (2d ed. 1914). In line with that

---

[17] *E.g.*, *Bracken v. Wm. & Mary Coll.*, 5 Va. 161, 163 (1797) ("This is an action on the case brought by the plaintiff to recover £553 Sterling for arrears of salary due to him as professor . . . on three counts of indebitatus assumpsit."); *Benson v. Remington*, 2 Mass. 113, 113 (1806) (affirming jury verdict for plaintiff on "action of *assumpsit* . . . for wages due"); *Butler v. Inhabitants of City of Plainfield*, 135 A. 669, 669 (N.J. 1927) ("The ordinary and well-recognized procedure where the right to salary is asserted and denied is by an ordinary suit at law for the salary."); *Northrup v. Haynes*, 15 Cal. App. 2d 665, 666 (1936) (same).

16

understanding, the 1789 Judiciary Act provided that the Article III courts would have "exclusive original cognizance . . . of all suits for penalties and forfeitures incurred, under the laws of the United States." Judiciary Act of 1789, 1 Stat. 73, 76-77 § 9 (Sept. 24, 1789). Thus, as the Supreme Court observed in *Tull*, "[a]ctions by Government to recover civil penalties under statutory provisions . . . historically have been viewed as one type of action in debt requiring trial by jury." 481 U.S. at 418 (citing, *inter alia*, *United States v. Mundell*, 27 F. Cas. 23 (C.C. Va. 1795)); *see also id.* at 422. This understanding persisted through the nation's history.[18] In fact, as late as 1972, it remained the case that "the vast majority of agencies must be successful in *de novo* adjudication in federal district court (whether or not an administrative proceeding has previously occurred) before a civil monetary penalty may be imposed."[19]

---

[18] *See, e.g.*, *Stearns v. United States*, 22 F. Cas. 1188, 1192 (C.C.D. Vt. 1835) ("Actions for penalties are civil actions, both in form and in substance, according to Blackstone."); *United States v. Gates*, 25 F. Cas. 1263, 1266 (S.D.N.Y. 1845) ("Ordinarily mere statutory penalties are to be sued for and recovered by action of debt."); *United States v. Chouteau*, 102 U.S. 603, 611 (1880) ("Admitting that the penalty may be recovered in a civil action, as well as by a criminal prosecution, it is still as a punishment for the infraction of the law. The term 'penalty' involves the idea of punishment, and its character is not changed by the mode in which it is inflicted, whether by a civil action or a criminal prosecution."); *Lees v. United States*, 150 U.S. 476, 478 (1893) ("From the earliest history of the government, the jurisdiction over actions to recover penalties and forfeitures has been placed in the district court."); *Hepner v. United States*, 213 U.S. 103, 108 (1909) ("It must be taken as settled law that a certain sum, or a sum which can readily be reduced to a certainty, prescribed in a statute as a penalty for the violation of law, may be recovered by civil action, even if it may also be recovered in a proceeding which is technically criminal."); *cf. Stockwell v. United States*, 23 F. Cas. 116, 121 (C.C.D. Me. 1870), *aff'd,* 80 U.S. 531 (1871) (explaining that "[p]enalties accruing by the breach of the act" could be collected "by indictment, information, debt, or action on the case").

[19] Harvey J. Goldschmid, *An Evaluation of the Present and Potential Use of Civil Money Penalties as a Sanction By Federal Administrative Agencies*, in 2 Recommendations and Reports of the Administrative Conference of the United States 896, 898-900 (1972), https://perma.cc/V3DB-CLYE. Professor Goldschmid explained that, as a practical matter, the majority of civil penalty proceeding settled without need for trial, but individuals targeted for civil penalties nonetheless had the right to insist on "trials *de novo*." *Id.*

17

This evidence of historical practice should hardly be surprising, insofar as one critical purpose of an independent judiciary is to serve as a bulwark between the private individual and the government's coercive power. *See* Federalist No. 78. In the proceedings below, the Agency's judges claimed authority to make findings of fact and to decide issues of law in order to impose monetary liability and, ultimately, deprive Sun Valley of its vested property rights. It would be unthinkable for the government to impose such liability without providing for *some* trial in *some* type of judicial forum. *See, e.g.*, *Bowden v. Morris*, 3 F. Cas. 1030, 1032 (C.C.E.D. Va. 1876) (stating "no person shall be deprived of his property except by due process of law," meaning "by suit in a court of justice, and upon judgment according to the law and evidence").[20] This is therefore precisely the type of "inherently judicial," *N. Pipeline*, 458 U.S. at 68-70, matter that must be resolved in a court of law—meaning, in our federal system, an Article III court with a Seventh Amendment jury.

### 2. Unlike A Debarment Proceeding, The Imposition Of Such Liability Does Not Involve An Issue of Public Right.

Conversely, the question whether to deprive Sun Valley of more than $550,000 of its private property on a breach-of-contract theory is nothing like the "public rights" matters that the Supreme Court has held can be "determined exclusively" by the political branches. As explained above, *supra* pp. 12-13, such "public rights" matters historically could have been decided by the

---

[20] *See also, e.g.*, *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 713 (2015) (Thomas, J., dissenting) ("[A]n exercise of the judicial power is required 'when the government wants to act authoritatively upon core private rights that had vested in a particular individual.'" (quoting Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 569 (2007))); *Taylor v. Porter & Ford*, 4 Hill 140, 146 (N.Y. 1843) ("[N]o member of the state shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had according to the course of the common law. It must be ascertained judicially . . . before either of them can be taken from him."); *Cohen v. Wright*, 22 Cal. 293, 318 (1863) (due process "clearly secur[es] to every person . . . a judicial trial, according to the established rules of law, before he can be deprived of life, liberty, or property").

executive branch without *any* need for adjudication; in that circumstance, an agency's use of court-like procedures does not implicate Article III. *See Oil States*, 138 S. Ct. at 1373-74. For all the reasons set out in the section just above, however, this case does not involve such a question.

To illustrate the distinction between public and private rights, it may be helpful to consider a related Agency proceeding that *would* fall into the public rights category. While Congress did not actually authorize the administrative adjudication at issue in this case (*see infra* pp. 25-27), Congress *did* direct the Agency to use agency judges to decide whether to exclude an employer from the H-2A program because of this type of alleged violation. *See* 8 U.S.C. §§ 1188(b)(2), (e).[21] That proceeding is a prime example of public rights adjudication: The decision to exclude an employer from further participation in an agency program could historically have been made by the agency without any adjudication, as it is a question that by its nature must be decided by the agency in the first instance. In such a case, Congress can direct the agency to employ court-like procedures without violating Article III.[22]

Most public rights cases likewise involve the grant, allocation, or revocation of some manner of public benefit. For instance, in *Oil States*, the Supreme Court's most recent case on this topic, the Court held that agency procedures for *inter partes* review of patents did not violate Article III because "[t]he decision to *grant* a patent is a matter involving public rights— specifically, the grant of a public franchise," and *inter partes* review "is simply a reconsideration

---

[21] The government never sought to impose that debarment remedy here, presumably because in order to do so it would have had to prove that the alleged violations were "substantial[]." 8 U.S.C. § 1188(b)(2)(A); *see also infra* p. 26.

[22] This is not to say that questions involving public rights entirely escaped judicial review. The decision to deny or withhold a benefit could historically be challenged through the writ of mandamus. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 170 (1803). The difference, however, is such review would occur after the fact and would be limited in scope, not unlike judicial review of public rights decisions by agencies today.

of that grant." 138 S. Ct. at 1373. While the procedure for *inter partes* review undoubtedly looked a great deal like a judicial procedure, at bottom the matter involved public rights because "granting patents is one of the constitutional functions that can be carried out by the executive or legislative departments without judicial determination." *Id.* (quotation marks and citations omitted). The same is true of decisions such as whether to allow imported goods into the United States (*e.g.*, *Buttfield v. Stranahan*, 192 U.S. 470 (1904)) or to grant foreigners access to the United States (*e.g.*, *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320 (1909)).[23] And that same logic also extends to the administration of welfare benefit programs, as well as cases involving public employment.[24] Those issues *may* be decided by agency judges following court-like procedures, but they nonetheless involve questions that historically would be decided by executive officials and not by the courts.[25] As noted above, *supra* p. 13 & n.14, such cases also encompass the vast majority of what federal ALJs do today.

---

[23] *Stranahan* also stands for the proposition that, in at least some circumstances, an agency can exact a monetary penalty as a condition of granting some other benefit—in that case, as a condition of granting permission for a ship to disembark. *See* 214 U.S. at 329; *see also Lloyd Sabaudo Societa v. Eltin,* 287 U.S. 329, 333 & n.1 (1932) (same); *but see Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) (placing constitutional limits on such exactions). The equivalent here would be if the Agency conditioned Sun Valley's future participation in the H-2A program on payment of these amounts. That, however, is not what the Agency has done.

[24] *Murray's Lessee* charts the special considerations in disputes between the government and its officers or employees. 59 U.S. at 281-82.

[25] Bankruptcy courts adjudicate "public rights" for similar historical reasons. *See In re Renewable Energy Dev. Corp.*, 792 F.3d 1274, 1281 (10th Cir. 2015) (Gorsuch, J.) (explaining the history and use of non-judicial bankruptcy commissioners). Likewise, non-Article III tax courts have been justified on the ground that historically there was no right to a judicial hearing prior to the *collection* of a tax by executive officials; taxpayers, of course, have the right to obtain a *de novo* hearing in an Article III tribunal by paying the tax and suing for a refund. *See Phillips v. Comm'r*, 283 U.S. 589, 595 (1931). Finally, other non-Article III courts, such as the territorial courts and military courts, are informed by a distinct set of historical considerations not at issue here. *N. Pipeline*, 458 U.S. at 64-66.

This case does not involve "public rights" merely because it is in some sense linked to the Agency's administration of the H-2A program. The Supreme Court has, at times, used language suggesting that the public rights category encompasses "cases in which the claim at issue derives from a federal regulatory scheme" or "in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490-92 (citations omitted). Taken literally, such language might be read to expand the public rights category to *any* case where an agency administers a regulatory program. However, the Court has rejected such a limitless view. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985) (statutes that "displace[] a traditional common law cause of action" are "within the range of matters reserved to Article III courts"); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989) (rejecting theory that would allow "Congress [to] conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal"). That view is also inconsistent with *Oil States*, which focused on the nature of the right at issue and not its entanglement with a regulatory scheme. *See* 138 S. Ct. at 1373. Nor is such an expansive view necessary to explain the result of any case.[26]

---

[26] The holding of *Thomas* rests on the conclusion that the statutory scheme involved a right to compensation that—much like the patent rights at issue in *Oil States*—was a benefit created by the government rather than a vested property right. *See Thomas*, 473 U.S. at 584-85. And the holding of *Schor* is best understood as resting on the fact that the parties involved in the case had consented to a non-Article III adjudicator. *See CFTC v. Schor*, 478 U.S. 833, 849-50 (1986). Those decisions have no application here, where Sun Valley was involuntarily hauled before an agency judge in order to be deprived of over half a million dollars of its private property.

Meanwhile, *Atlas Roofing* is distinct insofar as that case did not involve breach-of-contract claims. *Compare supra* pp. 14-16 & nn.16-17, *with Atlas Roofing*, 430 U.S. at 455-56 (contrasting common law rights with the "new statutory duty to avoid maintaining unsafe or unhealthy working conditions"). The Supreme Court has also subsequently read *Atlas Roofing* as holding that "the Seventh Amendment is not applicable to administrative proceedings," *Tull*, 481 U.S. at 418 n.4, which does not resolve the separate question of whether a particular case may proceed in an administrative tribunal in the first place.

Whatever connection this case has to a federal regulatory program, that connection does not change the fact that the claims here are—at bottom—claims to enforce the provisions of a contract between employer and employee. *See supra* pp. 14-16 & nn.16-17. To be sure, the Agency cites its regulations as the basis for its Award, A.R. 0006-08, but that regulatory scheme is not the "origin" of the claims at issue because the scheme merely incorporates contract rights that are separately enforceable at common law. *Thomas*, 473 U.S. at 587. In fact, H-2A employees often bring contract claims against H-2A employers based on the types of provisions at issue here. *See*, *e.g.*, *Leiva v. Clute*, 2020 WL 8514822, at *12 (N.D. Ind. Dec. 16, 2020), *R&R adopted,* 2021 WL 307302 (N.D. Ind. Jan. 29, 2021) ("Defendant['s] . . . failure to provide the housing promised in the [H-2A] Job Order constitutes a breach of the parties' contractual agreement."); *see also Arreguin v. Sanchez*, 398 F. Supp. 3d 1314, 1324 (S.D. Ga. 2019). The fact that a contract is regulated by the federal government does not transform every dispute involving the contract into a matter of "public right."

Finally, even taking the broadest articulations of the public rights doctrine at face value, this case *still* would not fall within the scope of that doctrine. This is not a case where some "limited" agency adjudication is essential to effectuating an administrative scheme. *Cf. Schor*, 478 U.S. at 856. The Agency's objective is hardly "limited": Following an on-site investigation and administrative proceedings before agency judges (ALJs and the ARB) who find facts and make legal conclusions, the Agency awards civil monetary penalties and back pay (and

---

Finally, while not binding on this Court, the recent decision in *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 5150464 (D.N.J. Nov. 5, 2021), is also distinct insofar as it involved the administration of a public benefits scheme. *See id.* at *31 (explaining that plaintiffs could not "point to any state law analog which the ADR Rule either replaces or depends on for a rule of decision" because "under state law, covered entities do not have rights in drugs sold at 340B prices").

potentially other remedies) to enforce provisions in an employment contract (a contract between not only employers and H-2A employees but also employers and domestic workers in corresponding employment) that addresses wide-ranging topics, such as housing, transportation, health and safety, and wages. *See generally* 29 C.F.R. Part 500; 20 C.F.R. Part 655. The Agency also does not bring "obvious expertise" to bear in resolving garden variety breach-of-contract questions. Finally, and "most significantly," enforcing the dictates of Article III would not "confound[]" the Agency's ability to enforce the employer-employee contract, because it (or the employees) could simply bring claims in Article III court. *Cf. Schor*, 478 U.S. at 856. In short, under any understanding, this case does not involve "public rights."

### 3. The Imposition Of Such Liability Involves The Exercise Of Judicial Power And Cannot Be Upheld On An Adjunct Theory.

The Agency also cannot defend the adjudication in this case on the ground that its judges merely acted as "adjuncts" of the Article III courts. The "adjunct" theory, articulated in *Crowell v. Benson*, 285 U.S. 22 (1932), allows non-Article III adjudication only under narrow circumstances. Those circumstances are not present here for at least three reasons.

First, the agency in *Crowell* was charged with "statutorily channeled factfinding functions" that involved making "only specialized, narrowly confined factual determinations." *Stern*, 564 U.S. at 500 (quotation marks and citation omitted). In particular, the agency had "the limited role" of administering a mandatory, no-fault workers' compensation system. *N. Pipeline*, 458 U.S. at 78 (quoting *Crowell*, 285 U.S. at 54)). Its role was thus akin to "parties, masters, and commissioners or assessors" who might be called upon to "take and state an account or to find

23

the amount of damages." 285 U.S. at 51. That limited role, of course, bears no resemblance to this case, where agency judges took cognizance of every aspect of the dispute.[27]

Second, the Court in *Crowell* emphasized that the limited factual issues decided by the agency fell outside the scope of the Seventh Amendment jury trial right. *See id.* at 51-52. By contrast, many issues in this case, if decided in Article III courts, would require a jury trial. *See Chauffeurs*, 494 U.S. at 570-71 (back pay); *Tull*, 481 U.S. at 422 (civil monetary penalties). No case suggests that an "adjunct" to the Article III courts can be employed in circumstances where a Seventh Amendment jury is required.

Third, the agency in *Crowell* could not enforce its "compensation orders" without resort to the federal courts. *See N. Pipeline*, 458 U.S. at 78. Here, by contrast, the ALJ's order is "the final agency order" unless the ARB or Secretary of Labor reviews it. 29 C.F.R. § 501.41(d); *see also* 85 Fed. Reg. 13187 § 6(a)(1) (Mar. 6, 2020). Moreover, the Agency's final order operates as a judgment because the Agency considers the payment ordered to be a "debt" or "claim" subject to collection, interest, and other penalties, without any need to involve the Article III courts.[28] It is of course true that the agency judges' decisions are subject to limited (deferential) review by the federal courts under the APA, but that opportunity for appellate review does not make the agency an "adjunct" of the district courts any more "than a district court can be deemed such an

---

[27] The Agency represents that its ALJs may decide even constitutional claims. *See OFCCP v. WMS Sols., LLC*, ARB No. 2020-0057, ARB Decision & Order at 11 (Nov. 18, 2021).

[28] *See, e.g.*, *Massachusetts v. DOL*, ARB No. 2004-0170, ARB Order Staying Final Decision & Order at 2 n.1 (Oct. 26, 2005) ("The stay of the Board's order does not affect any right of the U.S. DOL to the accrual of interest on the debt pursuant to the provisions of the Debt Collection Act."); *Mead v. S3J Elecs. Acquisition Co.*, ALJ No. 2016-LCA-0017, ALJ Decision & Order at 14 (July 19, 2016); *In re Oetting Harvesting, Inc.*, ALJ No. 2017-TAE-0007, ALJ Decision & Order Affirming Notice of Determination at 4 (Mar. 4, 2020); *see also* A.R. 0002 (warning that agency penalties "constitute a debt owed to the Federal government" subject to interest, penalties, and other costs "in accordance with the Debt Collection Act of 1982"); D.E. 1-5 at 2-3 (threatening to institute debt collection proceedings if employer does not pay penalties).

'adjunct' of the court of appeals." *Stern*, 564 U.S. at 500; *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 758 (2002) ("[T]he role of the ALJ . . . is similar to that of an Article III judge."). A federal agency judge with such wide-ranging discretion and judicial power "is no mere adjunct of anyone." *Stern*, 564 U.S. at 487-88.

> B.   Congress Has Not Authorized The Agency Adjudication In This Case.

Finally, even if there could be any doubt whether Congress *might* be able to assign adjudication of these questions to a non-Article III court, the fact is that Congress *has not* done so. Because Congress alone has authority to "vest decisionmaking authority" concerning matters involving public rights "in tribunals that lack attributes of the Article III courts," *Thomas*, 473 U.S. at 583, an agency cannot assume that authority without clear authorization from Congress. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-40 (1952) (Jackson, J., concurring). Any claim that Congress has provided such authorization, moreover, should be narrowly construed to avoid constitutional doubt. *See Int'l Union*, 793 F.2d at 817 (construing statute to avoid Article III concerns like those raised here); *Enron Power*, 2006 WL 2548453, at *15 (same).[29] The underlying statutory provisions in this case, however, provide no such clear authorization.

The administrative procedures at issue here were created by the Agency via regulation. *See* 29 C.F.R. § 501.30. The Agency, in turn, has cited 8 U.S.C. § 1188(g)(2) as statutory authority for that regulation. *See, e.g.*, 29 C.F.R. § 501.1(a)(2). That statutory provision, meanwhile, is buried within a set of provisions "[a]uthoriz[ing] appropriations" for the H-2A program, *see generally* 8 U.S.C. §§ 1188(g)(1), (3)-(4), and merely provides:

---

[29] The need for a clear delegation is particularly strong where, as here, the statute involves a penalty. After all, it is established that penalty provisions must be strictly construed. *See, e.g.*, *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan*, 24 F.3d 1491, 1505 (3d Cir. 1994), *cert. denied,* 513 U.S. 1149 (1995).

> The Secretary of Labor is authorized to take such actions, *including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations*, as may be necessary to assure employer compliance with terms and conditions of employment under this section.

*Id.* § 1188(g)(2) (emphasis added). The statute neither defines "penalties" nor mentions ALJs, internal appellate review, or authority to promulgate regulations "imposing appropriate penalties." Nothing in the statute indicates that penalties may be "imposed" via administrative adjudication, as opposed to enforcement proceedings in Article III courts. Certainly, the statute is not the type of clear and express authorization that should be required in this type of case.

Congress has, in fact, already addressed how penalties should be "imposed" when a statute calls for penalties without specifying a mode of procedure—and, in doing so, Congress made clear that Article III courts remain the default. In 28 U.S.C. § 2461(a), a background provision of federal law, Congress expressly provided, "Whenever a civil . . . penalty . . . is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action." This provision makes clear that if there is any ambiguity as to *how* a penalty should be "imposed," it should be imposed in the Article III courts. Against that backdrop, the Agency cannot suggest that Congress authorized agency adjudication simply because it said that penalties may be "imposed."

The lack of a clear statutory authorization is also particularly notable when compared with other statutes where Congress *has* authorized agency adjudication. Most significantly, as noted above, Congress expressly authorized the use of ALJs in proceedings to debar an employer from the H-2A program because of alleged violations like the ones at issue here. *See* 8 U.S.C. § 1188(e). The Agency, however, has not sought to exclude Sun Valley from the H-2A program, presumably because that would require proof the violations were "substantial." *Id.* § 1188(b)(2)(A). But these parallel statutory provisions show that Congress knows exactly

26

how—when it intends to—to delegate the powers necessary to adjudicate "public rights" in administrative proceedings.[30] Congress's failure to include similar provisions here is telling. *See, e.g.*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018).

To summarize the point, Congress did not authorize the Agency to adjudicate civil monetary penalties or back pay in administrative proceedings, and Congress would not have implicitly authorized such proceedings because they raise substantial constitutional issues. The Agency's unilateral exercise of such power must be vacated, lest "Article III . . . be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking." *Stern*, 564 U.S. at 495.

## II. The Agency's Award Must Be Vacated Because The ALJ Was Neither Appointed Nor Subject To Removal As Required By The Constitution.

The constitutionally indeterminate status of ALJs—neither wholly executive nor judicial—ultimately leads to yet another set of constitutional violations. For just as ALJs do not possess the necessary attributes of Article III judges, they *also* violate structural provisions that govern members of the executive branch. The ALJ in this case was not constitutionally appointed, and the ALJ also enjoyed protections from removal that (while less than those afforded under Article III) are not appropriate for an executive official.

The constitutional provisions governing the executive branch set both the mode of appointment and the means of removal of executive officials. The Constitution vests "[t]he executive Power . . . in a President" who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. Because no one person could carry out all the executive's duties, the Constitution allows that "Officers"—both "principal" and "inferior"—may assist the

---

[30] *See also* 8 U.S.C. §§ 1324a (specifying use of ALJs in cases involving unlawful employment of aliens), 1324b(g)-(j) (cases involving unlawful discrimination against aliens), 1324c(d) (cases involving document fraud).

President in faithfully executing the laws. *Id.* § 2, cls. 1 & 2. Although Congress may permit "the President alone, [] the Courts of Law, or [] the Heads of Departments" to appoint "inferior Officers," *id.* § 2, cl. 2, the President must appoint "principal Officer[s]" only with the advice and consent of the Senate, *id.* Whether they are "inferior" or "principal," the President is also charged with "oversee[ing] executive officers through removal." *See Free Enter. Fund*, 561 U.S. at 492. The dual powers of appointment and removal bolster the "legitimacy and accountability to the public" of the federal administrative body by creating "'a clear and effective chain of command' down from the President, on whom all people vote." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021); *see also Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) ("Without such power, the President could not be held fully accountable . . . the buck would stop somewhere else." (citation omitted)).

By contrast, ALJs stand outside that usual structure and, thus, violate these structural provisions as well. Because the adjudication is therefore null and void, at a minimum Sun Valley is entitled to a new hearing before the Agency. *See, e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2053-54 (2018); *Ryder v. United States*, 515 U.S. 177, 188 (1995); *see also Noel Canning v. NLRB*, 705 F.3d 490, 493 (D.C. Cir. 2013), *aff'd* 573 U.S. 513 (2014).[31]

### A.     The ALJ Was Not Constitutionally Appointed.

The ALJ who adjudicated Sun Valley's case was an "inferior officer" who was not constitutionally appointed by the President, the courts, or the Secretary of Labor. *See* U.S. Const. art. II, § 2, cl. The later-attempted ratification does not cure that constitutional violation.

---

[31] These constitutional claims also did not have to be exhausted before the agency. *Supra* n.15; *see also Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153-60 (3d Cir. 2020) (declining to impose exhaustion requirement for Appointments Clause challenge).

There is no question that the Agency ALJ is an inferior "officer" who must be appointed in conformance with the Appointments Clause. The Supreme Court held that SEC ALJs qualified as inferior officers in *Lucia*, and, like the ALJs there, the ALJ in this case "hold[s] a continuing office established by law" insofar as her appointment is not limited to a specific purpose, *see* 5 U.S.C. § 3105; has "duties, salary, and means of appointment" established by law, *see, e.g.*, 29 C.F.R. §§ 501.37-.41 (describing duties)[32]; exercises "significant discretion" in her duties, such as by making evidentiary rulings and credibility determinations, *see, e.g.*, *id.* § 501.34[33]; and has "last-word capacity" because her decisions can become the final decision of the Agency, *see also* 29 CFR § 501.42(a).[34] As a result, the ALJ must be appointed by one of the three individuals identified in Article II, Section 2, Clause 2; but she was not.[35]

The only question in this case, therefore, is whether the Secretary of Labor's ratification of the ALJ's appointment cured that defect. Because that ratification did not occur until after the hearing, the answer is that it did not. In *Lucia*, the Supreme Court held that the "'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." 138 S. Ct. at 2055. Under *Lucia*, Sun Valley was therefore entitled to a "new hearing," not merely to have the Secretary of Labor ratify the ALJ's appointment after that hearing had already occurred. *Cf. Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1127 & n.1 (9th Cir. 2021) (concluding that ratification prior to ALJ taking "significant action"—*i.e.*, when

---

[32] *See also* 5 U.S.C. § 5372 (setting ALJ salaries).

[33] *See* A.R. 4505 ("The Board gives ALJ credibility determinations great deference if they are not inherently incredible or patently unreasonable." (quotations omitted)).

[34] *See Lucia*, 138 S. Ct. at 2052-54. The analysis whether the ALJ is an "inferior" or "principal" officer is relatively simpler: She is an "inferior" officer because she has a "superior other than the president"—namely, the Merit Systems Protection Board, which decides whether ALJs may be removed, or the ARB, which may review decisions of the ALJ.

[35] Instead, the ALJ was hired in an interagency transfer from the Social Security Administration. *See supra* n.5.

ALJ "had neither heard the case nor issued a proposed decision"—cured Appointments Clause issue). At a minimum, Sun Valley is therefore entitled to a new trial before a new ALJ who has been appointed in conformance with the Constitution.

### B.    The ALJ Enjoyed Impermissible Protections Against Removal.

The ALJ who adjudicated Sun Valley's case also was not subject to effective control by the President through the removal power. Specifically, multiple layers of for-cause removal separated the ALJ, who "exercises significant executive power," from removal by the President. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 513-14. While ultimately these claims should have been adjudicated in an Article III court—where judges enjoy even *greater* protection from removal—the agency's disregard for Article III is not a reason to license an equal disregard for structural provisions that govern the executive branch.

The ALJ here was insulated from Presidential removal by multiple "for cause" provisions enacted by Congress. First, the ALJ herself was subject to removal only if the Agency initiated proceedings before the Merit Systems Protection Board and demonstrated "good cause established and determined by the . . . Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a), (b).[36] Second, the members of the Merit Systems Protection Board "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). In other words, neither the Secretary of Labor nor the ARB can remove ALJs without a good cause finding from a separate, congressionally created body; and the members of that separate, congressionally created body *also* cannot be removed by the President unless they have been inefficient, neglectful, or malfeasant. If the ALJs exercise

---

[36] The few exceptions are not relevant here. *See* 5 U.S.C. § 7521(b)(A-C) (excepting actions taken for national security or reduction-in-force reasons, or at the direction of Special Counsel).

"significant authority pursuant to the laws of the United States," then this arrangement would violate Article II of the Constitution. *See Free Enter. Fund*, 561 U.S. at 506-07.

The Agency's ALJs do exercise "significant authority pursuant to the laws of the United States." *See id.*; *see also id.* at 514. In *Free Enterprise Fund*, the Court expressly stated that its holding did not necessarily apply to ALJs. *Id.* at 507 n.10. However, the Court decided *Free Enterprise Fund* before *Lucia*, which held that ALJs do exercise the sort of important, discretionary powers that make them "inferior Officers" subject to the Appointments Clause. *See Lucia*, 138 S. Ct. at 2052-55. There is no reason to believe that the analysis would be any different for purposes of the removal power: To the contrary, although the Agency's ALJs "perform adjudicative rather than enforcement or policymaking functions," *Free Enter. Fund*, 561 U.S. at 507 n.10, their powers are not "purely recommendatory," *id.* In fact, the ARB exercises only discretionary review over ALJ decisions, creating the very real prospect that the ALJ's decision will become the Agency's final, binding order. *See* 29 C.F.R. § 501.41(d). That is a "significant executive power," even if it takes a "judicial" form.[37]

Furthermore, no "exceptions" apply. Historically, the Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 140 S. Ct. at 2192. The first, for "expert agencies led by a *group* of principal officers removable by the President only for good cause," does not apply here because, *inter alia*, ALJs are not a group of principal officers. *See id.* (citing *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)). The second, permitting "tenure protections to certain *inferior* officers with narrowly defined duties"

---

[37] *See Seila*, 140 S. Ct. at 2198 n.2 (citing *Arlington v. FCC*, 569 U.S. 290, 305 & n.4 (2013) for the proposition that "even though the activities of administrative agencies take legislative and judicial forms, they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power" (quotations omitted; emphasis in original)).

31

and "no policymaking or administrative authority," does not apply either. *See id.* at 2192, 2200 (discussing *United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison v. Olson*, 487 U.S. 654 (1988)). The duties of ALJs are not "limited" in the relevant sense, because they are not "appointed essentially to accomplish a single task." *Morrison*, 487 U.S. at 672 (noting as well that "when that task is over the office is terminated"). Instead, ALJs continue in office from case to case. Moreover, ALJs exercise "policymaking or administrative authority" insofar as they interpret and enforce the Agency's regulations during administrative proceedings, while also setting penalties for alleged violations.

In sum, because an ALJ enjoys "significant executive power" (or exercises "significant authority pursuant to the laws of the United States"), an ALJ cannot be separated from Presidential control by multiple "for cause" removal protections. Notwithstanding that, the ALJ who decided Sun Valley's case enjoyed just such dual, "for cause" insulation from Presidential control. As a result, the Agency's adjudication of Sun Valley's case was null and void, and the resulting Award must be vacated. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 513.

## III.    The Agency's Award Is Contrary To Law And Cannot Be Sustained Based On The Evidence In The Administrative Record.

If the Court rules for Sun Valley on either of the above claims, the Court can end the analysis there. If the Court proceeds further, however, the Agency's award of over half a million dollars in penalties and back wages cannot be sustained even under the deferential standard of review that typically applies to agency action under the APA.

### A.    The Agency's Award For The Meal Plan And Beverages Issues Is An Abuse Of Discretion And Is Not Supported By Substantial Evidence.

Over half of the award—over $198,000 in monetary penalties and $128,000 in back pay—pertains to the Marinos' paperwork error describing their meal plan. *See* A.R. 4499. Moreover, the Agency also awarded more than $73,000 in back pay based on beverage sales

32

made to the workers by their supervisor. All of these amounts must be vacated, as the Agency's award is not adequately justified and is not supported by the record.

### 1. *The Agency Did Not Adequately Justify Its Imposition of Monetary Penalties.*

The Agency's award of monetary penalties—including, particularly, its award of $198,450 in monetary penalties for the meal plan violation—cannot be sustained because the ALJ and ARB did not justify the penalty under the Agency's regulation and instead simply deferred to the decision of the Agency's enforcement personnel.[38]

Although the Agency's regulation sets forth factors to be considered in making a penalty determination, *see* 29 C.F.R. § 501.19(b), the ALJ did not consider those factors. Instead, the ALJ announced that she would defer to the decision of the enforcement personnel, insofar as the Agency's enforcement personnel had "rationally considered" the factors. A.R. 4342. Similarly, the ALJ deferred to the decision of enforcement personnel to impose separate penalties for *each* employee for the meal plan violation (vastly multiplying the penalty) while refraining to do so for other violations, stating only that enforcement personnel had acted "reasonably" in doing so. A.R. 4341-42. On appeal, then, the ARB deferred to the ALJ, compounding this total lack of analysis of the appropriate penalty. *See, e.g.*, A.R. 4496, 4500-01. As a result, the Agency judges ultimately deferred to the penalty determination of the Agency's enforcement arm.

While the Agency's adjudicative process is itself impermissible for all the reasons set forth above, at a minimum *if* an agency is to adjudicate these issues then the agency should be required to actually adjudicate them—rather than deferring to the judgment of enforcement

---

[38] Sun Valley raised this claim both before the ALJ and the ARB. *See* A.R. 4297 (asking the ALJ to "exercise its discretion to apply its own review of the applicable factors" and to set the penalties "at a reasonable level"); A.R. 4407-08 (arguing to the ARB that the ALJ "adopted, nearly unchallenged and unchanged, the Administrator's claims").

personnel. Indeed, that is what the APA requires: An ALJ, at the conclusion of a hearing, must articulate its "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981) ("[A]n administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests."). A hearing should result in a decision, not deference to prosecutors.[39]

### 2. *The Agency's Award Of Back Wages Is Not Supported By The Record.*

The Agency's award of $128,285 in back wages for the meal plan and $73,932.61 in back wages for the supervisor's beverage sales is likewise unsupported by the record, as the Agency failed to introduce any evidence to establish *any* harm from these violations.[40]

With respect to the meal plan, there is no question that the workers would have had to purchase their own food even if they had been granted kitchen access. Even if Sun Valley had provided kitchen access, the farm would have had no obligation to provide the workers with free food. *See* A.R. 4278-80, 4390-91. Moreover, Sun Valley introduced evidence to show that the USDA in 2015 estimated the average cost of food for a 19-50 year old male at between $43.40 and $86.50 per week; and those are national averages that would undoubtedly be higher in New

---

[39] Properly considered, the penalty factors set by the Agency's regulation do not support the penalty imposed. Sun Valley was in its first year participating in the H-2A program, and so it had no previous history of violations; Sun Valley fixed both issues in subsequent years and was not penalized going forward; the violation resulted from Sun Valley's lack of familiarity with the program, in its first year participating; and Sun Valley did not directly profit from the error, as any payments for the meals and beverages went to the supervisor (who is also Sun Valley's employee). The only factor that arguably weighs in favor of a higher penalty is the number of employees affected, but that alone cannot justify the fine.

[40] Again, Sun Valley raised these claims both before the ALJ and the ARB. *See* A.R. 4278-80 ("Payment of 100% of the meal charges is not warranted on the merits and vastly overstates any claimed 'harm' to the workers."); A.R. 4390-94 (arguing to the ARB that the penalty "is patently excessive" based on that same lack of harm).

Jersey (particularly for individuals doing hard manual labor). *See* A.R. 1691, 4279-80. The Agency itself set $83.02 as the maximum weekly charge for agricultural meal plans during that time. *See* 80 Fed. Reg. 9482 (Feb. 23, 2015). Against that backdrop, given that Sun Valley charged no more than $80 per week for meals, it is hard to say how much less (if any) the workers would have spent if they had cooked their own food. A.R. 497. Certainly, there is no evidence that would support charging the *full* value of the meals as back wages.

Similarly, with respect to the beverage violations, the Agency has not suggested that the workers were entitled to free beverages. Instead, the Agency argues that the sales should have been made by an independent vendor, rather than the workers' supervisor. *See* A.R. 4199-200 & n.22. The Agency, however, did not introduce any evidence to establish that the workers would have paid less for the beverages if the employer had instead arranged for an independent vendor to sell the beverages. Indeed, the Agency never suggested that the prices charged for the beverages were unreasonably high. *See* A.R. 4320-24; *see also* A.R. 0582-83 (indicating that the supervisor charged $1 for sodas and $1.50 for energy drinks). There is simply no evidence that the employees were damaged by these beverage sales.

The Agency did not cite any legal authority to underpin its award of back wages, but, whatever authority the Agency might think it possesses, the Agency certainly cannot award back wages in the absence of proof of harm. *See*, *e.g.*, *City of Ann Arbor v. DOL*, 733 F.2d 429, 432 (6th Cir. 1984) (setting aside DOL award of back pay where the "payment of back pay here would be a windfall, not a make-whole compensation"); *see also Richardson v. Tricom Pictures & Prods., Inc.*, 334 F. Supp. 2d 1303, 1310 (S.D. Fla. 2004) ("An award of back pay is intended to make the claimant whole, not to confer a windfall." (marks and citation omitted)). The award here likewise constitutes a windfall that is inconsistent with the concept of back pay.

35

B.     The Agency's Award For Early Termination Is Not Supported By Substantial Evidence.

Beyond the penalties and back wages discussed above, most of the remainder of the award consists of back wages for the early departure of nineteen workers in May 2015. This portion of the award—in addition to being entirely unjustified under the relevant statute—finds no support in the record.[41]

There is no dispute that the Marinos and these nineteen workers had a disagreement in May 2015, in which the workers explained that they were unhappy with the work at the farm, and it is further undisputed that the workers left the farm after this disagreement. *See* A.R. 2459-66. There is also no dispute that the workers gave false reasons for their departure, saying that they were leaving for nonexistent personal reasons. *See* A.R. 4318. However, the relevant question for this case is *why* the workers departed: The Agency found that the Marinos owed back wages because the workers were fired (and the firing was not reported to the Agency), whereas the Marinos contended that no back wages are owed because the workers quit.

The Agency's conclusion that the workers were fired is without support in the record. Both Marino brothers testified that the workers quit and that it would have made no sense for them to fire the workers given that they needed them to pick the crops in the field (which went to waste after the workers left). *See* A.R. 2465, 2549-50. It also would have made no sense for the Marinos to fire the workers surreptitiously, as their contract gave them the right to fire the workers for cause so long as they did so openly—and the Marinos would owe no back wages if they had done so. *See* A.R. 1513.[42]

---

[41] Sun Valley raised this argument before the ALJ, *see* A.R. 4285-90, and before the ARB, *see* A.R. 4402-03.

[42] Under the contract, the Marinos had the right to terminate the workers for cause. A.R. 1513. And cause was defined to include failure "to perform the work as specified," as well as

Even more critically, the workers did not actually testify that they were fired: They testified that they decided to leave—consistent with their having quit—but they never testified that they were *told* to leave by the Marinos. To the contrary, one worker was asked "[d]id anyone ever tell you [that] you were fired?" and answered "[n]o." A.R. 1859. Against this, the ALJ relied on testimony from the workers that they were "practically fired" (which is different from being *actually* fired) and that they were told they "'could leave' if they did not like the conditions" (which is consistent with the workers having quit). A.R. 1798, 4313 n.93 (quoting A.R. 1768, 1798, 1813-15). The ALJ also relied on another worker's testimony that Russell Marino "was very upset" at the farmworkers and "said 'we weren't necessary.'" A.R. 1840.[43] This testimony indicates that the Marinos told the workers they were free to leave if they did not like conditions at the farm, which, of course, should always be true in a voluntary employment relationship.[44] Because the ALJ's finding that the workers were fired "was not supported by any evidence, much less substantial evidence," *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 511 (7th Cir. 2003), it cannot survive even deferential review.

---

failure "to meet applicable production standards." *See* A.R. 1516. The obligation to pay back pay, in turn, would not be triggered by a for-cause dismissal, so long as Sun Valley reported the dismissal to the Agency. *See* 20 C.F.R. § 655.122(n).

[43] The ALJ also characterized this employee as having testified "that Hernandez told him he 'must leave.'" A.R. 4314 n.94. In fact, however, this employee testified that *nobody* told him he was required to leave the farm:

> Q. … Did anyone ever tell you you were fired, you may not work here anymore, you must leave?
> A.     No.

A.R. 1859.

[44] The ALJ quoted Russell Marino's testimony that certain *other* employees "were terminated." A.R. 4319 (citing A.R. 2484). However, that testimony unambiguously pertained to "[t]he workers who left in August," not the nineteen workers who left the farm in May. A.R. 2483-84. There is no dispute that the workers who departed in August were terminated because there was not sufficient work for them to do at the farm. *Id.*

37

C.    The Agency's Award Of Back Pay Is Not Authorized By Statute.

Finally, the Agency's entire award of back pay (for all the various violations) must be vacated because the statute does not authorize back pay.[45]

The text of the relevant statute, 8 U.S.C. § 1188(g)(2), does not authorize an award of back pay. The statute says that the Agency may impose "penalties," but back pay is not a penalty—it is traditionally understood either as damages or restitution. *See, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 & n.4 (2002). Likewise, while the statute says that the Agency may seek "appropriate injunctive relief and specific performance," that language authorizes *forward-looking* equitable relief but not *backwards-looking* damages or restitution. *See AMG Cap. Mgmt. LLC v. FTC*, 141 S. Ct. 1341, 1344 (2021) (statute authorizing "a permanent injunction" did not authorize "equitable monetary relief such as restitution or disgorgement"). As in the Supreme Court's recent unanimous decision in *AMG Capital Management*, the statutory language "focuses upon relief that is prospective, not retrospective," *id.* at 1347-48, and does not authorize back wages.

Congress's failure to provide for back pay is also significant given that Congress has expressly provided for back pay in other contexts. *E.g.*, 8 U.S.C. § 1182(m)(2)(E)(v) (permitting Secretary of Labor to order payment of back pay following hearing on the record).[46] That

---

[45] As with Sun Valley's constitutional claims, this argument did not have to be exhausted before the Agency because the Agency would be unable to afford adequate relief on the claims. *See* 85 Fed. Reg. 13187 (depriving the ARB of "jurisdiction to pass on the validity of any [regulations] . . . duly promulgated by the Department of Labor"); *see also Cirko*, 948 F.3d at 158 (courts "need not give an agency the opportunity for error correction that it is incapable of providing—i.e., where it is not 'empowered to grant effective relief'").

[46] *See also, e.g.*, 8 U.S.C. § 1182(n)(2)(D) (same); *id.* § 1182(t)(3)(D) (same); *id.* § 1324b(g)(2)(B) (permitting award of "back pay" as part of reinstatement order); § 1324b(g)(2)(C) (specifying "[l]imitation on back pay remedy"); *cf.* 29 U.S.C. § 1855(b) (permitting Secretary of Labor to sue in district court to recover "back pay" on behalf of seasonal workers alleging discrimination).

Congress went to the trouble of specifying, in related contexts, when back pay is available is strong evidence that Congress did not intend for back pay to be available as part of the "appropriate penalties" under Section 1188(g)(2). *See SAS Inst.*, 138 S. Ct. at 1355. The award of back pay must be vacated for this reason as well.

**IV.     The Agency's Award Violates The Excessive Fines Clause.**

In addition to being unsupported by the evidence and unauthorized by law, the Agency's award for the meal plan and beverages violations also violates the Eighth Amendment's Excessive Fines Clause. This issue, among others, should properly be addressed after a *de novo* hearing. *See supra* n.1. But, even if the issue is decided on the administrative record, the fine in this case is grossly disproportionate and therefore excessive.[47]

At the outset, there can be no serious question that the penalties imposed in this case are subject to review under the Excessive Fines Clause. The civil monetary penalties are punitive by their very nature and therefore are necessarily subject to that provision. *See, e.g., Salisbury v. United States*, 368 F. App'x 310, 311 (3d Cir. 2010). But the same is also true of the inflated amounts of back wages, which the ALJ justified on the ground that they were necessary to deter violations by other employers. *See* A.R. 4338 ("A less severe consequence . . . would provide a decreased deterrent effect to future employers . . . ."). Both aspects of the award "can only be explained as serving in part to punish," and are therefore subject to the Eighth Amendment. *Austin v. United States*, 509 U.S. 602, 610 (1993); *see also United States v. Lessner*, 498 F.3d

---

[47] While Sun Valley did not specifically cite the Excessive Fines Clause before the agency, Sun Valley argued that the assessment was "patently excessive," A.R. 4390-94, and "vastly overstates any claimed 'harm' to the workers," A.R. 4278-80. Nothing would be gained by requiring Sun Valley to specifically invoke the Eighth Amendment before the agency, given that the Agency set the amount of the penalty and clearly considered it to be appropriate.

185, 205 (3d Cir. 2007) ("At least one court of appeals has recognized that restitution . . . is punishment within the compass of the Eighth Amendment.").

The penalties are also grossly disproportionate to any harm suffered by the employees. As explained above, the Agency did not attempt to quantify *any* harm to the employees from the meal plan and beverage violations, but, reasonably, the harm was nowhere close to the amounts that the Agency awarded as back wages for those violations. *See supra* pp. 34-35. Yet, in addition to these inflated amounts of back wages, the Agency awarded an *additional* $198,450 in monetary penalties. The result is an award that vastly exceeds any possible underlying harm.

This significant disparity between the penalty imposed and the underlying harm violates the Excessive Fines Clause. *See United States v. Bajakajian*, 524 U.S. 321, 337 (1998) ("If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."); *cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("In practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). In this case, the extraordinary penalty imposed is many multiples of any plausible estimate of the actual damages, is "extremely harsh and unjust," and cannot be constitutionally justified. *United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993) (finding that per-occurrence penalty, magnified by large number of violations, was constitutionally excessive); *see also United States v. Kruse*, 101 F. Supp. 2d 410, 414 (E.D. Va. 2000) (same).

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment should be granted.

Dated: February 2, 2022

Respectfully submitted,

WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.

/s/ Scott M. Wilhelm
Scott M. Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ 08865
Tel: (908) 454-3200 Fax: (908) 454-3322
Email: wilhelms@wwgrlaw.com

-and-

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., #256
Shaker Heights, OH 44120
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rjohnson@ij.org

Robert Belden*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rbelden@ij.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff Sun Valley Orchards, LLC*

41