**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

SUN VALLEY ORCHARDS, LLC,

        Plaintiff,

    v.

U.S. DEPARTMENT OF LABOR, *et al.*,

        Defendants.

Case No. 1:21-cv-16625-JHR-MJS

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS, OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND.................................................................................................... 3

I.       The H-2A framework................................................................................ 3

II.      The Labor Department's H-2A enforcement system................................. 4

III.     Sun Valley's H-2A violations and proceedings........................................ 5

LEGAL STANDARDS ......................................................................................... 7

ARGUMENT......................................................................................................... 8

I.       The Department of Labor's adjudication does not violate Article III. ...................... 8

         A.      The Department of Labor is not exercising "judicial Power" at all. ............... 8

         B.      The Department of Labor is adjudicating only public rights that do not
                 require an Article III tribunal. ....................................................... 11

         C.      Sun Valley impliedly consented to the Labor Department's adjudication. .... 17

II.      The Department of Labor's Administrative Law Judges do not violate the
         Appointments Clause or the President's removal power........................................ 19

         A.      Plaintiff has forfeited its Appointments Clause and removal claims by
                 failing to raise them with the agency. ............................................. 19

         B.      Either by proper appointment or ratification, the ALJ in Sun Valley's case
                 did not violate the Appointments Clause........................................... 21

         C.      Proper appointment also vitiates Plaintiff's removal claim. ......................... 25

         D.      The Department of Labor's ALJs are permissibly protected from removal.... 26

III.     The Department of Labor's adjudicatory system is authorized by the statute and
         Plaintiff is not entitled to a trial de novo. ............................................... 29

IV.      The Department of Labor's imposition of back pay and penalties is fully
         supported by the record and is neither arbitrary nor capricious. .............................. 34

         A.      The Labor department properly awarded back wages and penalties
                 for Sun Valley's meal-plan and beverage violations...................................... 34

         B.      The Labor Department reasonably found that Sun Valley improperly
                 terminated nineteen workers in May 2015............................................... 37

i

C.      The Labor Department is fully authorized to assess back wages. ................... 38

V.      The Labor Department did not violate the Excessive Fines Clause. ....................... 39

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

## CASES

*Ableman v. Booth*,
  62 U.S. (21 How.) 506 (1859) ......................................................................... 9

*Advanced Disposal Servs. E., Inc. v. NLRB*,
  820 F.3d 592 (3d Cir. 2016) ....................................................................22, 23

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...................................................................... 7

*Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*,
  489 F. Supp. 3d 106 (E.D.N.Y. 2020) ............................................................ 8

*Amin. v. Mayorkas*,
  24 F.4th 383 (5th Cir. 2022) ......................................................................... 33

*Anderson v. Yungkau*,
  329 U.S. 482 (1947) ....................................................................................... 31

*Apple Inc. v. Voip-Pal.com, Inc.*,
  976 F.3d 1316 (Fed. Cir. 2020) .................................................................... 39

*Arizona v. United States*,
  567 U.S. 387 (2012) ....................................................................................... 14

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
  430 U.S. 442 (1977) ..................................................................................*passim*

*Bd. of Trs. of Univ. of Ill. v. United States*,
  289 U.S. 48 (1933) ......................................................................................... 13

*Beard v. Braunstein*,
  914 F.2d 434 (3d Cir. 1990) .......................................................................... 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................... 7

*Bennett v. Panama Canal Co.*,
  475 F.2d 1280 (D.C. Cir. 1973) .................................................................... 31

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ....................................................................................... 26

*Bureau of Consumer Fin. Prot. v. Fair Collections & Outsourcing, Inc.*,
  2020 WL 7043847 (D. Md. Nov. 30, 2020) .................................................. 22

iii

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................................ 33

*Carr v. Saul*,
141 S. Ct. 1352 (2021) ........................................................................ 19, 21

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ................................................................ 23

*CFPB v. Seila Law LLC*,
997 F.3d 837 (9th Cir. 2021) .................................................................. 25

*CFTC v. Schor*,
478 U.S. 833 (1986) .......................................................................... 13, 17

*Chicago & S. Air Lines v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) .................................................................................. 9

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................ 33

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ................................................................................ 10

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) .......................................................................... 2, 25

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ................................................................................ 31

*Crowell v. Benson*,
285 U.S. 22 (1932) ...................................................................... 10, 11, 16

*Dareth T. v. Kijakazi*,
2022 WL 671540 (C.D. Cal. Mar. 7, 2022) .......................................... 22, 25

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021) .............................................................. *passim*

*Deron Sch. of N.J., Inc. v. U.S. Dep't of Agric.*,
2012 WL 13187163 (D.N.J. July 16, 2012) .............................................. 33

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) .......................................................................... 34, 37

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
535 U.S. 743 (2002) ................................................................................ 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................................*passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   537 F.3d 667 (D.C. Cir. 2008) ....................................................... 28

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ................................................... 13, 14

*Gonzalez Boisson v. Pompeo*,
   2020 WL 4346913 (D.D.C. July 29, 2020) ................................. 34

*Gordon v. United States*,
   117 U.S. 697 (1864) ..................................................................... 9

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) .................................................................. 12, 15

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ...................................................... 24

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   579 U.S. 93 (2016) ...................................................................... 31

*Hayburn's Case*,
   2 U.S. (2 Dall.) 408 (1792) .......................................................... 9

*Hepner v. United States*,
   213 U.S. 103 (1909) .................................................................... 32

*In re Tribe Media Co.*,
   902 F.3d 384 (3d Cir. 2018) ....................................................... 18

*Kalaris v. Donovan*,
   697 F.2d 376 (D.C. Cir. 1983) ................................................... 10

*Kingdomware Techs., Inc. v. United States*,
   579 U.S. 162 (2016) .................................................................... 31

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
   991 F.3d 458 (3d Cir. 2021) ......................................................... 7

*Kovaco v. Rockbestos-Surprenant Cable Corp.*,
   834 F.3d 128 (2d Cir. 2016) ....................................................... 24

*Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*,
   287 U.S. 329 (1932) ................................................................ 14, 17

v

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ................................................................................. 21

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ...................................................................... 8

*Mason v. United States*,
   84 U.S. (17 Wall.) 67 (1873) ......................................................................... 8

*McKinney v. Wormuth*,
   5 F.4th 42 (D.C. Cir. 2021) .......................................................................... 32

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*,
   869 F.3d 246 (3d Cir. 2017) ......................................................................... 31

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ...................................................................... 4

*Michele T. v. Comm'r of Soc. Sec.*,
   --- F. Supp. 3d ---, 2021 WL 5356721 (W.D. Wash. Nov. 17, 2021) .............................. 25

*Morrison v. Olson*,
   487 U.S. 654 (1988) ......................................................................... 24, 27, 29

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
   59 U.S. (18 How.) 272 (1855) ..................................................................... 12, 14

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................... 26, 29

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) .................................................................................. 17

*Nat'l Wildlife Fed'n v. Sec'y of the U.S. Dep't of Transp.*,
   960 F.3d 872 (6th Cir. 2020) ........................................................................ 31

*Neto v. Thompson*,
   506 F. Supp. 3d 239 (D.N.J. 2020) ................................................................. 7, 8

*Neustar, Inc. v. FCC*,
   857 F.3d 886 (D.C. Cir. 2017) ....................................................................... 33

*NVE, Inc. v. Dep't of Health & Hum. Servs.*,
   436 F.3d 182 (3d Cir. 2006) ..................................................................... 33, 34

*Oceanic Steam Nav. Co. v. Stranahan*,
   214 U.S. 320 (1909) ................................................................................. 14

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018) ..................................................................................*passim*

*Overdevest Nuseries, L.P. v. Walsh*,
  2 F.4th 977 (D.C. Cir. 2021) ....................................................................1, 3

*Pajazetovic v. City of Utica*,
  2021 WL 4440473 (N.D.N.Y. Sept. 27, 2021) ........................................... 24

*Patchak v. Zinke*,
  138 S. Ct. 897 (2018) ................................................................................ 11

*Penasquitos Vill., Inc. v. NLRB*,
  565 F.2d 1074 (9th Cir. 1977) ................................................................... 38

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017)................................................................... 31

*Pharaon v. Bd. of Governors of Fed. Rsrv. Sys.*,
  135 F.3d 148 (D.C. Cir. 1998).................................................................. 39

*Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*,
  998 F.3d 999 (D.C. Cir. 2021)................................................................... 33

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995)................................................................. 8, 9, 10, 11

*Ruiz v. Fernandez*,
  2012 WL 1442556 (E.D. Wash. 2012)....................................................4, 16

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
  --- F. Supp. 3d ---, 2021 WL 5150464 n.46 (D.N.J. Nov. 5, 2021)............ 10, 14

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020) ............................................................................. 26

*Shane Meat Co. v. U.S. Dep't of Def.*,
  800 F.2d 334 (3d Cir. 1986) ..................................................................... 38

*Sims v. Apfel*,
  530 U.S. 103 (2000).................................................................................. 19

*Sodexo-MAGIC, LLC v. Drexel Univ.*,
  24 F.4th 183 (3d Cir. 2022)........................................................................ 7

*Stern v. Marshall*,
  564 U.S. 462 (2011)..................................................................*passim*

*Swisher v. Brady,*
  438 U.S. 204 (1978) ................................................................................................ 8

*Takahashi v. Fish & Game Comm'n,*
  334 U.S. 410 (1948) ............................................................................................... 14

*Thomas v. Union Carbide Agric. Prod. Co.,*
  473 U.S. 568 (1985) .................................................................................... 10, 13, 16

*Tillman v. Lebanon Cty. Corr. Facility,*
  221 F.3d 410 (3d Cir. 2000) ................................................................................... 40

*Toll v. Moreno,*
  458 U.S. 1 (1982) ................................................................................................... 14

*U.S. ex rel. Marcus v. Hess,*
  317 U.S. 537 (1943) ............................................................................................... 32

*United States v. Arthrex, Inc.,*
  141 S. Ct. 1970 (2021) ........................................................................................... 24

*United States v. Bajakajian,*
  524 U.S. 321 (1998) ............................................................................................... 39

*United States v. Cheeseman,*
  600 F.3d 270 (3d Cir. 2010) ............................................................................ 39, 40

*United States v. Ferreira,*
  54 U.S. (13 How.) 40 (1851) ................................................................................... 9

*United States v. Jackson,*
  964 F.3d 197 (3d Cir. 2020) ................................................................................... 31

*United States v. Perkins,*
  116 U.S. 483 (1886) ............................................................................................... 26

*Weinstein v. Albright,*
  261 F.3d 127 (2d Cir. 2001) ................................................................................... 31

*Wellness Int'l Network, Ltd. v. Sharif,*
  575 U.S. 665 (2015) ............................................................................................... 18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
  139 S. Ct. 361 (2018) ............................................................................................. 31

*Wiener v. United States,*
  357 U.S. 349 (1958) ............................................................................................... 28

viii

*Wilkes-Barre Hosp. Co., LLC v. NLRB,*
857 F.3d 364 (D.C. Cir. 2017) .................................................................. 22

*Wnuck v. Comm'r,*
136 T.C. 498 (T.C. 2011) .......................................................................... 39

*Zirnsak v. Colvin,*
777 F.3d 607 (3d Cir. 2014) ..................................................................... 38

## STATUTES

5 U.S.C. § 301 ........................................................................ 24, 29, 30

5 U.S.C. § 556 .................................................................................. 33

5 U.S.C. § 706 ........................................................................ 7, 32, 33

5 U.S.C. § 1202 ................................................................................ 27

5 U.S.C. § 7521 ................................................................................ 27

8 U.S.C. § 1101 .................................................................................. 3

8 U.S.C. § 1188 ........................................................................... *passim*

28 U.S.C. § 2461 ..................................................................... 30, 31, 32

28 U.S.C. § 3001 .............................................................................. 32

## RULES

Fed. R. Civ. P. 56 ............................................................................... 7

## REGULATIONS

20 C.F.R. § 655.100 ............................................................................ 3

20 C.F.R. § 655.103 ............................................................................ 4

20 C.F.R. § 655.121 ............................................................................ 3

20 C.F.R. § 655.122 ............................................................... 3, 4, 35, 37

20 C.F.R. § 655.130 ............................................................................ 3

20 C.F.R. § 655.135 ............................................................................ 4

29 C.F.R. part 18 ............................................................................. 20

29 C.F.R. § 18.10 ...................................................................................................5, 20

29 C.F.R. § 18.12 ..................................................................................................... 20

29 C.F.R. § 18.14 ..................................................................................................... 20

29 C.F.R. § 18.20 ..................................................................................................... 20

29 C.F.R. § 18.50 ..................................................................................................... 20

29 C.F.R. §§ 18.50-18.65 ........................................................................................... 5

29 C.F.R. § 18.60 ..................................................................................................... 20

29 C.F.R. § 18.61 ..................................................................................................... 20

29 C.F.R. § 18.63 ..................................................................................................... 20

29 C.F.R. § 18.64 ..................................................................................................... 20

29 C.F.R. § 18.65 ..................................................................................................... 20

29 C.F.R. § 18.70 ...................................................................................................5, 20

29 C.F.R. § 18.72 ...................................................................................................5, 20

29 C.F.R. § 18.80 ...................................................................................................5, 20

29 C.F.R. § 18.101...................................................................................................20, 33

29 C.F.R. §§ 101 *et seq.*........................................................................................... 20

29 C.F.R. §§ 501 *et seq.*........................................................................................... 18

29 C.F.R. § 501.0 *et seq.* ......................................................................................... 14

29 C.F.R. § 501.15...................................................................................................... 4

29 C.F.R. § 501.16....................................................................................................5, 39

29 C.F.R. § 501.19....................................................................................................5, 36

29 C.F.R. § 501.20...................................................................................................... 5

29 C.F.R. § 501.31...................................................................................................... 5

29 C.F.R. § 501.32...................................................................................................... 5

29 C.F.R. § 501.33..................................................................................................5, 18, 20

29 C.F.R. § 501.34.................................................................................... 5, 20, 33

29 C.F.R. § 501.35........................................................................................... 5

29 C.F.R. § 501.41........................................................................................5, 36

29 C.F.R. § 501.42................................................................................... 5, 11, 30

29 C.F.R. § 531.31......................................................................................... 35

Secretary's Order 01-2020,
    85 Fed. Reg. 13187 (Mar. 6, 2020) ...............................................5, 11, 24, 30

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8 ................................................................................ 13, 14

U.S. Const. art. II, § 1................................................................................... 26

U.S. Const. art. II, § 2.............................................................................21, 26

U.S. Const. art. II, § 3................................................................................... 26

U.S. Const. art. III, § 8 .................................................................................. 8

## OTHER AUTHORITIES

Alexander Schultz, *Sovereign Immunity and the Two Tiers of Article III*,
    29 Geo. Mason L. Rev. 287 (2021) ................................................................ 9

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts
    112 (2012) ................................................................................................. 31

Black's Law Dictionary (11th ed. 2019)......................................................... 39

Caleb Nelson, *Adjudication in the Political Branches*,
    107 Colum. L. Rev. 559 (2007) ................................................................8, 14

Gary Lawson, *The Rise and Rise of the Administrative State*,
    107 Harv. L. Rev. 1231 (1994) .................................................................. 11

H.R. Rep. No. 99-682 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649 ................................ 1

John Harrison, *Public Rights, Private Privileges, and Article III*,
    54 Ga. L. Rev. 143 (2019)........................................................................14, 17

Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*,
    65 Ala. L. Rev. 1205 (2014) ...................................................................... 28

The Federalist No. 81 (J. Cooke ed. 1961)......................................................................... 9

William Baude, *Adjudication Outside Article III*,
    133 Harv. L. Rev. 1511 (2020) ...................................................................10, 11, 14, 17

William Baude, *The Judgment Power*,
    96 Geo. L.J. 1807 (2008) ................................................................................. 8, 9, 10

## INTRODUCTION

Under Congress's foreign-commerce and immigration-related powers, "[t]he United States has long provided temporary work authorization for foreign agricultural workers." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021). To that end, the "H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's."[1] H.R. Rep. No. 99-682(I), at 50 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654. And since 1986, Congress has tasked the Secretary of Labor with regulating the H-2A program and "tak[ing] such actions, including imposing appropriate penalties" as "may be necessary to assure" compliance with the program. 8 U.S.C. § 1188(g)(2). Now, after more than 35 years of implementation, Plaintiff Sun Valley contends that the Labor Department's enforcement regime—which uses administrative law judges (ALJs) to adjudicate H-2A violations—contravenes Articles II and III of the Constitution. *See* Pl.'s Mem. in Supp. of Partial Summ. J. (Pl.'s Mot.) at 1–2, ECF No. 19-1. Sun Valley never raised those constitutional objections in four years of litigation before the agency, and the Court should reject them now.

Nothing about the Labor Department's adjudicatory regime implicates Article III. Agency judges, unlike Article III judges, do not issue binding judgments in the Article III sense, so they are not unconstitutionally exercising "judicial Power." And regardless, there are only public rights—not private rights—at issue here. The Supreme Court has *never* found an Article III violation in a government-enforcement action against a private actor. To the contrary, "Congress has often created new statutory obligations, provided for civil penalties for their violation, and committed exclusively to an administrative agency the function of deciding whether a violation has in fact occurred." *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450 (1977). And even if none of that were true, Plaintiff impliedly consented to agency adjudication, which resolves any Article III issue.

---

[1] The Immigration Reform and Control Act of 1986 separated the H-2 program into two temporary-worker programs: H-2A for agricultural workers and H-2B for non-agricultural workers.

1

Nor are there any Article II problems.  For starters, Plaintiff forfeited these claims by failing to raise them with the agency.  But, in any event, the Secretary of Labor properly appointed the ALJ who handled Sun Valley's case before she issued her decision.  So either by proper appointment or by ratification of her own decisions—not to mention affirmation of her decision by the Labor Department's appellate tribunal—there was no Appointments Clause violation.  This also resolves Plaintiff's removal-power claim because "there is no reason to regard any of the actions taken by the" ALJ "as void" if there is no Appointments Clause violation.  *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021).  And even if the Court reaches the merits of Plaintiff's removal-power claim, the good-cause removal restriction on ALJs is straightforwardly allowable because it is the President—or the Secretary of Labor he can remove at will—who "decide[s] whether the officer's conduct merit[s] removal under the good-cause standard."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 495 (2010).

Plaintiff's remaining claims fare no better.  The Secretary has full authority to "take such actions, including imposing appropriate penalties" as "may be necessary to assure employer compliance with" the H-2A program.  8 U.S.C. § 1188(g)(2).  And he has permissibly chosen to exercise that authority by allowing H-2A violators like Sun Valley to contest their violations through the Labor Department's adjudicatory regime.  So Plaintiff misunderstands both the governing statutes and Administrative Procedure Act review by arguing that it "is entitled to 'trial de novo by the reviewing court'" under the APA because "Congress has not authorized adjudication of alleged H-2A violations by agency judges."  Compl. ¶ 139.

On the merits of Plaintiff's APA claim, the agency reasonably adjudicated Sun Valley's H-2A violations—including by examining witness credibility—and reasonably explained its decision to order $344,945.80 in back wages (money owed to workers) and $211,800 in civil monetary penalties based on the miserable conditions at, and misrepresentations by, Sun Valley during the 2015 growing season.  In fact, despite the significance of Plaintiff's violations, the Labor Department fairly considered all relevant facts and, in its discretion, applied a "ten percent reduction in the [penalties], due to the fact that [Plaintiff] had

2

no prior history with the H-2A program." Admin. R. (AR) at 4342. So the Labor Department's decision should be upheld on the administrative record.[2] For the same reasons, there is no violation of the Eighth Amendment's Excessive Fines Clause here. The agency imposed appropriate penalties for Sun Valley's H-2A violations, far below what it *could have* imposed.

From start to finish, Plaintiff's claims are meritless. Sun Valley voluntarily chose to participate in the H-2A program and it cannot now escape liability for its H-2A violations with belated and baseless constitutional and APA challenges. The Court should dismiss all these claims or summary judgment should be granted for Defendants.

**BACKGROUND**

**I.      The H-2A framework.**

Under the H-2A program, qualifying employers may hire foreign workers "to perform agricultural labor or services" of "a temporary or seasonal nature" in the United States. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). To do so, the employer must first seek certification from the Department of Labor that (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed" to fill the open position, and (2) hiring foreign workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 1188(a)(1); 20 C.F.R. § 655.100. Once approved by the agency, the employer can "petition the Department of Homeland Security to designate foreign workers as H-2A workers." *Overdevest Nurseries*, 2 F.4th at 980.

"Congress directed the Secretary of Labor to promulgate regulations that would set the parameters of the program, particularly for temporary workers coming 'to perform agricultural labor or services.'" *Id.* (quoting 8 U.S.C. § 1101(a)(15)(H)). And under these regulations, an employer who wishes to hire H-2A workers must first recruit U.S. workers using a "job order," which lists "job qualifications and requirements," including all the work to be performed, and "minimum benefits, wages, and working conditions." 20 C.F.R. §§ 655.121, 655.122(b)-(c), 655.130(a). The employer also must submit an application to the Department

---

[2] The administrative record is available online here. *See* Notice, ECF No. 18.

3

of Labor specifying, among other things, the description of the work to be performed, the number of workers to be hired, and the dates for which the workers are needed, along with a copy of the job order. 20 C.F.R. § 655.130. If approved to hire H-2A workers, the employer must, among other requirements, provide a copy of the job order (or other written agreement with the same terms as the job order) to its H-2A workers before they travel to the employer's worksite no later than the first day of the work. *Id*. §§ 655.103(b), 655.122(q).

Employers voluntarily choose to participate in the H-2A program because it confers benefits not afforded to other employers in the United States: the ability to hire foreign workers to fulfill temporary labor needs. To obtain these benefits, however, an employer must agree to abide by the terms of the program, including those established by the Labor Department's H-2A regulations. *See* 20 C.F.R. § 655.135. Even "after an employer's H-2A application is approved and the employer hires foreign laborers," the employer "must continue to provide its American and foreign workers the minimum wages and working conditions laid out in the regulations to ensure the employment of foreign workers does not adversely affect the terms of employment of similarly employed American workers." *Mendoza v. Perez*, 754 F.3d 1002, 1008 (D.C. Cir. 2014) (citing 20 C.F.R. § 655.122(a)); 8 U.S.C. § 1188(a)(1)(B).

## II.     The Labor Department's H-2A enforcement system.

The Secretary of Labor is ultimately and solely responsible for enforcing the requirements of the H-2A program. *Ruiz v. Fernandez*, 2012 WL 1442556, at *3 (E.D. Wash. 2012). By statute, he "is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment" of the H-2A program. 8 U.S.C. § 1188(g)(2). To fulfill this enforcement responsibility, the Secretary primarily relies on the Administrator of the Labor Department's Wage and Hour Division. *See* 29 C.F.R. § 501.15. The Administrator investigates possible H-2A violations and, where the Administrator determines violations have occurred, may institute administrative proceedings to recover back wages (money owed to workers) or debar the

employer from receiving future H-2A labor certifications, among other sanctions and remedies. *See id.* § 501.16(a)(1); *id.* § 501.20(a). The Administrator may also impose civil monetary penalties through administrative proceedings, which may be assessed "for each violation of the work contract, or the obligations imposed" by statute or regulations. *Id.* § 501.19(a). And in considering whether to assess penalties, "the WHD Administrator shall consider the type of violation committed and other relevant factors" laid out by regulation. *Id.* § 501.19(b).

To institute administrative proceedings, the Administrator issues a written determination letter explaining the Administrator's findings as well as the sanctions and remedies sought. 29 C.F.R. §§ 501.31, 501.32. Any employer "desiring review of" the Administrator's determination, "including judicial review," must "make a written request for an administrative hearing" within 30 days. *Id.* § 501.33(a). An ALJ is then assigned to the case. *Id.* § 501.35; *id.* § 501.34. Litigation before the ALJ closely mirrors federal civil litigation. In fact, Labor Department regulations specify that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for," *id.* § 18.10(a). The parties can move to dismiss, *id.* § 18.70(c), take discovery, *id.* § 18.50–65, and move for the equivalent of summary judgment, *id.* § 18.72(a). There may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* § 1880–81; *id.* § 1892; *id.* § 501.41. The parties can appeal an ALJ's decision to the Labor Department's Administrative Review Board, which consists of up to five members appointed by the Secretary for four-year terms. *Id.* § 501.42(a); Secretary's Order 01-2020, 85 Fed. Reg. 13187 §§ 5(a), 7(a), 8(a) (Mar. 6, 2020). And any decision of the Review Board is subject to revision by the Secretary of Labor. 85 Fed. Reg. 13187 § 6(a).

### III.    Sun Valley's H-2A violations and proceedings.

Plaintiff Sun Valley is a New Jersey farm owned by the Marino family, including brothers Russell and Joseph. AR 4489. During the 2015 growing season—its first time in the program—Sun Valley hired H-2A workers to harvest asparagus and peppers. AR 4490. Conditions at Sun Valley were deplorable. The workers harvested vegetables twelve hours each

day with only a single, one-hour break.  AR 4490–91.  Worse yet, potable drinking water and clean bathrooms were not regularly available to workers in the fields.  *Id.*  Sun Valley also transported the workers in school buses—with worn, unsafe tires—that were driven by workers without drivers licenses.  *Id.*

Conditions were not much better in the workers' housing.  The facilities had dirty bathrooms with two broken sinks and no hot water.  AR 4491.  The windows and doors had no screens, and "garbage cans lacked lids, which attracted flies and other pests."  *Id.*  The housing also had undersized kitchens.  Plaintiff had filed two job orders with the Labor Department representing that Sun Valley would "furnish free cooking and kitchen facilities to those workers who are entitled to live in the employer housing so that workers may prepare their own meals.''  *Id.*  But it never did.  Because the kitchens in the workers' housing were too small, Sun Valley's supervisor managed a meal plan where he would provide cooked food, charging the workers a fee of $75 to $80 per week.  *Id.*  The supervisor also sold beverages to the workers, including beer, even though he did not have a license to sell alcohol.  AR 4491.

In a May 2015 meeting with management, nineteen workers tried to raise concerns about their living conditions, to no avail.  *Id.*  The workers testified that Russell Marino was very angry at the meeting, culminating in Russell firing them.  *Id.*  Sun Valley then had the workers sign false departure forms stating that they resigned due to personal issues, which Plaintiff later provided to the Labor Department and other government agencies.  *Id.*

After an investigation, the Administrator concluded that Sun Valley violated various aspects of the H-2A program and assessed $369,703.22 in back wages and $212,250 in penalties.  AR 4492.  Plaintiff timely requested an ALJ hearing, and Judge Theresa Timlin was assigned to the case.  Shortly after Judge Timlin held a four-day evidentiary hearing in July 2017, the Secretary of Labor ratified her appointment "to address any claim that administrative proceedings pending before, or presided over by, administrative law judges of the U.S. Department of Labor violate the Appointments Clause."  Ltr. to Hon. Theresa C. Timlin (Dec. 21, 2017) (emphasis added), *available* here; *see* Compl. ¶ 81.  Almost two years later,

Judge Timlin issued her 55-page decision, finding numerous H-2A violations and imposing $344,945.80 in back wages and $211,800 in penalties—a reduction of over 25 thousand dollars from the Administrator's assessment. AR 4300–54. Sun Valley then appealed to the Review Board, which issued its own 21-page decision affirming the ALJ. AR 4488–4508.

Despite litigating in the agency for four years without raising any constitutional objections, Plaintiff filed this lawsuit alleging various constitutional defects. *See* Compl. ¶¶ 107–34. Sun Valley now claims that the Labor Department's adjudication violated Article III, the Appointments Clause, the President's Article II removal power, and the Eighth Amendment's Excessive Fines Clause. *Id.* Plaintiff also advances two APA claims. First, Sun Valley says that "Congress has not authorized adjudication of alleged H-2A violations by agency judges," so it "is entitled to trial de novo by the reviewing court.'" *Id.* ¶ 139 (quoting 5 U.S.C. § 706(2)(F)). Second, Plaintiff claims that "the agency decision in this case fails review even under" the APA's "deferential standard." *Id.* ¶¶ 144–50. In accord with the parties' proposed briefing schedule and the Court's scheduling order, Sun Valley has moved for partial summary judgment. *See* ECF Nos. 16–17, 20–21. This motion follows.

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And under Rule 56, "summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Sodexo-MAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).

But where, as here, "a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Neto v. Thompson*, 506 F. Supp. 3d 239, 243–44 (D.N.J. 2020) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). So for purely legal questions, "there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion

7

for summary judgment." *Id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  Otherwise, "the court relies on the administrative record for the material facts to determine if the agency's decision exceeds the agency's statutory authority or is arbitrary and capricious or an abuse of discretion." *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106, 128 (E.D.N.Y. 2020).

## ARGUMENT

**I.     The Department of Labor's adjudication does not violate Article III.**

### A.     The Department of Labor is not exercising "judicial Power" at all.

Article III vests "the judicial Power of the United States" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1.  So there is no question that "Congress cannot confer the Government's 'judicial Power' on entities outside Article III." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1372–73 (2018) (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)).  But here, Plaintiff's Article III claim fails at the outset because the agency is not exercising any "judicial Power of the United States" at all.  U.S. Const. art. III, § 1.

"During the ratification of the Constitution and immediately afterwards, a wide range of constitutional scholars, jurists, and officers explained that the 'judicial' power vested by [Article III] was the power to make authoritative and final judgments in individual cases." William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1815 (2008); Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 574 (2007) (noting that proceedings were considered non-judicial if they did not involve a "court render[ing] a final judgment that bound [the parties]").  Simply put, "a 'judicial Power' is one to render dispositive judgments." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995) (citation omitted); *Stern*, 564 U.S. at 494 (calling "the entry of a final, binding judgment" "the most prototypical exercise of judicial power" (emphasis omitted)); *Swisher v. Brady*, 438 U.S. 204, 209 (1978) (noting that "the *sine qua non* of judicial office" is "the power to enter a binding judgment"); *Mason v. United States*, 84 U.S. (17 Wall.) 67, 73 (1873) (referring to "judicial power" as the "power to

8

bind . . . parties by [a] decision"); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 525 (1859) (describing the judicial Power as "the power of this court to decide, ultimately and finally").

What makes "judicial Power" unique is that its exercise not only binds the parties, but cannot be revised by the Political Branches. So Congress "cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases." *Plaut*, 514 U.S. at 222 (quoting The Federalist No. 81, p. 545 (J. Cooke ed. 1961)). Indeed, according to James Madison, "one of the goals of the Constitution's structure was to avoid the examples of Virginia, where the legislature had 'decided rights which should have been left to judiciary controversy,' and Pennsylvania, where 'cases belonging to the judiciary department [had been] frequently drawn within legislative cognizance and determination.'" Baude, *The Judgment Power*, *supra*, at 1817–18 (citations omitted). And as Alexander Hamilton bluntly explained, "[e]very reason . . . militates against placing the judiciary power, in the last resort, in a body composed of men chosen for a limited period," which is why Article III judgments "will not be in any manner subject to the revision or correction of the legislative body." *The Federalist* No. 81, at 417–19 (Gideon ed., 2001); Alexander Schultz, *Sovereign Immunity and the Two Tiers of Article III*, 29 Geo. Mason L. Rev. 287, 305 (2021).

Likewise, "[t]he clear judicial consensus was that the judicial power could not be revised in particular cases by the Executive." Baude, *The Judgment Power*, *supra*, at 1820. The Supreme Court has repeatedly said as much since the Founding. *See, e.g.*, *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 (1792) (Justices riding circuit explaining, among other things, that "revision and control" of judgments by the Executive and Congress is "radically inconsistent with the independence of that judicial power which is vested in the courts"); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 50 (1851) ("[T]he duty imposed, when the decision was subject to the revision of a Secretary and of Congress, could not be executed by the court as a judicial power."); *Gordon v. United States*, 117 U.S. 697, 703 (1864) (op. of Taney, C.J.) (same); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113–14 (1948) ("It has [ ] been the firm and unvarying practice of Constitutional Courts to render no judgments . . . that are subject

9

to later review or alteration by administrative action." (citations omitted)); *Plaut*, 514 U.S. at 218 ("Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch.").  So an Article III court's decision "settle[s] legal rights authoritatively in a particular case, even though the President ha[s] the authority to decide similar cases differently if there [i]s no judicial decree."  Baude, *The Judgment Power*, *supra*, at 1821.

The binding nature of an Article III judgment remains the touchstone of "judicial Power" even if Congress could assign the same adjudicatory task to either the Executive or the Judiciary.  "Courts usually exercise their judicial power through adjudication, so when another entity adjudicates, it might seem to exercise judicial power."  William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1520 (2020).  But "[m]uch of the confusion of non-Article III adjudication comes from a lack of attention to power."  *Id.*  "The judicial power attaches special consequences to judicial adjudications, most especially legally binding judgments, but there's nothing about adjudication that is exclusively judicial."  *Id.*; *Oil States*, 138 S. Ct. at 1378 ("The fact that an agency uses court-like procedures does not necessarily mean it is exercising the judicial power."); *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (Agency "activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power.'").  So it is no surprise that "[m]any matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts."  *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 583 (1985).  Congress can authorize such adjudications by the Executive Branch or by the Judiciary.[3]  *See*

---

[3] Congress's power to assign decisions to either the Executive or the Judiciary is, of course, subject to other constitutional restraints, including the Due Process Clause of the Fifth Amendment.  But "even when private rights are at stake, Article III does not require federal courts to perform every stage of adjudication" to satisfy due process.  *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ---, 2021 WL 5150464, at *28 n.46 (D.N.J. Nov. 5, 2021) (quoting *Kalaris v. Donovan*, 697 F.2d 376, 386 (D.C. Cir. 1983); *Crowell v. Benson*, 285 U.S. 22, 47 (1932).  And Sun Valley rightly does not raise a due process claim here.

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 452 (1977) (quoting *Crowell v. Benson*, 285 U.S. 22, 50–51 (1932)); *see also Patchak v. Zinke*, 138 S. Ct. 897, 907 (2018). In fact, "[m]uch adjudicative activity by executive officials . . . is execution of the laws by any rational standard, though it also fits comfortably within the concept of the judicial power if conducted by judicial officers." Gary Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231, 1246 (1994); Baude, *Adjudication Outside Article III*, *supra*, at 1522. But if adjudications occur in the Executive Branch, they are subject to supervision by the President and Congress; if they occur in the Judiciary, they are not.

This foundational principle makes all the difference here. While the ALJ imposed back wages and penalties for Sun Valley's H-2A violations, that decision was examined by the Review Board. *See* AR 4488–4508 (Review Board decision); 29 CFR 501.42(a). It was also subject to review by the Secretary and the President. *Cf.* 85 Fed. Reg. at 13187 § 6(a). Sun Valley—like any other H-2A violator—could also petition Congress for a law that would directly decide its case on more favorable terms. *See Oil States*, 138 S. Ct. at 1374. That's the advantage of executive adjudication: one may always seek a different result in the Political Branches. But it also resolves the key question here: the Labor Department is not exercising "judicial Power" because its assessment of back wages and penalties is not a "dispositive judgment[]" in the Article III sense. *See, e.g.*, *Plaut*, 514 U.S. at 218–19. And because the agency did not exercise any "judicial Power," Plaintiff's Article III claim should fail.

**B.    The Department of Labor is adjudicating only public rights that do not require an Article III tribunal.**

Even if this Court were to examine Plaintiff's Article III claim through the lens of public and private rights, the claim would still fail. When determining whether a proceeding involves an exercise of Article III judicial power, the Supreme Court has distinguished between "public rights" that can be adjudicated outside Article III courts and "private rights" that cannot. *Oil States*, 138 S. Ct. at 1373. While the "Court has not definitively explained the distinction between public and private rights" and its precedents "have not been entirely

11

consistent," one thing is crystal clear: public rights encompass "matters which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Id.* (citations omitted). Put more simply, public-rights matters are those "that can be pursued only by grace of the other branches." *Stern*, 564 U.S. at 493 (citing *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 284 (1855)). So despite routinely deciding Article III cases, the Supreme Court has *never* found an Article III violation in a matter between the government and a private actor—as contrasted with matters about the liability of one individual to another—especially in an area, like immigration and foreign commerce, that is totally subject to congressional control. This Court should not break new ground by doing so here.

There has never been any question that a suit between the government and others, by definition, falls squarely within the public-rights doctrine. At its core, public rights are not "rights important to the public, or rights created by the public, but rights *of the public*—that is, rights pertaining to claims brought by or against the United States." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 68 (1989) (Scalia, J. concurring); *id.* at 65–66 (collecting cases). So the major question that the Supreme Court has tackled in more recent Article III cases is how far *beyond* that core definition the public-rights doctrine extends. And it is now settled that cases may involve public rights even when they *do not* concern matters between the federal government and others. *Stern*, 564 U.S. at 490 (noting that the Court previously "rejected the limitation of the public rights exception to actions involving the Government as a party"); *Granfinanciera*, 492 U.S. at 54 ("[T]he Federal Government need not be a party for a case to revolve around 'public rights.'"). As the Supreme Court recently explained, the public-rights doctrine now extends to "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490–91. "In other words," what "makes a right 'public' rather than private is that the right is integrally related to particular Federal Government action." *Id.*

12

That's why the Supreme Court has routinely rejected Article III challenges, even in cases where the claim at issue arises between two *private* parties.  In *Thomas*, there was "a data-sharing arrangement between companies under a federal statute providing that disputes about compensation between the companies would be decided by binding arbitration." *Stern*, 564 U.S. at 491 (discussing *Thomas*, 473 U.S. at 571–75).  The Court held that the binding-arbitration scheme did not violate Article III, explaining that "any right to compensation results from the statute and does not depend on or replace a right to such compensation under state law." *Id.* (alterations omitted) (quoting *Thomas*, 473 U.S. at 584).  Similarly, *Schor* "concerned a statutory scheme that created a procedure for customers injured by a broker's violation of the federal commodities law to seek reparations from the broker before the Commodity Futures Trading Commission (CFTC)." *Id.* (describing *CFTC v. Schor*, 478 U.S. 833, 836 (1986)).  In rejecting an Article III challenge to a broker's counterclaim handled by the CFTC along with a customer's reparations claim, "the Court repeatedly emphasized that it was 'necessary' to allow the agency to exercise jurisdiction over the broker's claim, or else 'the reparations procedure would have been confounded." *Id.* at 492 (quoting *Schor*, 478 U.S. at 856).  Recently, the Supreme Court upheld inter partes review—an agency adjudication between private parties in which the petitioner requests the cancelation of a patent owner's patent—against an Article III challenge. *Oil States*, 138 S. Ct. at 1373–75.  Reasoning that "the grant of a patent involves a matter arising between the government and others" insofar as "patents are public franchises that the Government grants to the inventors of new and useful improvements," the Court emphasized that patents are "creature[s] of statute law" and Congress has full authority to "grant patents itself by statute." *Id.* at 1374 (citations omitted).

Here, the government's case against Sun Valley for its H-2A violations falls in the heartland of the public-rights doctrine.  Congress's power to "regulate Commerce with foreign Nations" is "exclusive and plenary" and "comprehend[s] every species of commercial intercourse between the United States and foreign nations." U.S. Const. art. I, § 8; *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.)

13

1, 193 (1824) (Marshall, C.J.)).  Likewise, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); U.S. Const. art. I, § 8 (Congress's power to "establish an uniform Rule of Naturalization"); *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948).  So the federal government need not allow employers to hire foreign agricultural workers *at all*.  *See Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 334 (1909) (noting that "the authority of Congress over foreign commerce and its right to control the coming in of aliens into the United States" entitles Congress to "regulate that subject in the fullest degree").  But it has chosen to do so with certain conditions.  *See* 8 U.S.C. § 1188; 29 C.F.R. § 501.0 *et seq.*; John Harrison, *Public Rights, Private Privileges, and Article III*, 54 Ga. L. Rev. 143, 170 (2019) ("When Congress used a regulatory power to impose a general prohibition that could be relaxed through a license, it put the government in the position of a private owner who could demand that others not interfere with the owner's interest or could relax that demand.").  And because "control of the admission of aliens is committed exclusively to Congress," in "the exercise of that control, it may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them."  *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 334 (1932); *Oceanic Steam*, 214 U.S. at 339.

Put simply, Sun Valley was able to hire foreign agricultural workers only "by grace of the other branches."  *Stern*, 564 U.S. at 493 (citing *Murray's Lessee*, 59 U.S. (18 How.) at 284); *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, --- F. Supp. 3d ---, 2021 WL 5150464, at *29 (D.N.J. Nov. 5, 2021).  Granting H-2A certifications and punishing H-2A violators is something "Congress could do on its own, and so it is something that it could authorize the executive branch to do through a properly drawn statute."  Baude, *Adjudication Outside Article III*, *supra*, at 1543; *see also* Nelson, *supra* at 580–81 (2007) ("[T]he power to expel aliens after entry, no less than the power to turn them away at the border, 'may be exercised

14

entirely through executive officers' without the need for 'judicial trial or examination.'" (citation omitted)).  And Plaintiff freely admits that the government's enforcement action was grounded in Sun Valley's violation of Labor Department regulations.  Pl.'s Mot. at 22 (citing AR 0006–08).  So this case not only "arise[s] between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Oil States*, 138 S. Ct. at 1373, but also "derives from a federal regulatory scheme" and is "integrally related to particular Federal Government action,"[4] *Stern*, 564 U.S. at 490–91; *Beard v. Braunstein*, 914 F.2d 434, 441 (3d Cir. 1990)

This is nothing new: "Congress has often created new statutory obligations, provided for civil penalties for their violation, and committed exclusively to an administrative agency the function of deciding whether a violation has in fact occurred."  *Atlas Roofing*, 430 U.S. at 450.[5]  The Supreme Court has repeatedly upheld these statutory schemes against Article III

[4] This case also involves "resolution of [a] claim by an expert Government agency [that] is deemed essential to a limited regulatory objective within the agency's authority." *Stern*, 564 U.S. at 490–91; *contra* Pl.'s Mot. at 22–23.  The Labor Department obviously has extensive expertise in labor-related matters, especially as they relate to the H-2A program, which it has been enforcing for decades.  And the Secretary of Labor is specifically empowered to "impos[e] appropriate penalties" for H-2A violations.  8 U.S.C. § 1188(g)(2).  So unlike cases where a non-Article III tribunal is tasked with deciding wide-ranging issues like tangential state-law claims, the agency here resolved a claim by "an expert Government agency" (the Labor Department) that is "essential to a limited regulatory objective" (enforcement of H-2A requirements) "within the agency's authority."

[5] Plaintiff attempts to sidestep *Atlas Roofing* by arguing that it only addresses whether the Seventh Amendment is applicable to administrative proceedings and "does not resolve the separate question of whether a particular case may proceed in an administrative tribunal in the first place."  Pl.'s Mot. at 21 n.26.  But in determining whether a jury trial is required, the Court looks at the same public-rights doctrine that animates the Court's Article III cases. *See Atlas Roofing*, 430 U.S. at 450 (explaining that "[a]t least in cases in which 'public rights' are being litigated" the right to a jury trial does not apply).  So it is no surprise that the Supreme Court has relied on *Atlas Roofing* and other Seventh Amendment cases in its Article III decisions. *See Stern*, 564 U.S. at 489 (citing *Atlas Roofing*); *Granfinanciera*, 492 U.S. at 53 (explaining that, "if a statutory cause of action is legal in nature," the Seventh Amendment question "requires the same answer as the question [of] whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal").

(and Seventh Amendment right-to-jury-trial) challenges. *Id.*; *id.* at 451 ("Congress has entrusted to an administrative agency the task or adjudicating violations of the customs and immigration laws and assessing penalties based thereon."); *Crowell*, 285 U.S. at 51 (noting "[f]amiliar illustrations of administrative agencies created for the determination of [public-rights] matters" in connection with "interstate and foreign commerce" and "immigration").

And nothing here requires a different result. Plaintiff attempts to cast this as a private-rights case because it essentially involves "claims to enforce the provisions of a contract between employer and employee." Pl.'s Mot. at 22; *id.* at 14–18. But this is an enforcement action *by the federal government*, which by definition cannot involve private rights. *Stern*, 564 U.S. at 489 (Public rights arise "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments" while "matters of private right" involve "the liability of *one individual to another* under the law as defined." (emphasis added)); *Thomas*, 473 U.S. at 585 (same); *Crowell*, 285 U.S. at 50 (same). And everyone agrees that the government's enforcement action here was based on Sun Valley's violation of Labor Department regulations—not some state-law breach-of-contract theory—which makes this case just like every other regulatory-based enforcement action that is adjudicated outside Article III. Pl.'s Mot. at 22 (citing AR 0006–08); *Oil States*, 138 S. Ct. at 1373; *Stern*, 564 U.S. at 490–91. Indeed, *only* the Secretary of Labor can enforce the terms and conditions of employment under the H-2A program. *See* 8 U.S.C. § 1188(g)(2); *Ruiz v. Fernandez*, 2012 WL 1442556, at *3 (E.D. Wash. 2012).

Plaintiff even points out that "H-2A employees often bring contract claims against H-2A employers based on the types of provisions at issue here." Pl.'s Mot. at 22 (citing cases). True. And if this case were about whether the Labor Department could adjudicate state-law contract claims between Sun Valley and its former H-2A employees, it would be a closer case.[6] In fact, the Supreme Court has *only* found non-Article III adjudication to implicate private

---

[6] The Labor Department does not adjudicate such claims.

rights in cases concerning state-law claims between individuals in bankruptcy proceedings. *See Stern*, 564 U.S. 462 (holding that a state-law tortious-interference counterclaim in bankruptcy was not a matter of public right); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (concluding that the public-rights doctrine did not cover a state-law contract claim against an entity that was not otherwise part of the bankruptcy proceedings). But that is light years away from what we have here: a government enforcement action based on a federal regulatory regime under the federal government's foreign-commerce and immigration-related powers. *See Elting*, 287 U.S. at 335.

Sun Valley cites no case finding improper non-Article III adjudication under these circumstances because no such case exists. This federal enforcement action is at the core of public rights that may adjudicated outside Article III. *See* Harrison, *supra* at 173–74 ("Executive adjudication through the exercise of public rights, with correlative effects on private interests that are not rights, is [ ] an unproblematic exercise of executive power."). So the Court should reject Plaintiff's Article III challenge. "Congress is not required by" Article III "to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field." *Atlas Roofing*, 430 U.S. at 455.

### C.    Sun Valley impliedly consented to the Labor Department's adjudication.

Even if the Court were to break new ground and hold that the Labor Department's adjudication against Sun Valley ran afoul of Article III, Plaintiff's Article III claim should still be dismissed because Sun Valley consented to executive adjudication. "[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried." *Schor*, 478 U.S. at 848–49; Baude, *Adjudication Outside Article III*, *supra* at 1557 (explaining that "consent cannot confer judicial power" but consent "can make judicial power unnecessary"). So non-Article III adjudicators may "decide claims submitted to them by consent" without "offend[ing] the separation of powers so

17

long as Article III courts retain supervisory authority over the process." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678 (2015). Here, of course, Article III courts retain supervisory authority over the Labor Department's adjudication: Plaintiff is in this Court challenging that adjudication under the APA. So the only question is whether Sun Valley consented to the agency's adjudication. It did.

While a litigant must "knowingly and voluntarily consent" to jurisdiction of a non-Article III tribunal, consent "may be express or implied." *In re Trib. Media Co.*, 902 F.3d 384, 394 (3d Cir. 2018) (quoting *Wellness Int'l*, 575 U.S. at 684–85). And a party "may impliedly consent through [its] actions rather than [its] words," including by litigating before a non-Article III tribunal without objection. *Id.* at 394 (quoting *Wellness Int'l Network*, 575 U.S. at 684 and collecting cases). This implied-consent rule "increas[es] judicial efficiency and check[s] gamesmanship," preventing a litigant from "sandbagging" the court by "remaining silent about his objection and belatedly raising the error only if the case does not conclude in [its] favor." *Id.* at 395 (quoting *Wellness Int'l*, 575 U.S. at 685 and *Stern*, 564 U.S. at 482).

That's exactly what happened here. When the Labor Department originally notified Plaintiff of its H-2A violations in 2016, it explained that Sun Valley had "the right to request a hearing on the determination that any or all of the violations occurred," and any hearing request would be "referred to the Chief Administrative Law Judge" for administrative adjudication. AR 0002 (citing adjudicatory procedures in 29 C.F.R. § 501 *et seq.*); 29 C.F.R. § 501.33(a). Sun Valley timely requested "an evidentiary hearing before an Administrative Law Judge on" its H-2A violations, AR 0011, and then continued to litigate through the Labor Department for the next four years, never once objecting to the agency's non-Article III status. So this is not a case where "an objecting [party]" was "forced to litigate involuntarily before a non-Article III court." *Wellness Int'l*, 575 U.S. at 682–83. Sun Valley impliedly consented to non-Article III adjudication and has now lodged a (meritless) APA challenge in this Court. *Trib. Media*, 902 F.3d at 394–96. Its Article III claim should therefore be dismissed.

18

II.    **The Department of Labor's Administrative Law Judges do not violate the Appointments Clause or the President's removal power.**

A.    **Plaintiff has forfeited its Appointments Clause and removal claims by failing to raise them with the agency.**

The Court should not even consider Plaintiff's Appointments Clause and removal claims because it failed to raise them in the Labor Department's adjudication. "Administrative review schemes commonly require parties to give the agency an opportunity to address an issue before seeking judicial review of that question." *Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021). And where, as here, "statutes and regulations are silent," courts decide "whether to require issue exhaustion based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Id.* So in determining whether to impose an issue-exhaustion requirement, the Court must examine "the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Id.* (citation omitted).

The key to distinguishing between adversarial proceedings (that require issue exhaustion) and inquisitorial proceedings (that do not) is "whether claimants bear the responsibility to develop issues for adjudicators' consideration." *Id.* For example, in *Carr*, the Supreme Court recently held that Social Security Administration's ALJs conducted largely inquisitorial proceedings and therefore an issue-exhaustion requirement did not apply. *Id.* at 1359–63. In so holding, the Court noted that "it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits" and that "the Commissioner has no representative before the ALJ to oppose the claim for benefits." *Id.* at 1359 (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000)). "Regulations also provide that [Social Security] ALJs will look fully into the issues themselves, and may raise a new issue at any time before mailing notice of the hearing decision." *Id.* (citations omitted). In fact, "the form to request an ALJ hearing provides roughly three lines for claimants to explain their disagreement with the agency's determination," and Social Security "regulations provide no notice that claimants must raise specific issues before" the ALJ "to preserve them for review in federal court." *Id.* at 1359–60.

19

The Labor Department's H-2A enforcement proceedings could not be further from *Carr*: the H-2A enforcement regulations require "formal adversarial adjudications." *See* 29 C.F.R. § 18.101; *id.* § 501.34 (noting that "29 CFR part 18 shall apply to administrative proceedings" for H-2A violations). Regulations require "[a]ny person desiring review of a determination [that they are liable for H-2A violations], including judicial review, shall make a written request for an administrative hearing," which must, among other things, "[s]tate the specific reason or reasons why the person requesting the hearing believes such determination is in error." *Id.* § 501.33; *see, e.g.*, AR 0009–11. And after the case is referred to an ALJ, the ALJ does not look into issues on their own. Rather, the parties must identify contested issues, *see* 29 C.F.R. §§ 18.80(c), and the ALJ "has all powers necessary to conduct fair and impartial proceedings" between the parties, 29 C.F.R. § 18.12(b); *id.* § 18.20. So, unlike *Carr*, "ex parte communications on the merits of a case with the judge" are prohibited. *Id.* § 18.14.

And Labor Department regulations establish rules for adjudicative proceedings that resemble federal civil litigation in every meaningful way, even specifying rules of evidence, *id.* §§ 18.101 *et seq.*, and that "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for," 29 C.F.R. § 18.10(a). For example, the parties must provide initial disclosures, *id.* § 18.50(c)(1), and expert reports, *id.* § 18.50(c)(2), as necessary. They may request documents, *id.* § 18.61(a), serve interrogatories and requests for admission, *id.* § 18.60(a)(2); *id.* § 18.63(a)(1), and take oral or written depositions, *id.* § 18.64(a); *id.* § 18.65(a). The parties can also move to dismiss, *id.* § 18.70(c), or for the equivalent of summary judgment, *id.* § 18.72(a). Of course, as in Sun Valley's case, there may also be the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ "must issue a written decision and order." *Id.* §§ 1880–81; *id.* § 1892; AR 4492 (noting an evidentiary hearing in July 2017); AR 4300–56 (ALJ decision). And, as here, parties may appeal an ALJ's decision to the Review Board. 29 C.F.R. § 501.42(a); AR 4488–4508 (Review Board decision). At every step of this adversarial process, the Labor Department's

20

regulations make clear that employers "bear the responsibility to develop issues for adjudicators' consideration," and thus issue exhaustion was required.[7] *Carr*, 141 S. Ct. at 1358.

Because issue exhaustion was required and Sun Valley failed to raise its Appointments Clause and removal objections in the agency's adversarial proceedings, those claims should be deemed forfeited and the Court should dismiss them. *Id.* at 1358–59.

**B.      Either by proper appointment or ratification, the ALJ in Sun Valley's case did not violate the Appointments Clause.**

Procedural missteps aside, there is no Appointments Clause problem here. It is true that Judge Timlin—the ALJ presiding over Sun Valley's case—was not appropriately appointed as an "inferior [o]fficer" when Sun Valley began contesting its case before the agency. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); U.S. Const. art. II, § 2. But shortly after Judge Timlin held a July 2017 hearing in Sun Valley's case, her appointment was ratified by the "Head[] of [her] Department[]"—the Secretary of Labor—"to address any claim that administrative proceedings *pending before*, or presided over by, administrative law judges of the U.S. Department of Labor violate the Appointments Clause." Ltr. to Hon. Theresa C. Timlin (Dec. 21, 2017) (emphasis added), *available* here; *see* U.S. Const. art. II, § 2; Compl. ¶ 81. And Judge Timlin did not decide Sun Valley's case for nearly another *two years* after that appointment. *See* AR 4300 (ALJ decision dated October 28, 2019). So either by the Secretary's or the ALJ's own ratification, the Appointments Clause was not implicated.

As to the Secretary's ratification, it is uncontested that the Secretary ratified Judge Timlin's appointment after she held a hearing but before she *decided* Sun Valley's case. *See* Pl.'s Mot. at 29. And, of course, an ALJ's exercise of executive power is at its zenith when

---

[7] Given the plainly adversarial nature of the agency's adjudication, there is no need to examine any "additional considerations"—like the nature of the claims or futility—that might "tip the scales" against imposing an issue-exhaustion requirement. *Carr*, 141 S. Ct. at 1360; *id.* at 1363 (Thomas, Gorsuch, Barrett, JJ., concurring) (finding that because Social Security "proceedings bear little resemblance to adversarial litigation," the analysis ends there).

she actually adjudicates (that is, decides) a case. *See Lucia*, 138 S. Ct. at 2055 ("[T]he appropriate remedy for an *adjudication* tainted with an appointments violation is a new hearing before a properly appointed official." (emphasis added)); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) ("[T]he ALJ lawfully exercised power that he possessed by virtue of his appointment, which the Secretary ratified before the ALJ adjudicated the claim."); *Dareth T. v. Kijakazi*, 2022 WL 671540, at *2 (C.D. Cal. Mar. 7, 2022) (collecting cases and finding that no Appointments Clause violation occurs where the ALJ was properly appointed "at the time he decided Plaintiff's disability claim"). In fact, Plaintiff is not truly challenging any action Judge Timlin took before her decision, like minor scheduling issues or evidentiary rulings. *See* Compl. ¶¶ 83–95, 144–50 (arguing against the Labor Department's assessment of back wages and civil monetary penalties); Pl.'s Mot at 29. So the only exercise of "significant authority" at issue is Judge Timlin's decision, *Lucia*, 138 S. Ct. at 2051, at which time her appointment had been ratified. And no Appointments Clause violation arises from a properly appointed official exercising her most important official duty: deciding cases.

Even if something about Judge Timilin's pre-decision conduct were at issue, it wouldn't matter: Judge Timlin necessarily ratified all prior proceedings after the Secretary properly ratified her appointment. "[R]atification can remedy a defect arising from the decision of an improperly appointed official when a properly appointed official has the power to conduct an independent evaluation of the merits and does so." *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) (citation omitted). For an effective ratification, the ratifier must (1) have the authority to take the action, (2) have full knowledge of the decision to be ratified, and (3) make "a detached and considered affirmation of the earlier decision." *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 602 (3d Cir. 2016). While this may be done by a properly appointed superior official, a properly appointed official is also capable of ratifying her own actions. *Id.* at 605; *Bureau of Consumer Fin. Prot. v. Fair Collections & Outsourcing, Inc.*, 2020 WL 7043847, at *5 (D. Md. Nov. 30, 2020) (collecting cases). And

in determining whether ratification has occurred, agency officials are owed "proper deference" under "the presumption of regularity." *Advanced Disposal*, 820 F.3d at 605.

Here, there can be little question that Judge Timlin ratified her own prior actions. It is undisputed that Judge Timlin's appointment was properly ratified after Sun Valley's hearing, so she undoubtedly had the authority to ratify her prior actions. *Id.* at 604; Compl. ¶ 81. And because she presided over Sun Valley's case—including a four-day hearing—"the knowledge requirement is easily satisfied" because "at the time of ratification, [s]he, better than anyone else, had full knowledge of h[er] earlier actions." *Advanced Disposal*, 820 F.3d at 604–05. By deciding Sun Valley's case after her proper appointment, Judge Timlin also made "a detached and considered affirmation" of all earlier decisions. *Id.* at 602. Ratification need not be express; it "can be implied from subsequent conduct, such as when a later act is necessarily an affirmation of an earlier act." *Id.* at 603 (citations omitted). And here, Judge Timlin's decision was "necessarily an affirmation of the validity of h[er] earlier actions in conducting the" case. *Id.* at 605 (citation omitted). Judge Timlin did not decide anything of substance for nearly two years *after* the Secretary ratified her appointment. So this is not a case where an official needed to ratify their own final determination, which itself is a low bar. *Id.* ("[M]ere lack of detail in [an official]'s express ratification is not sufficient to overcome the presumption of regularity."); *CFPB v. Gordon*, 819 F.3d 1179, 1190–92 (9th Cir. 2016) (stating that even "rubberstamp" ratification may cure earlier Appointments Clause deficiencies). Ratification could not be any more straightforward here.

Nor is the Appointments Clause implicated by the Review Board's affirmance of Judge Timlin's decision. *See* AR 4488–4508 (Review Board decision). Sun Valley does not contend that any member of the Review Board was an improperly appointed "inferior officer" when they thoroughly decided Plaintiff's case. *See* Pl.'s Mot. at 28–29. Rather, Plaintiff alleges— but does not seek summary judgment on its claim—that "the ALJs who make up the [Review Board]" violate the Appointments Clause because they "qualify as principal officers of the

23

Un[it]ed States" insofar as their "decisions are the final decisions of the [Labor Department] and are not subject to review by a superior executive officer." Compl. ¶¶ 124–25.

To the extent Plaintiff has not abandoned this claim, it is mistaken. *Pajazetovic v. City of Utica*, 2021 WL 4440473, at *6 (N.D.N.Y. Sept. 27, 2021) (deeming a claim abandoned based on plaintiff's failure to defend or affirmatively pursue the claim in a cross motion for summary judgment); *cf. Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016). In general, "an inferior officer must be directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1980 (2021) (citation omitted). But that is true here because the Review Board is made up of "inferior officers whose decisions a superior executive officer can review or implement a system for reviewing." *Id.* at 1984. As discussed further below, the Secretary of Labor has ultimate responsibility for "tak[ing] such actions, including imposing appropriate penalties . . . as may be necessary" under the H-2A program, and has "prescribe[d] regulations for the government of his department" and "the distribution and performance of its business" by allowing H-2A violators like Sun Valley to contest their violations through ALJ adjudication and appeals to the Review Board. 8 U.S.C. § 1188(g)(2); 5 U.S.C. § 301; Argument Section III., *infra*. And, regardless, the Secretary has now made explicit what was always true: the Secretary has final review authority for all H-2A adjudications. *See* 85 Fed. Reg. at 13187 § 6(a). Review Board members are also "limited in tenure" because they are appointed for four-year terms, further indicating that they are "inferior officers." *Id.* § 8(a); *Morrison v. Olson*, 487 U.S. 654, 672 (1988). So the Review Board consists of properly appointed "inferior officers," not improperly appointed "principal officers."

Simply put, there was no Appointments Clause violation here. Judge Timlin and the Review Board were properly appointed "inferior officers" when they decided Sun Valley's case. And, in any event, Judge Timlin's decision ratified anything Sun Valley could contest. *Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019) ("[A] properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting a claim, resolves the claim

24

on the merits by remedying the defect (if any) from the initial appointment." (quotation marks omitted)).  So Plaintiff's Appointments Clause claim should be dismissed.

### C.    Proper appointment also vitiates Plaintiff's removal claim.

The lack of any Appointments Clause problem also resolves any claim that the Labor Department's order of back wages and penalties should be set aside because "[t]he ALJ who adjudicated Sun Valley's case [ ] was not subject to effective control by the President through the removal power."  Pl.'s Mot. at 30; Compl. ¶ 123.  Even if there were a removal-power issue, "there is no reason to regard any of the actions taken by the" ALJ "as void" if she was "properly appointed."  *Collins*, 141 S. Ct. at 1787.  "Here, the ALJ lawfully exercised power that [s]he possessed by virtue of h[er] appointment, which the Secretary ratified before the ALJ adjudicated the claim."  *Decker Coal*, 8 F.4th at 1137.  So "[a]bsent a showing of harm," the Court should "refuse to unwind the decisions below."  *Id.*; *CFPB v. Seila Law LLC*, 997 F.3d 837, 847 (9th Cir. 2021) (confirming that "ratification is available to cure both Appointments Clause defects and structural, separation-of-powers defects").

Sun Valley has not attempted to show any harm, nor could it.  "Plaintiff identifies no particular harm suffered by virtue of [its] claim being adjudicated . . . by an ALJ who was otherwise properly appointed" and Sun Valley "has failed to show any connection between the unconstitutional removal clause and the ALJ's decision."  *Dareth T.*, 2022 WL 671540, at *3 (collecting cases).  Nor is there any indication that the President or the Secretary of Labor would have removed Judge Timlin "and appointed a new [ALJ] who would have administered this plaintiff's claims differently."  *Michele T. v. Comm'r of Soc. Sec.*, --- F. Supp. 3d ---, 2021 WL 5356721, at *5 (W.D. Wash. Nov. 17, 2021); *see Collins*, 141 S. Ct. at 1789 (noting that harm might be shown if "the President had made a public statement expressing displeasure with actions taken by [the official at issue] and had asserted that he would remove the [official] if the statute did not stand in the way").  Put simply, "there is no indication the ALJ took unlawful action" and the Court should not "conclude that the existence of [removal restrictions] alone tainted the ALJ's decision."  *Decker Coal*, 8 F.4th at 1137.  Indeed, if the

Court accepted Sun Valley's argument—which hinges on a statute that prescribes removal for all federal ALJs—"it would have potentially catastrophic effects on numerous past and ongoing claim adjudications under various benefits programs administered throughout the federal government." *Id.* There is no reason to invite such "catastrophic effects" here, and Plaintiff's removal-power claim should be rejected.

> **D.      The Department of Labor's ALJs are permissibly protected from removal.**

Even if the Court reaches the merits of Plaintiff's removal-power claim, it should fail. Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1; *id.* § 3. Because "[t]he entire 'executive Power' belongs to the President alone," the Supreme Court has found that executive "officers must remain accountable to the President, whose authority they wield." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020). That accountability "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of their functions, obey.'" *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)). The removal protections for the Labor Department's ALJs do not run afoul of this principle.

As "inferior [o]fficers," the Labor Department's ALJs were appointed by the Head[] of [their] Department[]," the Secretary of Labor. U.S. Const. art. II, § 2. And "the power of appointment to executive office carries with it, as a necessary incident, the power of removal." *Myers v. United States*, 272 U.S. 52, 126–27 (1926). That's why the Supreme Court has "sustained [ ] restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010); *United States v. Perkins*, 116 U.S. 483, 485 (1886) ("[W]hen congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest."). Where "only one level of protected tenure separate[s] the President from an officer exercising executive power," there is no removal problem because "[i]t [i]s the President—or a subordinate he c[an] remove

26

at will—who decide[s] whether the officer's conduct merit[s] removal under the good-cause standard." *Free Enter. Fund*, 561 U.S. at 495. And that's exactly what we have here: ALJs may be removed by the Secretary of Labor—himself removable by the President at will—only for "good cause."[8] 5 U.S.C. § 7521(a).

It makes no difference that an ALJ may be removed "*by the agency in which the administrative law judge is employed* only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." *Id.* (emphasis added). The Board does not rove around the federal government in search of ALJs to fire. It is the "the agency in which the administrative law judge is employed" that decides to remove an ALJ for good cause; the Board is simply there to make sure that the agency properly invoked "good cause" for removal. *Id.*; Pl.'s Mot. at 30 (noting that "the ALJ herself was subject to removal only if the Agency initiated proceedings"). And it is nothing new that, after the "Head[] of [a] Department[]" decides to remove an inferior officer, his or her decision is independently examined. Just as the Attorney General's decision to fire an "inferior officer" for good cause was allowable even though it was subject to judicial review, so too is the Secretary's decision to fire an ALJ for good cause allowable even though it is subject to the Merit Systems Protection Board's review. *Morrison v. Olson*, 487 U.S. 654, 663–64, 686–93 (1988). If anything, the President has *more* control over removal where, as here, the reviewers of a subordinate's firing decision are *also* removable by the President, rather than Article III judges who cannot be removed by the President at all. *Compare Morrison*, 487 U.S. at 663–64 *with* 5 U.S.C. § 1202(d) (Merit Systems Protection Board members may be removed "by the

---

[8] Contrary to Plaintiff's contention, *Free Enterprise Fund* does not control here. Pl.'s Mot. at 30; *Free Enter. Fund*, 561 U.S. at 507 n.10 (noting that the Court's holding does not apply to ALJs); *Decker Coal*, 8 F.4th at 1132 ("*Free Enterprise Fund* did not address the issue [of Labor Department ALJs] and its limited holding does not reach § 7521."). In that case, the Supreme Court held unconstitutional a statutory scheme where certain inferior officers could be removed only for good cause by principal officers that were themselves removable by the President only for "inefficiency, neglect of duty, or malfeasance in office." *Free Enter. Fund*, 561 U.S. at 496 (citation omitted). Here, in contrast, the Secretary of Labor—who may fire ALJs for good cause—is "subject to the President's direct control." *Id.* at 495.

President only for inefficiency, neglect of duty, or malfeasance in office"). Because ALJs are removable by the Secretary of Labor for good cause, nothing about Merit Systems Protection Board review transforms this into an impermissible removal scheme.

This is especially true because "the ALJ here was performing a purely adjudicatory function." *Decker Coal*, 8 F.4th at 1133. Unlike other executive officials "who exercise policymaking and enforcement functions," a Labor Department ALJ does not set agency-wide rules and "cannot sua sponte initiate investigations or commence a [H-2A] case." *Id.* This is noteworthy in the removal context because "questions of presidential control and direction arise only for discretionary actions of executive branch officers," and "[e]xecutive branch adjudicators are not generally thought to have discretion in this sense, but rather like other judges to be applying the law to particular facts." Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1248 (2014); *Decker Coal*, 8 F.4th at 1133 ("ALJs perform only adjudicatory functions . . . that arguably would not be considered 'central to the functioning of the Executive Branch' for purposes of the Article II removal precedents." (quoting *Free Enter. Fund*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting))); *see also Wiener v. United States*, 357 U.S. 349, 356 (1958). Because the role of a Labor Department ALJ is "functionally comparable" to that of a judge[9] and "the process of agency adjudication is currently structured so as to assure that the [ALJ] exercises his independent judgment on the evidence before him," there is even less reason to be troubled by for-cause removal. *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 756 (2002) (citation omitted).

And, as the Ninth Circuit recently held in upholding the good-cause removal restriction on Labor Department ALJs, there is no removal-power problem when the Secretary

---

[9] For these reasons, it makes little sense to say that ALJs "exercise 'policymaking or administrative authority' insofar as they interpret and enforce the Agency's regulations during administrative proceedings, while also setting penalties for alleged violations." Pl.'s Mot. at 32. Labor Department ALJs are adjudicators, not policymakers, and they exercise no more "policymaking or administrative authority" by "interpret[ing] and enforc[ing] the Agency's regulations" than this Court does by interpreting and enforcing Congress's laws.

28

need not use ALJs *at all*.  Like adjudications under the Black Lung Benefits Act at issue in *Decker Coal*, "[n]o statute mandates that the [Labor Department] employ ALJs in adjudicating" H-2A assessments.  *Decker Coal*, 8 F.4th at 1133.  As discussed below, the Secretary of Labor has ultimate responsibility for "tak[ing] such actions, including imposing appropriate penalties . . . as may be necessary" under the H-2A program, and has "prescribe[d] regulations for the government of his department" and "the distribution and performance of its business" by allowing H-2A violators like Sun Valley to contest their violations through agency adjudication and appeals.  8 U.S.C. § 1188(g)(2); 5 U.S.C. § 301; Argument Section III., *infra*.  "[G]iven that the President (through his department head subject to at-will removal) chose to use ALJs, that choice required the President to accept" good-cause removal, "even if that means 'restraining *himself* in his dealings with subordinates.'"  *Decker Coal*, 8 F.4th at 1134 (quoting *Free Enter. Fund*, 561 U.S. at 497).  So there is no removal-power issue because "[t]he President has broad executive power to order the Secretary of Labor to change [the Labor Department]'s regulatory scheme and remove ALJs from the adjudicatory process."  *Id.*

The Supreme Court has long held that when "appointment of [ ] inferior officers" is committed "to the heads of departments, [Congress] may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal."  *Myers*, 272 U.S. at 161.  That is true here.  The good-cause removal restriction that protects Labor Department ALJs, especially given their adjudicatory role, causes no "interfere[nce] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II."  *Morrison*, 487 U.S. at 690.  Plaintiff's removal-power claim should therefore be dismissed.

III.    **The Department of Labor's adjudicatory system is authorized by the statute and Plaintiff is not entitled to a trial de novo.**

Sun Valley also claims that "[b]ecause Congress has not authorized adjudication of alleged H-2A violations by agency judges, Plaintiff is entitled to 'trial de novo by the reviewing

29

court'" under the APA. Compl. ¶ 139. This fundamentally misunderstands both the governing statutes and APA review. Everyone agrees that the "[t]he Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under" the H-2A program. 8 U.S.C. § 1188(g)(2); Compl. ¶ 136. In an odd twist, however, Plaintiff effectively complains that it received *more* process than required by this provision.

By the plain terms of the statute, the Secretary could have received the Administrator's report about Sun Valley's H-2A violations and simply decided that he would "take such actions" and "impos[e]" the "appropriate penalties" of ordering $369,703.22 in back wages and $212,250.00 in penalties. 8 U.S.C. § 1188(g)(2); AR 1 (letter from Wage and Hour Division). But instead, the Secretary has "prescribe[d] regulations for the government of his department" and "the distribution and performance of its business" by allowing H-2A violators like Sun Valley to challenge these assessments through an adjudicatory process where ALJs can consider testimony and evidence. 5 U.S.C. § 301; Argument Section II.A., *supra*. And if violators are dissatisfied with the ALJ's decision, they may appeal to the Review Board. 29 C.F.R. § 501.42(a). After that, the Secretary may still adjust the assessment if he chooses to do so. 85 Fed. Reg. at 13187 § 6(a). This process actually *reduced* Sun Valley's assessment by over 25 thousand dollars. AR 4508 (Review Board assessing $344,945.83 in back wages and $211,800 in civil monetary penalties). Yet Plaintiff argues that the Secretary must essentially jettison thorough proceedings, abandon ALJ expertise, and "impos[e] appropriate penalties" by himself, foregoing any opportunity for H-2A violators to plead their case before the agency. 8 U.S.C. § 1188(g)(2). Nothing in the statute requires that harsh result.

Nor is the Secretary required to recover any assessed penalties in court. Pl.'s Mot. at 26; Compl. ¶ 137. Plaintiff argues that "because Congress has not expressly provided for agency adjudication of H-2A penalties, those penalties must be assessed in a civil action" under 28 U.S.C. § 2461(a). Compl. ¶ 137. But this statute specifies only that "[w]henever a

civil fine, penalty or pecuniary forfeiture is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it *may* be recovered in a civil action." 28 U.S.C. § 2461(a) (emphasis added). And "'may' is a permissive not a mandatory term." *Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1282 (D.C. Cir. 1973); *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 266 (3d Cir. 2017).

As one court put it, "[t]he clearest case of 'discretion' is when an agency doesn't have to act—for instance, if a statute says 'may' rather than 'must' or 'shall.'" *Nat'l Wildlife Fed'n v. Sec'y of the U.S. Dep't of Transp.*, 960 F.3d 872, 876 (6th Cir. 2020); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 371 (2018); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016). This is especially true where, as here, the same statutory section uses the distinct words "may" and "shall." *Compare* 28 U.S.C. § 2461(a) *with id.* § 2461(b) ("a proceeding by libel [ ] *shall* conform as near as may be to proceedings in admiralty" (emphasis added)) *and id.* § 2461(c) ("the court *shall* order the forfeiture of the property" (emphasis added)). "When a statute uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 607 (D.C. Cir. 2017) (citation omitted); *Weinstein v. Albright*, 261 F.3d 127, 137 (2d Cir. 2001); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947); *see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012) ("The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive."). So "may" in § 2461 means "may," not "must," and the agency is *allowed* to bring a civil action for fines and penalties but is not *required* to do so. After all, "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *United States v. Jackson*, 964 F.3d 197, 201 (3d Cir. 2020) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

The statute's plain text makes sense in light of its legislative history. "Numerous sections in the United States Code prescribe civil fines, penalties, and pecuniary forfeitures for

31

violation of certain sections without specifying the mode of recovery or enforcement thereof." 28 U.S.C. § 2461, Historical and Revision Notes, *available* here.  So before § 2461 was enacted in 1948, the Supreme Court had to determine, statute by statute, whether particular enforcement regimes allowed for civil actions to recover fines and penalties.  *See, e.g.*, *U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 541 (1943); *Hepner v. United States*, 213 U.S. 103, 109 (1909).  "Subsection (a)" of § 2461—which says that fines and penalties "may be recovered in a civil action"—was therefore "drafted to clarify a serious ambiguity in existing law and is based upon rulings of the Supreme Court."  28 U.S.C. § 2461, Historical and Revision Notes.  In other words, Congress meant only to clarify that civil actions are *allowed* if other statutes are ambiguous, not to *mandate* that agencies must recover fines and penalties *only* in civil actions. Congress knows how to say exactly that when it wants to.  *See, e.g.*, 28 U.S.C. § 3001(a) (setting forth "the exclusive civil procedures for the United States--(1) to recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim").  So Plaintiff is simply wrong to argue that the Secretary cannot "impos[e] appropriate penalties" after agency adjudication, 8 U.S.C.§ 1188(g)(2), and that he can only assess fines and penalties through a civil lawsuit, 28 U.S.C. § 2461(a).

Sun Valley is equally wrong in claiming that it is entitled to a "trial de novo" under the APA.  Compl. ¶ 139 (citing 5 U.S.C. § 706(2)(F)).  Plaintiff seems to reason that "[t]he APA provides for 'substantial evidence' review of agency decisions only if those decisions were made at 'an agency hearing provided by statute.'"  *Id.* ¶ 138 (citing 5 U.S.C. § 706(2)(E)). And because the Labor Department's H-2A adjudications are not provided by statute, "the APA provides for 'trial de novo by the reviewing court.'"  *Id.* (citing § 706(2)(F)).  But while it is true that the substantial-evidence standard "applies only to formal adjudications," *McKinney v. Wormuth*, 5 F.4th 42, 46 (D.C. Cir. 2021), Plaintiff's argument is a non sequitur.

There are more categories for judicial review than just substantial-evidence review of formal adjudication or a "trial de novo."  *See* 5 U.S.C. § 706(2).  It is common for agencies to undertake *informal* adjudications that are not mandated by statute.  *Neustar, Inc. v. FCC*, 857

F.3d 886, 893 (D.C. Cir. 2017) ("[A]gencies may use informal adjudications when they are not statutorily required to engage in the notice and comment process or to hold proceedings on the record." (citation omitted)).  And informal adjudications—like the vast majority of other administrative decisions—must simply "comply with the familiar APA standard banning arbitrary and capricious actions."[10]  *Id.* at 893 (citing 5 U.S.C. § 706(2)(A)).  That's exactly what the Supreme Court held 50 years ago.  *Camp v. Pitts*, 411 U.S. 138, 141–42 (1973).  And that's exactly what we have here: as explained above, the Secretary is not required to conduct on-the-record-hearings for H-2A assessments, but he has chosen to do so through adjudications with agency ALJs.

Importantly, judicial review of informal adjudications is based on "the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142.  So Plaintiff's request for a "trial de novo" is inappropriate.  *See* Compl. ¶¶ 138–42.  A "trial de novo" is limited to two extremely rare situations: "(1) when the action is adjudicatory in nature and the agency factfinding procedures are inadequate, and (2) when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action."  *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 189 (3d Cir. 2006) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)); *Deron Sch. of N.J., Inc. v. U.S. Dep't of Agric.*, 2012 WL 13187163, at *3 (D.N.J. July 16, 2012).  Unsurprisingly, Plaintiff does not and cannot allege that the Labor Department's H-2A assessment falls into either of these categories.  *See* Compl. ¶¶ 136–42.  Even if the agency's H-2A assessment was "adjudicatory in nature," it had extensive factfinding procedures that mirror those in

---

[10] The APA also provides for substantial-evidence review "in a case subject to sections 556 and 557 of this title," 5. U.S.C. § 706(2)(E), and the Labor Department's regulations arguably subject H-2A adjudications to 5 U.S.C. § 556, *see* 29 C.F.R. § 501.34(b); 29 C.F.R. § 18.101.  So the substantial-evidence standard may apply to H-2A adjudications in any event.  But this distinction makes little difference here because arbitrary-and-capricious review is functionally the same as substantial-evidence review "when performing the function of assuring factual support."  *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022); *Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv.*, 998 F.3d 999, 1005 (D.C. Cir. 2021).

federal courts.  *See* Argument Section II.A., *supra*.  This goes far beyond "adequate" factfinding procedures.  *See Gonzalez Boisson v. Pompeo*, 2020 WL 4346913, at \*2 (D.D.C. July 29, 2020) ("[I]n the only case the Court can locate concluding that § 706(2)(F) is applicable, the relevant factfinding procedures were tainted by 'biased' investigators.").  And, of course, this is not a situation where "issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *NVE*, 436 F.3d at 189.  So Plaintiff is not entitled to a "trial de novo" and its claim should be dismissed.  Compl. ¶¶ 136–42.

## IV.     The Department of Labor's imposition of back pay and penalties is fully supported by the record and is neither arbitrary nor capricious.

On the merits, the Labor Department's assessment of back wages and penalties was not arbitrary or capricious.  "Judicial review under that [arbitrary-and-capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  "A court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision." *Id.*  The ALJ's and Review Board's decisions here, spanning 76 pages, more than meet this standard.  AR 4300–54 (ALJ decision); AR 4488–4508 (Review Board decision). The agency "reasonably considered" every aspect of Sun Valley's H-2A violations and "reasonably explained" its imposition of back wages and penalties, rejecting many of the same arguments Sun Valley raises again here.  So the agency's determination should be upheld and summary judgment entered for Defendants.

### A.     The Labor Department properly awarded back wages and penalties for Sun Valley's meal-plan and beverage violations.

Plaintiff contests only two narrow aspects of the agency's adjudication related to Sun Valley's meal-plan and beverage violations: (1) back wages were allegedly improper because "the Agency failed to introduce any evidence to establish *any* harm from these violations," and (2) penalties were allegedly improper because "the ALJ and [Review Board] did not justify the penalty under the Agency's regulation and instead simply deferred to the decision of

34

the Agency's enforcement personel." Pl.'s Mot. at 33–34.  Neither of these arguments render the agency's decision arbitrary or capricious.

As to back wages, an employer's job orders must list any deduction not required by law.  20 C.F.R. 655.122(p)(1), (2); 29 C.F.R. § 531.31.  Here, not only did Sun Valley deduct meal-plan charges from workers' pay without prior disclosure in the job order, AR 4499–4500, but Sun Valley also deducted payment for beverages, which it sold to H-2A workers at a profit and (as to beer) in violation of state law, AR 4503–04.  With respect to meal plans, "the undisclosed deductions" reduced "the workers' wages below the required wages (*i.e.* the wages specified in the job orders)."  AR 4501.  So "the back pay award for all meal plan deductions allows the workers to receive the wages that they were contractually promised."  AR 4501–02.  In rejecting the same argument that Sun Valley advances here, the agency explained that Sun Valley's meal-plan "deductions were unlawful because they were not disclosed, not because they provided a profit."  AR 4501.  When Sun Valley "provided a meal plan to its workers, rather than kitchen access, [it] changed a material term of the job order."  AR 4339.  And a material change to the terms of the job order "necessarily provides 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself" because the Labor Department "depends on this information to ensure that the employment of the H-2A workers will not adversely affect the wages and working conditions of' domestic workers."  *Id.*; AR 4502.

The same is true of back wages for Sun Valley's beverage-related violations.  *See* Pl.'s Mot. at 35.  Nothing in the regulations requires an employer to provide beverages to its employees.  But if an employer does so, it is prohibited from profiting from the sales (and from violating state law).  20 C.F.R. § 655.122(p)(2); AR 4503.  And where, as here, the employer runs afoul of these requirements, "the employer is liable for the amount charged that reduced the employee's wages below the amount promised in the job orders."  AR 4503.  The H-2A regulation prevents the employer from profiting off its own workforce, so it does not matter

35

what the employer charged as compared to an independent vendor.  Pl.'s Mot. at 35.  The key is whether the H-2A employer profited, which Sun Valley did.  AR 4503; AR 4339–42.[11]

As to the penalties for meal-plan and beverage violations, Plaintiff complains that Judge Timlin deferred "to the decision of the enforcement personnel, insofar as the Agency's enforcement personnel had 'rationally considered' the factors" set forth by regulation.  Pl.'s Mot. at 33 (citing 29 C.F.R. § 501.19(b)).  But the cited regulation directs "the *WHD Administrator*," not the ALJ, to "consider the type of violation committed and other relevant factors."  29 C.F.R. § 501.19(b).  And there is no requirement that the ALJ conduct a de novo review of the Administrator's determination.  Rather, the ALJ may "affirm, deny, reverse, or modify, in whole or in part, the determination of the WHD Administrator[,]" as long as she states "[t]he reason or reasons for such order."  29 C.F.R. § 501.41(b).  The ALJ did so here.

After considering all the facts and appropriately applying the regulatory factors, the Administrator assessed one penalty for Sun Valley's combined meal- and drink-related violations, in the amount of $1,350, for each of Sun Valley's 147 workers.  Judge Timlin specifically considered the Administrator's penalty assessment, including each of the factors, and concluded that the Administrator applied each factor appropriately.  AR 4341–42.  For example, Judge Timlin explained that, although it was within the Administrator's discretion to assess separate penalties for each of the meal- and drink-related violations, the Administrator reasonably decided to assess just one penalty of $1,350 for the combined violations.  AR 4341.  And she concluded the Administrator "reasonably assessed the $1,350 penalty for each of the 147 effected workers[,]" noting that "the Administrator assessed the penalty in this way due to the seriousness of the violation and the 'large amount of workers affected.'"  AR 4341–42.  Sun Valley even received a "ten percent reduction in the [penalties], due to the fact that [it]

---

[11] Sun Valley also argues that the award of back wages for all the unlawful deductions is improper because it "constitutes a windfall" rather than "make-whole compensation."  Pl.'s Mot. at 35 (citation omitted).  But the back pay award here is, in fact, "make-whole compensation," returning the amount of the illegal deductions necessary to raise the 147 workers' wages to the required minimum they were due.

36

had no prior history with the H-2A program." AR 4342. So, as the Review Board correctly concluded, the ALJ properly affirmed the Administrator's assessment of penalties for Sun Valley's meal- and beverage-related violations, which could "deter other H-2A employers from making the same failures to disclose in a potentially exploitative way." AR 4500–02.

For all of these back wages and penalties, the agency "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158. The APA requires nothing more, even though the Labor Department's thorough rulings would satisfy a higher standard of review.

### B.    The Labor Department reasonably found that Sun Valley improperly terminated nineteen workers in May 2015.

The H-2A regulations require employers to offer each worker "employment for a total number of work hours equal to at least three-fourths of the workdays" that are "specified in the work contract." 20 C.F.R. 655.122(i)(1). An employer is relieved of this obligation only when a worker abandons employment or is terminated for cause. *Id.* § 655.122(n). Given that Sun Valley did not offer certain workers the total number of work hours equal to three-fourths of the workdays specified in the job order, the dispute here was whether those workers were impermissibly fired or permissibly quit. Pl.'s Mot. at 36.

The ALJ correctly found—and the Review Board affirmed—that Sun Valley improperly fired nineteen of its workers after a May 2015 altercation. AR 4313–14, 4342–43, 4505. In reaching that conclusion, Judge Timlin recounted the testimony of various employees who explained that Russell Marino "became upset and became verbally and, perhaps even, physically abusive." AR 4343. This culminated in Marino, "[i]n his anger," terminating "the nineteen workers." *Id.* Then, in an attempt to circumvent the three-fourths guarantee, Plaintiff required the workers to sign departure forms that "did not allow the [workers] to state the true reasons they left." AR 4348. Although Plaintiff argues that "it would have made no sense for [Sun Valley] to fire the workers given that they needed them to pick the crops in the field," Pl.'s Mot. at 36, that same argument was raised before the agency. And in rejecting

this argument, Judge Timlin assessed the witnesses' credibility and found that "the employee witnesses were consistent in describing the heated events at the meeting while Joseph Marino was unable to remember specifically what was said." AR 4343; *id.* ("Joseph Marino's testimony, compared to the employees, lacks credibility."). In the end, based on the evidence before her, Judge Timlin found that "[m]anagement made a decision, albeit a rash, and perhaps illogical, decision, to terminate this group of workers," thus violating H-2A regulations. *Id.* And on appeal, the Review Board examined Judge Timlin's cited evidence, properly deferred to her credibility determinations, and ultimately affirmed her ruling. AR 4505–06.

Sun Valley's arguments boil down to a simple disagreement with Judge Timlin's credibility assessments and the Review Board's corresponding affirmance. Pl.'s Mot. at 37. But "[w]eight is given the [ALJ]'s determinations of credibility for the obvious reason that he or she sees the witnesses and hears them testify," *Penasquitos Vill., Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977), and therefore this Court "defers to the ALJ's assessment of credibility." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). Given the testimony before Judge Timlin and her (and the Review Board's) thorough explanation, the agency did more than enough to survive APA review by "establish[ing] a rational connection between the facts found and the decision made." *Shane Meat Co. v. U.S. Dep't of Def.*, 800 F.2d 334, 336 (3d Cir. 1986).

### C.     The Labor Department is fully authorized to assess back wages.

As a Hail Mary, Plaintiff argues that the agency's "entire award of back pay (for all the various violations) must be vacated because the statute does not authorize back pay." Pl.'s Mot. at 38–39. This again fundamentally misconstrues the Secretary's authority.

As discussed above, the Secretary of Labor may "take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under" the H-2A program. 8 U.S.C. § 1188(g)(2). True, the

38

Secretary's authority "includ[es]" the power to impose "appropriate penalties," seek "appropriate injunctive relief," and pursue "specific performance of contractual obligations."[12]  Pl.'s Mot. at 38.  But the text is hardly so limited.  "Anyone fluent in English knows that the word 'includes' cannot be assumed to mean 'includes only.'"  *Wnuck v. Comm'r*, 136 T.C. 498, 506 (T.C. 2011); *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020) (collecting cases); Include, Black's Law Dictionary (11th ed. 2019) ("The participle including typically indicates a partial list.").  Congress left the Secretary's authority open ended, specifically allowing him to "take such actions" as necessary "to assure employer compliance with" the H-2A program.  8 U.S.C. 1188(g)(2).  Nothing in this statutory provision forecloses retrospective relief.  *Contra* Pl.'s Mot. at 38.  And, of course, nothing in the statute forecloses an award of back wages, which the Labor Department has been awarding for decades.  *See, e.g.*, 29 C.F.R. 501.16(a).  Plaintiff's last-ditch attempt to sidestep back wages should be rejected.

## V.    The Labor Department did not violate the Excessive Fines Clause.

Finally, Plaintiff's excessive-fines claim fails.  Compl. ¶¶ 129–34; Pl.'s Mot. at 39–40.  Because the agency's award of penalties was reasonable and easily survives APA review, it necessarily does not violate the Excessive Fines Clause of the Eighth Amendment.  *See Pharaon v. Bd. of Governors of Fed. Rsrv. Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998).  In any event, Sun Valley bears the burden of establishing that the Labor Department's award is "grossly disproportionate" to the gravity of the offense.  *United States v. Bajakajian*, 524 U.S. 321, 336 (1998); *United States v. Cheeseman*, 600 F.3d 270, 283 (3d Cir. 2010).  It cannot bear that burden here.

While Sun Valley's H-2A meal- and drink-related violations were not catastrophic, they were far from harmless, "necessarily provid[ing] 'harm' to both the workers' reliance on the H-2A program to ensure that their rights are protected, as well as the overall integrity of the program itself."  AR 4339; AR 4502; *see* Argument Section IV.A., *supra*.  As explained

---

[12] The back wage award here orders "specific performance of [Sun Valley's] contractual obligations" insofar as Sun Valley must pay the difference between the contractual wages their workers were promised and the actual wage they were paid.  8 U.S.C. § 1188(g)(2).

above, the agency reasonably imposed one penalty of $1,350 per worker for Sun Valley's combined violations, even though the agency *could have* imposed separate penalties for each of the meal- and drink-related violations.[13] AR 4341. Plaintiff even received a "ten percent *reduction* in the [penalties], due to the fact that [it] had no prior history with the H-2A program." AR 4342 (emphasis added). These penalties can hardly be considered "grossly disproportionate" in violation of the Eighth Amendment when Plaintiff incurred far below the "the legally permissible fine." *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 420–21 (3d Cir. 2000); *Cheeseman*, 600 F.3d at 283. And as Plaintiff readily acknowledges, there is nothing out of the ordinary about Sun Valley's $198,450 in penalties: "from 2005 through August 2021, DOL has imposed three civil monetary penalties over $1 million; 52 penalties between $100,000 and $1 million; 482 penalties between $10,000 and $100,000; and 1,850 penalties under $10,000 for alleged violations of the H-2A program." Compl. ¶ 30; Pl.'s Mot. at 40 (challenging "$198,450 in monetary penalties"); *cf. Cheeseman*, 600 F.3d 270, 284 (noting that the Third Circuit has looked to "sentences imposed for commission of the same crime"). Sun Valley's excessive-fines claim should be dismissed, or judgment entered for Defendants.

## CONCLUSION

For the reasons explained above, Plaintiff's partial-summary-judgment motion should be denied. Its claims should be dismissed and judgment should be entered for Defendants.

---

[13] Plaintiff is incorrect that back wages should be considered in the excessive-fines analysis. Pl.'s Mot. at 39. As Sun Valley itself admits, "back pay is not a penalty—it is traditionally understood either as damages or restitution." Pl.'s Mot. at 38. Even if the Court considered back wages, however, it would not impact the analysis because the agency's back-pay award was reasonable and directly linked to the amount Sun Valley reduced its workers' pay below the minimum required wage. *See* Argument Section IV.A., *supra*

DATED:  April 13, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

/s/ *Stephen Ehrlich*
STEPHEN EHRLICH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

*Attorneys for Defendants*