## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SUN VALLEY ORCHARDS, LLC,

       *Plaintiff*,

   v.

U.S. DEPARTMENT OF LABOR,
and MARTIN J. WALSH, in his
official capacity as United States
Secretary of Labor,

       *Defendants*.

Case No. 1:21-CV-16625-JHR-MJS

## PLAINTIFF'S COMBINED
## REPLY IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND CROSS-MOTION FOR
## SUMMARY JUDGMENT

Scott M. Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ 08865
Tel: (908) 454-3200 Fax: (908) 454-3322
Email: wilhelms@wwgrlaw.com

*-and-*

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chargin Blvd., #256
Shaker Heights, OH 44120
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rjohnson@ij.org

Robert M. Belden*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rbelden@ij.org

*Admitted *pro hac vice*
*Attorneys for Plaintiff Sun Valley Orchards, LLC*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 4

  I.  DOL's Adjudication In This Case Violated Article III. ........................................ 4

    A.  Under A Proper Historical Analysis, This Case Involves "Private Rights." ........................................................................................... 5

    B.  The Court Should Reject DOL's Limitless And Circular Theory Of Its Own Authority To Adjudicate Enforcement Proceedings. ...................... 8

  II.  Congress Has Not Authorized DOL's Adjudication Of Claims To Impose Monetary Penalties In The H-2A Context. .............................................. 16

    A.  DOL Does Not Cite Any Statutory Authorization For Its Adjudication Of This Type Of Case. ............................................................ 17

    B.  DOL Cannot Adjudicate This Case In The Absence Of Congressional Authorization ...................................................................... 18

  III.  The ALJ Who Adjudicated Sun Valley's Case Was Neither Appointed Nor Subject To Removal As Required By The Constitution. ............................... 19

    A.  The ALJ Was Not Constitutionally Appointed........................................... 20

    B.  The ALJ Enjoyed Impermissible Protections Against Removal. ................ 22

    C.  Sun Valley Was Not Required To Exhaust Its Article II Claims. ............... 25

  IV.  DOL's Award Fails Even The APA's Deferential Review, And DOL's Counterarguments Bolster Sun Valley's Article III Claims............................... 26

    A.  DOL Improperly Assessed More Than $400,000 In Monetary Penalties And Back Pay For The Meal-Plan And Beverages Issues........................... 26

    B.  The Back Pay Awarded For The Early Departure Of 19 Workers Was Not Supported By Substantial Evidence.................................................... 28

    C.  Congress Did Not Authorize DOL To Award Back Pay. ........................... 29

  V.  The Award Violates The Eighth Amendment's Excessive Fines Clause. ........... 29

CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Advanced Disposal Servs. E., Inc. v. NLRB,*
  820 F.3d 592 (3d Cir. 2016)................................................................................ 22

*AMG Capital Mgmt., LLC v. FTC*
  141 S. Ct. 1341 (2021)........................................................................................ 29

*Arlington v. FCC,*
  569 U.S. 290 (2013).................................................................................... 22, 23

*Atlas Roofing Co. v. OSHRC,*
  430 U.S. 442 (1977)..................................................................... 6, 13, 14, 18

*Bureau of Consumer Fin. Prot. v. Fair Collections & Outsourcing, Inc.,*
  2020 WL 7043847 (D. Md. Nov. 30, 2020) ................................................. 22

*Carr v. Saul,*
  141 S. Ct. 1352 (2021)................................................................................ 25, 26

*CFPB v. Gordon,*
  819 F.3d 1179 (9th Cir. 2016) ......................................................................... 22

*CFTC v. Schor,*
  478 U.S. 833 (1986)..................................................................................... 13, 15

*Chauffeurs v. Terry,*
  494 U.S. 558 (1990)................................................................................... 6, 7, 12

*Cirko v. Comm'r of Soc. Sec.,*
  948 F.3d 148 (3d Cir. 2020).............................................................................. 25

*City of Ann Arbor v. DOL,*
  733 F.2d 429 (6th Cir. 1984)............................................................................ 28

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021)....................................................................................... 24

*Dareth T. v. Kijakazi,*
  2022 WL 671540 (C.D. Cal. Mar. 7, 2022). ................................................ 21

*Decker Coal Co. v. Pehringer,*
  8 F.4th 1123 (9th Cir. 2021) ...................................................................... 20, 21

*Enron Power Mktg., Inc. v. Luzenac Am., Inc.*,
   2006 WL 2548453 (S.D.N.Y. Aug. 31, 2006) ........................................................ 6

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) ........................................................................................... 22

*Granfinanciera, S.A. v. Nordberg*,
   492 U.S. 33 (1989) .................................................................................... 6, 12, 15

*In re Trib. Media Co.*,
   902 F.3d 384 (3d Cir. 2018) ................................................................................ 15

*Lloyd Sabaudo Societa v. Eltin*,
   287 U.S. 329 (1929) ..................................................................................... 14, 27

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ..................................................................... 2, 16, 20, 21, 22, 24

*Marrs v. Comm'r of Soc. Sec.*,
   2021 WL 4552254 (N.D. Tex. Oct. 5, 2021) ........................................................ 20

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) ........................................................................................ 29

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. 272 (1856) ................................................................................................ 5

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) ........................................................................................... 5, 16

*New York v. United Parcel Serv., Inc.*,
   942 F.3d 554 (2d Cir. 2019) ................................................................................ 30

*NVE, Inc. v. Dep't of Health & Hum. Servs.*,
   436 F.3d 182 (3d Cir. 2006) ................................................................................ 19

*Oceanic Steam Nav. Co. v. Stranahan*,
   214 U.S. 320 (1909) ............................................................................................ 14

*Oil States Energy Services, LLC v. Greene's Energy Group*, LLC,
   138 S. Ct. 1365 (2018) ........................................................................ 4, 7, 9, 10, 11

*Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*,
   No. 21-cv-634-FLW, 2021 WL 5150464 (D.N.J. Nov. 5, 2021) ............................ 13

*Seila L. LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ........................................................................... 22, 23

*Stern v. Marshall*,
    564 U.S. 462 (2011) ........................................................................... 5 14, 15

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ....................................................................... 10, 13, 18

*Tull v. United States*,
    481 U.S. 412 (1987) ............................................................................. *passim*

*United States v. 3814 NW Thurman St., Portland, Or., A Tract of Real Prop.*,
    164 F.3d 1191 (9th Cir.),
    *amended* 172 F.3d 689 (9th Cir. 1999) ........................................................ 30

*United States v. Arthrex, Inc.*,
    141 S. Ct. 1970 (2021) ................................................................................ 23

*United States v. Bajakajian*,
    524 U.S. 321 (1998) .................................................................................... 30

*United States v. Fifty Nine Thousand Dollars ($59,000.00), in U.S. Currency*,
    282 F. App'x 785, 2008 WL 2485594 (11th Cir. 2008) .............................. 30

*United States ex rel. Smith v. Gilbert Realty Co.*,
    840 F. Supp. 71 (E.D. Mich. 1993) ............................................................ 30

*Wellness Int'l Network, Ltd v. Sharif*,
    575 U.S. 665 (2015) .................................................................................... 15

*Wilkes-Barre Hosp. Co., LLC. v. NLRB*,
    857 F.3d 364 (D.C. Cir. 2017) .................................................................... 22

**Statutes**

28 U.S.C. § 3001 ............................................................................................. 15

28 U.S.C. § 3102-3105 .................................................................................... 15

28 U.S.C. § 2461(a) ........................................................................................ 17

5 U.S.C. § 706(2)(C) ....................................................................................... 19

5 U.S.C. § 706(E) ...................................................................................... 19, 28

5 U.S.C. § 1204(a)(1) ............................................................................... 23

5 U.S.C. § 1204(a)(2) ............................................................................... 23

5 U.S.C. § 7521(a) ................................................................................... 23

5 U.S.C. § 7521(b) ................................................................................... 23

5 U.S.C. § 706(F) ................................................................................... 19

8 U.S.C. § 1188(g)(2) .......................................................................... 17, 29

## Regulations

20 C.F.R. § 655.103(b) .............................................................................. 13

29 C.F.R. § 18.12(b) ............................................................................... 21

29 C.F.R. §18.101 .................................................................................... 21

29 C.F.R. § 501.19(b) ............................................................................... 27

## Other Authorities

Federalist No. 78 .................................................................................... 11

William Baude, *Adjudication Outside Article III*,
    133 Harv. L. Rev. 1511 (2020) ............................................................ 7

David J. Bier, Cato Institute, Immigration Research and Policy Brief
    No. 17, *H-2A Visas for Agriculture: The Complex Process for Farmers
    to Hire Agricultural Guest Workers* (Mar. 10, 2020) .............................16

Harvey J. Goldschmid, *An Evaluation of the Present and Potential Use
    of Civil Money Penalties as a Sanction By Federal Administrative
    Agencies*, in 2 Recommendations and Reports of the Administrative
    Conference of the United States (1972) ............................................18

**INTRODUCTION**

Defendants (collectively, "DOL" or the "Agency") contend that the Constitution places no effective limit on their ability to impose over one-half million dollars in monetary liability through a trial held before an agency judge—where employees of the same executive agency serve the role of prosecutor, judge, and jury. In DOL's view, *any* "matter between the government and a private actor" can be adjudicated by an agency judge. D.E. 22-1 ("Opp.") at 12. If DOL's view is accepted, the federal government could decide to adjudicate any and all proceedings to impose monetary penalties in agency courts.

In contrast to DOL's sweeping assertion of authority, Sun Valley's opening brief offered a modest theory of Article III that is rooted in both history and precedent. The vast majority of federal ALJs' work involves "public rights," such as the grant or denial of a benefit, and thus is not implicated by Sun Valley's claims. If DOL had sought to exclude Sun Valley from the H-2A program, for instance, Sun Valley would not dispute that an agency judge could adjudicate that proceeding. However, adjudication of matters that were historically the province of the common law courts involves "private rights," which, in the federal system, must be adjudicated in Article III courts—where Seventh Amendment jury rights also attach. That "private rights" doctrine encompasses claims seeking to impose monetary liability on a breach-of-contract theory—like the claims at issue here—and it also applies to proceedings by the government to impose monetary penalties, which the Supreme Court has already held were historically the province of common law courts. *See Tull v. United States*, 481 U.S. 412 (1987). While Sun Valley's opening brief cited and discussed *Tull* at length, DOL ignores *Tull* in its response.

DOL's sweeping assertion of authority, moreover, is particularly concerning given that DOL cites *no* statutory provision that expressly authorizes it to adjudicate these claims. Sun

Valley's opening brief explained that Congress has not expressly authorized DOL to adjudicate this type of case, and DOL's response notably does not cite a single statutory provision conferring such authority. Instead, DOL asserts an "open ended" (Opp. 39) right to *unilaterally* remove cases from the Article III courts. This lack of express statutory authorization heightens the Article III violation, and it also provides an additional basis for review under the APA.

At the same time, precisely because these adjudicative proceedings are impossible to reconcile with the Constitution's basic structure, the proceedings here *also* violated structural provisions that apply to the executive branch. DOL concedes that its ALJ was improperly appointed, and its assertion that the proceeding need not be vacated as a result is inconsistent with *Lucia v. SEC*, 138 S. Ct. 2044 (2018). Similarly, DOL cannot seriously dispute that its ALJ was improperly shielded by two layers of "for cause" removal. Adjudication of this dispute in the executive branch violated both Article II and Article III.

Finally, DOL's response to the other issues raised in the opening brief confirms the need for a hearing before a neutral adjudicator. DOL argues that the ALJ's decision is subject only to extremely deferential review under the APA, Opp. 34, and DOL meanwhile presents a highly fact-dependent response to Sun Valley's claim that the penalties imposed here are excessive under the Eighth Amendment, *id.* at 39-40. In discussing the Eighth Amendment issue, DOL concedes that "Sun Valley's H-2A meal- and drink-related violations were not catastrophic," *id.* at 39, but the amount of liability imposed here *is* catastrophic for Sun Valley. Sun Valley should be entitled to an independent judicial hearing before such liability is imposed.

## BACKGROUND

Sun Valley set out the facts in detail in its opening brief. *See* D.E. 19-1 ("Br.") at 2-10. Here, Sun Valley offers a more limited response to several of DOL's factual assertions.

2

First, DOL's assertion that "[c]onditions at Sun Valley were deplorable," Opp. 5, is untrue and not relevant to the real issues in this case. For instance, DOL asserts that "potable drinking water [was] not regularly available," *id.* at 6, even though DOL's inspector found that potable water was available during his inspection, A.R. 4318. While some of the workers early in the season complained that the free water available in the fields had a bad taste (leading them to purchase bottled beverages), the ALJ found that Sun Valley "replaced the filter and fixed the problem," A.R. 4317, and DOL did not impose any fine based on any complaint about the water. *See* A.R. 4503.[1] Other claims regarding living and working conditions—such as a bus's broken taillight or uncovered garbage cans—were the basis for $10,650 in penalties, or less than 2% of the total Award. *See* A.R. 4349-52. The *actual* Award is based mostly on Sun Valley's meal plan and beverage sales, which DOL is forced to concede "were not catastrophic." Opp. 39.

Second, DOL's assertion that the 19 workers who left the farm did so because of "concerns about their living conditions" is incorrect. D.E. 4 at 6. The workers testified at the hearing that they were unhappy because picking asparagus was hard work; they "needed more time to learn how to harvest asparagus" and their supervisor "would want us to work faster." A.R. 1866, 1872. Nothing in the record suggests that the departure of these workers resulted from the issues that DOL focuses on, like the cleanliness of the bathrooms.[2]

Ultimately, the parties' contrasting factual narratives highlight the importance of the constitutional issues in this case. Sun Valley categorically disagrees with the grim picture of life on the farm that DOL paints in its brief, but the Court should not be forced to consider that

---

[1] Workers also testified that the water (which was brought out to the fields in coolers) would sometimes run out and have to be refilled, *see* A.R. 4318, but DOL has never suggested there is any requirement to have a running tap out in the fields.

[2] Moreover, DOL makes much of the workers providing false reasons for their departure on the departure forms, but that fact accounted for just $1,350 in penalties. A.R. 4348-49.

dispute on a cold administrative record. Rather, that disagreement should have been resolved in the first instance in an Article III court, by a Seventh Amendment jury.

## ARGUMENT

### I.  DOL's Adjudication In This Case Violated Article III.

DOL states that the agency hearing here was "the equivalent of a bench trial where the parties present evidence and testimony to the ALJ, after which the ALJ must issue a written decision and order." Opp. 5 (marks and citation omitted). DOL asserts that the result of this trial is subject only to "deferential" review under the APA and must be upheld so long as the Agency "reasonably considered the relevant issues and reasonably explained the decision." *Id.* at 34 (marks and citation omitted).[3] The fundamental question posed by this case is whether it is permissible for a federal administrative agency to impose over half a million dollars in monetary liability through that type of agency proceeding, rather than through a trial in an Article III court with a Seventh Amendment jury.

The parties' briefs in this case offer two starkly different frameworks to resolve that question. Sun Valley's opening brief rooted its analysis in history, explaining that this case falls within the core of Article III because it involves issues (both breach-of-contract claims and the imposition of monetary penalties) that would have been resolved by the courts at common law. *See* Br. 11-27. Sun Valley's approach is supported by Supreme Court case law—including the most recent opinion in this area, *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365 (2018)—which looks to history to guide the Article III analysis. DOL's brief, meanwhile, does not dispute the details of that historical analysis, and instead offers a

---

[3] *See also* Opp. 20 (ALJ's powers and proceedings "resemble federal civil litigation in every meaningful way"); *see id.* (ALJs conduct "formal adversarial adjudications"); *id.* 38 (calling for deferential review of the "ALJ's assessment of credibility determinations" (citations omitted)).

sweeping theory, based on a misreading of cobbled-together Supreme Court cases, under which Article III imposes no effective limit on agency adjudication. *See* Opp. 8-18. In DOL's view, regardless of the magnitude or importance of the individual rights at stake, when a dispute is related to federal agency action, the dispute necessarily involves a "public right" and, therefore, can be adjudicated by the agency outside Article III courts. As explained below, DOL's sweeping assertion of authority should be rejected.

A.      Under A Proper Historical Analysis, This Case Involves "Private Rights."

This case involves Sun Valley's "private rights" under the proper historical framework that was set out and applied in Sun Valley's opening brief. Although the Supreme Court has not exhaustively defined the category, the Court has made clear that cases involving "private rights" at a minimum encompass (1) "any matter which, from its nature, is the subject of a suit at the common law"[4] as well as (2) government action that historically would *not* have been *exclusively* undertaken by the executive branch and that instead is "inherently . . . judicial." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982). In other words, the "private rights" category encompasses claims and remedies that historically would have been the province of the common law courts.

DOL cannot seriously dispute that this case involves issues of the sort that would have historically been litigated in the common law courts. In fact, in *Tull*, the Supreme Court conducted the necessary historical analysis and held that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." 481 U.S. at 422; *see also id.* at 418-19 ("Actions by the Government to recover civil penalties under statutory provisions . . .

---

[4] *Stern v. Marshall*, 564 U.S. 462, 488 (2011) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)); *see also id.* at 484 (citing and quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring)).

historically have been viewed as one type of action in debt requiring trial by jury."). While *Tull* conducted that historical analysis in order to hold that such claims require a Seventh Amendment jury, DOL concedes that "in determining whether a jury trial is required [by the Seventh Amendment], the Court looks at the same public-rights doctrine that animates the Court's Article III cases." Opp. 15 n.5; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989). By DOL's own admission, then, the Supreme Court's holding in *Tull*, that a suit to enforce monetary penalties historically would have been decided in a common law court, with a common law jury, should be determinative. For that reason, Sun Valley cited and discussed *Tull* at length in its opening brief. *See* Br. 16-17, 21 n.26, 24. DOL, by contrast, does not even cite *Tull* in its brief, much less attempt to address it.[5]

That this case involves private rights is further enforced by the fact that DOL's claims here center on an alleged breach of Sun Valley's contract with its workers. *See, e.g.*, Br. 14-15; Opp. 35, 37; *Enron Power Mktg., Inc. v. Luzenac Am., Inc.*, 2006 WL 2548453, at *15 (S.D.N.Y. Aug. 31, 2006) (stating "contract claims traditionally have been resolved by jury trial in state courts or Article III courts"). DOL once again ignores the Supreme Court's most relevant case law on this topic. While Sun Valley cited the Supreme Court's holding in *Chauffeurs v. Terry*, 494 U.S. 558, 570-71 (1990), which conducted the necessary historical analysis and concluded that claims for back pay require a Seventh Amendment jury, DOL does not cite that opinion or even attempt to address it. *Compare* Br. 15-16, 24, *with* Opp. 11-17. Given that DOL agrees that the Seventh Amendment and Article III questions turn on the "same public-rights doctrine," Opp. 15 n.5, DOL's elision of the relevant Seventh Amendment case law is telling.

---

[5] DOL argues that a different Seventh Amendment decision should be controlling, citing *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 450 (1977). *See* Opp. 15 n.5. But that case is distinct for all the reasons explained *infra* pp. 13-14.

In addition to ignoring the Supreme Court's decisions in *Tull* and *Chauffeurs*, DOL also ignores Sun Valley's historical evidence that these types of claims would have been litigated in the common law courts. The opening brief gave numerous examples of lawsuits at common law involving contract claims (Br. 16 & n.17) and governmental penalties (*id.* at 17 n.18). DOL entirely ignores these cases. And DOL also ignores the historical conclusions of secondary sources that it otherwise relies upon. *Compare* William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1542 (2020) (contrasting "deprivation of life, liberty, and property [that] generally requires judicial process and therefore judicial power" with "'public rights' cases"), *with* Opp. 10-11, 14, 17 (citing that article in public rights argument). DOL does not engage with any of this historical analysis because there is no real question that the claims here historically would have been heard in the courts at common law.

The Supreme Court's most recent application of the public/private rights framework, in *Oil States*, confirms that this historical analysis should be controlling. In *Oil States*, the question was whether claims involving the validity of patent rights could permissibly be adjudicated by an agency outside the Article III courts. *See* 138 S. Ct. at 1374-75. Both the majority and dissent in *Oil States* agreed in principle that this question had to be resolved with reference to history. *Compare* 138 S. Ct. at 1377-78 (describing "the executive proceeding[s] of the Privy Council" to revisit patents from the 17th to the 20th centuries), *with id.* at 1383 (Gorsuch, J., dissenting) (concluding historical record did "not come close to proving that patent disputes were routinely permitted to proceed outside a court of law"). Sun Valley followed the *Oil States* model and offered extensive historical analysis, but DOL offers no competing history in response.

Finally, it is worth pausing to emphasize that this historical approach imposes only modest limitations on the scope of agency adjudication. As Sun Valley's opening brief

explained, the vast majority of what federal ALJs do involves awards of benefits, which are quintessential "public" rights. *See* Br. 12-13. If DOL had sought to disbar Sun Valley from the H-2A program, that, too, would have involved a public rights issue, as the decision to exclude an employer from such a program is the type of decision that could historically have been made by the Executive in the first instance. *See id.* at 19. This case requires judicial determination only because DOL sought to impose over half a million dollars in monetary liability, while also premising nearly all that liability on a breach-of-contract theory. Enforcing Article III in this context would in no way call into question the typical work of federal ALJs.

> B.    The Court Should Reject DOL's Limitless And Circular Theory Of Its
>        Own Authority To Adjudicate Enforcement Proceedings.

In contrast to Sun Valley's historical analysis, DOL offers a series of extreme, circular, and limitless arguments that would breathtakingly expand the Executive's power at the expense of the Article III judiciary. These arguments take several forms, but all would remove any real limitation on the scope of agency adjudication. Ultimately, while DOL attempts to cobble together cases to support these arguments, they rest on a misreading of the governing case law.

*First*, DOL argues that the "agency is not exercising any 'judicial Power of the United States' at all" because its decision does not result in an Article III judgment. *See* Opp. 8-11. DOL argues that the defining characteristic of an Article III judgment is that it cannot be revised by the political branches, *id.* at 9, whereas, "if adjudications occur in the Executive Branch, they are subject to supervision by the President and Congress," *id.* at 11. In other words, DOL argues that agency adjudication cannot implicate Article III because, by definition, agency adjudication occurs outside Article III. If this theory were accepted, then agency adjudication would *never* violate Article III in any circumstance at all.

However, the fact that agency ALJs are part of the executive branch—and thus subject to executive influence—is the *problem* under Article III, not a reason to immunize their role from constitutional challenge. If agency adjudication were categorically outside Article III—because it does not result in an Article III judgment—then there would have been no need for the Supreme Court's extensive historical analysis in *Oil States*, as the Court could simply have held that agency judges by definition are not part of Article III and thus do not exercise Article III power. *See supra* pp. 5-7. In fact, all of the Supreme Court's other cases discussing the permissible scope of non-Article III adjudication would have likewise been unnecessary. DOL's argument is therefore impossible to square with the case law in this area.

Beyond the mere fact that this adjudication occurred outside Article III, DOL does not point to any meaningful distinction between the agency decision here and an Article III judgment. Sun Valley's opening brief explained that DOL's "final order operates as a judgment because the Agency considers the payment ordered to be a 'debt' or 'claim' subject to collection, interest, and other penalties, without any need to involve the Article III courts," Br. 24 (citing authority), and DOL does not contest that its final orders have that effect. Moreover, the opening brief explained that the limited scope of review of agency orders under the APA is directly analogous to the limited scope of appellate review of trial court decisions. *See id.* at 24-25. DOL concedes that the agency trial was "the equivalent of a bench trial," Opp. 5, and argues that the ALJ's "credibility determinations" are entitled to the same type of deference that would be afforded any other judicial factfinder, *id.* at 38. *See also id.* at 5 ("Litigation before the ALJ closely mirrors federal civil litigation."); *id.* at 28 ("[T]he role of a Labor Department ALJ is 'functionally compatible' to that of a judge."). DOL's ALJ acts as a judge and issues a decision

that—unless appealed—is final and binding. DOL's suggestion that the ALJ did not wield "judicial power" should accordingly be rejected.[6]

**Second**, DOL argues that this case involves public rights because the government is a party, as there supposedly "has never been any question that a suit between the government and others, by definition, falls squarely within the public rights doctrine." Opp. 12, 16. Under that theory, while agency adjudication of cases between private individuals may violate Article III, agencies can adjudicate *any* case where they are a party.

Again, this argument cannot be reconciled with Supreme Court case law. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587-88 (1985) (rejecting theory that "the identity of the parties alone determine[s] the requirements of Article III"). This theory is impossible to square with *Tull*, which held in a suit involving the government that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." 481 U.S. at 422. Similarly, if DOL was correct that *Oil States* involved public rights simply because the government issues a patent and it thus is a matter involving the government, *see* Opp. 13, then there would have been no reason for the Court's historical analysis. The Court's analysis has focused on the history, not the identity of the parties.

DOL's contrary argument rests on a misreading of cases applying the "public rights" doctrine. *See* Opp. 12-13. The public rights doctrine applies to matters that historically could have been decided by the executive branch on its own authority, without any need for judicial involvement, such as the award of a public franchise or the distribution of public benefits. *See* Br. 12-13 (citing cases). By their nature, cases involving the distribution of public benefits or the

---

[6] Sun Valley also explained in its opening brief how DOL's adjudicatory powers, among other things, mean the agency adjudication cannot be upheld under an "adjunct" theory. Br. 23-25. DOL did not respond to this portion of the opening brief.

award of a public franchise often involve the government as a party, but no case suggests that the government's presence alone is sufficient to place a case in this category; rather "public rights" cases typically "arise between the Government and persons subject to its authority in connection with the performance of *the constitutional functions* of the executive or legislative branches." Opp. 12 (quoting *Oil States*, 138 S. Ct. at 1373) (emphasis added). The "constitutional functions of the executive" include things like awarding benefits, issuing licenses, and awarding permits— things the executive could historically have done alone, without any need for adjudication.[7] On the other hand, they do *not* include adjudicating cases involving monetary penalties or breach-of-contract claims, which instead were historically heard in common law courts.

In addition to finding no support in the case law, DOL's argument would eliminate the protections of Article III where they are needed most. As Sun Valley's opening brief explained, there is significant empirical evidence that agency judges face pressure to favor their employer in their decisions. *See* Br. 12. Indeed, ALJs have a "*duty* to decide all cases in accordance with agency policy." *Id.* (citing and quoting sources). Without minimizing the serious issues that arise when ALJs adjudicate cases between private parties, those issues are magnified considerably when ALJs adjudicate cases where their own employer is a party. A significant purpose of Article III was to interpose an independent judiciary as a bulwark between the people and the government, *see* Federalist No. 78, and that purpose would not be served if Article III dropped away entirely so long as the government was a party.

---

[7] DOL argues that this case involves public rights because "[g]ranting H-2A certifications and punishing H-2A violations" is something the Agency can do alone. Opp. 14. However, Sun Valley does not dispute that DOL could permissibly use agency adjudication to decide whether to grant or revoke permission to participate in the H-2A program. The Article III problem arises here because DOL has *not* tried to exclude Sun Valley from the H-2A program and has instead sought to impose over half a million dollars in monetary liability.

**Third**, DOL argues that this case involves public rights because it involves the application of federal regulations pertaining to immigration. *See* Opp. 13-15. In this view, any enforcement action relating to a violation of a governmental regulation necessarily implicates public rights because such a claim would "'derive[] from a federal regulatory scheme' and [be] 'integrally related to particular Federal Government action.'" *See id.* at 15 (citations omitted). Taken to its logical conclusion, this argument would permit non-Article III adjudication of any matter involving a person or activity that an agency regulates.

Again, that is not the law. The Supreme Court, in *Granfinanciera*, considered the argument that Congress might "assign[] to administrative agencies . . . all causes of action not grounded in state law, whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears," and the Court specifically held that "[t]he Constitution nowhere grants Congress such puissant authority." 492 U.S. at 52. Likewise, in *Tull* the Supreme Court held that cases where the government seeks to impose monetary penalties involve private rights that would historically be litigated in the common law courts, even if the penalties are imposed under a federal regulatory scheme—there, the Clean Water Act. *See* 481 U.S. at 414. The Court did not ask whether actions under the Clean Water Act had historically been heard at common law; rather, the Court reasoned more generally that "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 422; *see also Chauffeurs*, 94 U.S. at 565-66 (holding that actions for back pay trigger the Seventh Amendment even if they arise under novel provisions of federal law). The same reasoning applies here.[8]

---

[8] For this reason, DOL is far off base when it asserts that "everyone agrees that the government's enforcement action here was based on Sun Valley's violation of Labor Department regulations—not some state-law breach of contract theory." Opp. 16. To the contrary, DOL itself has repeatedly recognized that almost the entirety of the liability at issue in this case is ultimately

Once again, DOL's contrary argument misreads the cited cases. *Thomas*, for instance, rests on the conclusion that the statutory scheme involved a right to compensation that was itself a benefit created by the government rather than a vested property right. *See Thomas*, 473 U.S. at 584-85 (explaining that any right to compensation for data "result[ed] from" the federal statute, which thus created the right at issue). By contrast, Sun Valley undoubtedly has a vested property interest in the over-half million dollars that the DOL is seeking to take away through the proceedings in this case. Meanwhile, *CFTC v. Schor*, 478 U.S. 833 (1986), stands for the modest proposition that a party who *affirmatively* seeks relief from an agency in agency proceedings (and engages in gamesmanship in parallel Article III proceedings) cannot later complain that the agency proceedings violated Article III. *See infra* pp. 14-15 (addressing DOL's argument based on consent). If the courts in those cases were using DOL's framework, they could simply have noted the disputes' regulatory contexts and stopped there. However, they did nothing of the sort, as the "public rights" doctrine is not nearly as broad as DOL suggests.[9]

While DOL asserts that *Atlas Roofing*, 430 U.S. 450, upheld a statutory scheme that provided for the imposition of monetary penalties through agency adjudication, *see* Opp. 15, that

---

premised on its conclusion that Sun Valley breached its contract with its workers—both by failing to provide kitchen access and by supposedly firing the nineteen workers who left early in the season. *See, e.g.*, Br. 15 n.16 (citing administrative record); Opp. 4 & 30 ("contractual obligations"); *id.* at 5 & 37 ("violation[s] of the work contract"); *id.* at 35 ("contractually promised" wages); *id.* at 39 n.12 ("contractual wages").

[9] Meanwhile, in *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, No. 21-cv-634-FLW, 2021 WL 5150464, at *31 (D.N.J. Nov. 5, 2021), the court acknowledged that contract claims were involved, but it explained both that the underlying contract was between the manufacturer and the government itself and that the contract could not be enforced by private parties and was not negotiated. Here, by contrast, DOL is trying to enforce a contract between Sun Valley and H-2A workers, a contract that can be enforced by the workers and is subject to negotiation. *E.g.*, 20 C.F.R. § 655.103(b) ("The contract between the employer and the worker may be . . . a *separate* written document . . . incorporating the required terms and conditions of employment, *agreed to by both the employer and the worker*." (emphases added)).

case is readily distinguished. It is true that *Atlas Roofing* rejected a Seventh Amendment claim that was brought in the context of an OSHA proceeding to impose monetary penalties. However, as the opening brief explained, the Supreme Court in *Tull* addressed *Atlas Roofing* and explained that it held only that "the Seventh Amendment is not applicable to administrative proceedings." Br. 21 n.26 (quoting *Tull*, 481 U.S. at 418 n.4). In other words, *Atlas Roofing* held that agency judges cannot be forced to preside over jury trials; under *Atlas Roofing*, <u>if</u> a case can permissibly be heard in an agency court, <u>then</u> there is no Seventh Amendment right to a jury trial in that agency proceeding. *Atlas Roofing* did not resolve the separate question of whether the claims belonged in Article III court. The Article III analysis turns on a historical analysis of whether a case involves a "matter which, from its nature, is the subject of a suit at the common law," *Stern*, 564 U.S. at 488, and the Supreme Court's decision in *Tull* conducts that necessary historical analysis for claims seeking to impose monetary penalties. Moreover, *Atlas Roofing* is doubly irrelevant because the claims at issue here, unlike in *Atlas Roofing*, also seek to impose liability on a breach-of-contract theory and thus lie at the core of the common law.[10]

  **Fourth**, DOL asserts that Sun Valley "consented to executive adjudication" by contesting the Agency's enforcement proceeding in the agency courts. Opp. 17-18. Evidently DOL believes that, in order to raise an Article III challenge, Sun Valley would have had to essentially default in the Agency's enforcement proceeding.[11] Again, if accepted, this argument would essentially

---

[10] *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320 (1909), and *Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329 (1929), are also inapposite. As Sun Valley's opening brief explained, those cases held that executive officials can condition the receipt of a federal benefit on a monetary payment. *See* Br. 20 n.23. Those cases might possibly support DOL's position if DOL gave Sun Valley the choice to *either* pay the penalty *or* withdraw from the H-2A program, but DOL gave Sun Valley no such choice and never sought to exclude Sun Valley from the program.

[11] If DOL means to suggest that Sun Valley should have raised its Article III challenge before the Agency, that argument fails because structural constitutional claims such as this do not need

14

immunize agency adjudication of enforcement proceedings from Article III challenge, as all entities targeted for enforcement proceedings would "consent" to non-Article III adjudication just by defending themselves against the agency.

To the contrary, Sun Valley did not "consent" to adjudication before the DOL's agency judges because it did not affirmatively request relief from the Agency and did not forego an alternative forum. This case is therefore unlike *Schor*, where the Supreme Court held that a litigant had "effectively agreed to an adjudication by the CFTC of the entire controversy by seeking relief in [the agency's] alternative forum." *Schor*, 478 U.S. at 850. Here, unlike in *Schor*, Sun Valley did not affirmatively seek out relief from the agency courts, and Sun Valley also did not reject some alternative forum when it decided to defend itself in DOL's agency courts. Rather, Sun Valley simply defended itself in the forum where the government proceeded against it.[12] Moreover, if Sun Valley had instead chosen *not* to defend itself, then DOL would have issued a default judgment that would have become immediately enforceable as a debt. A.R. 0002; 28 U.S.C. §§ 3001 & 3102-3105. Sun Valley defended itself in the agency courts because it had no realistic alternative, not because it somehow "consented" to that tribunal.

***Finally***, DOL suggests that its adjudication should be upheld simply because it reflects "35 years of implementation" of the H-2A program by the Agency. *See* Opp. 1. DOL, however,

---

to be exhausted in administrative proceedings. *See* Br. 13 n.15 (citing cases); *infra* pp. 25-26. DOL cannot avoid that conclusion by reframing an exhaustion argument in terms of "consent."

[12] *See also, e.g.*, *Stern*, 564 U.S. at 493 (litigant "did not truly consent" because he had "nowhere else to go if he wished to recover from" bankruptcy estate (citing *Granfinanciera*, 492 U.S. at 59 n.14)); *Wellness Int'l Network, Ltd v. Sharif*, 575 U.S. 665, 684-85 (2015) (litigant may impliedly consent to bankruptcy proceedings only if he is "'made aware of the need for consent and the right to refuse it, and still voluntarily appear[s] to try the case' before the non-Article III adjudicator"); *In re Trib. Media Co.*, 902 F.3d 384, 394-96 (3d Cir. 2018) (finding litigant consented to bankruptcy court's non-Article III adjudication when he "filed a proof of claim" and "made clear that he sought a final judgment on the merits").

15

ignores data cited in the Complaint showing that DOL in recent years has significantly increased its reliance on monetary penalties in the H-2A context. *See* Compl. ¶¶ 28-30. As recently as 2006, the *total* penalties imposed for H-2A violations totaled just $57,900, and total penalties under the H-2A program first surpassed one million dollars in 2012. *Id.* ¶¶ 28-29.[13] The structural constitutional violations at issue in this case cannot be excused just because they have persisted over time, *see*, *e.g.*, *Lucia*, 138 S. Ct. 2044, but, in any event, the liability imposed here is far more novel than DOL would have the Court believe.

*      *      *

Enforcement of Article III in this case is critical to uphold the principle of judicial independence at the core of that provision. DOL here imposed a crushing amount of liability—over half a million dollars—on a family farm. That deprivation of property rights is an "inherently . . . judicial" matter, *N. Pipeline*, 458 U.S. at 68-70, that necessarily requires *some* trial before *some* neutral factfinder. In the federal system, that means trial in an Article III court with a Seventh Amendment jury. A system that instead combines the office of prosecutor, judge, and jury in a single administrative agency cannot be reconciled with Article III.

## II.   Congress Has Not Authorized DOL's Adjudication Of Claims To Impose Monetary Penalties In The H-2A Context.

Because this case involves private rights, it could not be litigated before an agency even if Congress authorized that procedure. *See supra* pp. 5-8. In this case, however, DOL's adjudication is also improper for an additional reason, as Congress *has not* authorized DOL's

---

[13] *See* David J. Bier, Cato Institute, Immigration Research and Policy Brief No. 17, *H-2A Visas for Agriculture: The Complex Process for Farmers to Hire Agricultural Guest Workers* (Mar. 10, 2020) (Table B), *available at* https://www.cato.org/publications/immigration-research-policy-brief/h-2a-visas-agriculture-complex-process-farmers-hire.

agency judges to resolve this type of case. That lack of congressional authorization factors into the Article III analysis and provides an additional ground for relief under the APA.

        A.      <u>DOL Does Not Cite Any Statutory Authorization For Its Adjudication Of This Type Of Case.</u>

The opening brief explained that, whereas Congress has expressly authorized DOL's agency judges to resolve cases seeking to exclude employers from the H-2A program (cases that, unlike this one, involve "public rights"), Congress has not expressly authorized DOL's agency judges to adjudicate cases imposing these types of monetary penalties. *See* Br. 25-27. Notably, DOL's response does not show otherwise, as DOL does not cite any statute that expressly authorizes agency adjudication for this type of case.

While DOL cites 8 U.S.C. § 1188(g)(2) as authority for these proceedings, the opening brief explained that provision nowhere authorizes adjudication by agency judges. *See* Br. 26. After all, while the statute authorizes DOL to "impos[e] appropriate penalties," the statute does not say how those penalties should be imposed and it certainly does not say that they can (or should) be imposed in proceedings before agency judges.

DOL, in response, contends that "Plaintiff effectively complains that it received *more* process than required by this provision" as, under DOL's reading of Section 1188(g)(2), the Agency could have simply "imposed" penalties without providing any process at all. Opp. 30. That is a stunning assertion of power: In DOL's apparent view, it would be permissible for an agency to simply impose monetary penalties by fiat, without any adjudication at all, and such penalties would then receive factual and legal deference from the courts. That is not the law, and DOL does not cite any case for that proposition.

To the contrary, 28 U.S.C. § 2461(a) sets out the clear background rule, which is that, unless Congress states otherwise, penalties should be collected "in a civil action" in the Article

III courts.[14] While DOL responds that this statute says penalties "may" be collected in a civil action, rather than that they "must," Opp. 30-31, Congress used the word "may" because an agency always has the option not to collect penalties at all. The use of the word "may" does not suggest that agencies have the option to impose penalties under alternate procedures that Congress has nowhere authorized. To the contrary, DOL itself acknowledges that Section 2461 was adopted because courts had previously held that agencies could not impose monetary penalties *at all* absent congressional authorization of an enforcement action. *See* Opp. 32. DOL turns that background understanding upside down when it reads Congress's silence on how penalties should be "imposed" as an authorization for the Agency to impose penalties following any procedure that the Agency might conjure into existence.

      B.    <u>DOL Cannot Adjudicate This Case In The Absence Of Congressional Authorization.</u>

The lack of statutory authorization for DOL's adjudicatory procedures is doubly relevant, as it both informs the Article III analysis and provides an additional ground for APA review.

First, as to the Article III analysis, many of the cases that DOL relies on to support its argument that this case involves "public rights" rest in part on a finding that Congress—not an agency—required adjudication in an agency court. *See*, *e.g.*, *Atlas Roofing*, 430 U.S. at 460 (noting "Congress' power to regulate to create new public rights and remedies by statute and commit their enforcement, if it chose, to . . . an administrative agency"); *Thomas*, 473 U.S. at 583 (with respect to public rights, "Congress is not barred from acting pursuant to its powers

---

[14] Consistent with that background rule, as recently as 1972 it was still the case that "[t]he vast majority of agencies must be successful in *de novo* adjudication in federal district court . . . before a civil money penalty may be imposed." Harvey J. Goldschmid, *An Evaluation of the Present and Potential Use of Civil Money Penalties as a Sanction By Federal Administrative Agencies*, in 2 Recommendations and Reports of the Administrative Conference of the United States 896, 899 (1972), *available at* https://www.acus.gov/sites/default/files/documents/1972-06%20Civil%20Money%20Penalties%20as%20a%20Sanction.pdf.

18

under Article I to vest decisionmaking authority in tribunals that lack the attributes of Article III courts"). Because this case involves private rights, rather than public rights, Congress could not require adjudication of this case in the agency courts. However, even assuming Congress *could* require agency adjudication here, it is an entirely separate question whether DOL can adopt these procedures *on its own*—unilaterally appointing itself prosecutor, judge, and jury.

Second, at a minimum, the fact that DOL acted without statutory authorization provides an additional ground for review under the APA. This review may take the form of vacatur, as the agency adjudication was "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). Alternately, this review may take the form of trial *de novo*. After all, 5 U.S.C. § 706(E) requires deference to agency factfinding where decisions are "reviewed on the record of an agency hearing *provided by statute*," but in other categories of cases Section 706(F) provides for "trial *de novo*" to assess whether the decision is "unwarranted by the facts." Because the agency proceedings here were not "provided by statute," the plain text of the APA dictates that deferential review under Section 706(E) should not apply, and the Agency's factfinding should be subject to *de novo* review. *See NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 189 (3d Cir. 2006) (APA's provision for *de novo* review applies "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate"). Either way, DOL's factfinding here is not entitled to deferential review under the APA where Congress has not authorized it to fulfill a factfinding function.

## III. The ALJ Who Adjudicated Sun Valley's Case Was Neither Appointed Nor Subject To Removal As Required By The Constitution.

Precisely because the ALJ's role here departed from the three-branch structure of the Constitution, the ALJ's adjudication of Sun Valley's case *also* violated structural provisions applicable to the executive branch. The remedy for these Article II violations is different from (and more limited than) the remedy for the Article III violations discussed above: Whereas

19

Article III provides that this case cannot proceed before the Agency at all, the Article II violations require vacatur and remand to the Agency, so that the Article II defects can be cured. As a result, the Court must reach the Article III question discussed above however it resolves the Article II questions discussed here. At a minimum, however, the Article II violations mean that the agency decision below cannot continue to stand.

A.       The ALJ Was Not Constitutionally Appointed.

The opening brief explained that the ALJ in this case was unconstitutionally appointed, and DOL does not argue otherwise. *See* Opp. 21. Instead, DOL argues that the unconstitutional appointment was cured by the fact that the Secretary ratified the ALJ's appointment after the hearing in this case. *See id.* However, DOL's argument must be rejected for the simple reason that the Secretary's ratification came too late to cure the violation.

DOL's argument is inconsistent with the Supreme Court's decision in *Lucia*, which held that "[t]he appropriate remedy for an adjudication tainted with an appointments violation is a *new hearing* before a properly appointed official." 138 S. Ct. at 2055 (marks and citation omitted; emphasis added). DOL argues that it remedied the Appointment Clause violation because the ALJ issued her final written decision after the Secretary ratified her appointment, *see* Opp. 21-22, but under *Lucia* the appropriate remedy for the violation is a "new hearing," not just a new final decision. Moreover, DOL's argument is similarly inconsistent with *Decker Coal Co. v. Pehringer*, 8 F.4th 1123 (9th Cir. 2021), which held that the Secretary of Labor's ratification was effective to cure the violation only because it occurred when the ALJ had neither "*heard the case* nor issued a proposed decision on the merits." *Id.* (emphasis added); *see also Marrs v. Comm'r of Soc. Sec.*, 2021 WL 4552254, at *4 (N.D. Tex. Oct. 5, 2021) (finding ratification effective where it occurred before the ALJ "heard the case"). In this case, by contrast, ratification

20

occurred long after the ALJ "heard the case." Thus, although DOL cites *Decker Coal* and *Lucia* repeatedly, those cases actually support Sun Valley's position.[15]

This Court should follow *Lucia* and *Decker Coal* by treating the ALJ's management of the multi-day hearing in this case as "significant action," after which ratification is no longer effective. *See Decker Coal*, 8 F.4th at 1127 n.1. DOL describes in detail how agency ALJs are imbued with "*all* powers necessary to conduct fair and impartial proceedings," Opp. 20 (emphasis added) (quoting 29 C.F.R. § 18.12(b)), which "resemble federal civil litigation in every meaningful way," *id.* (citing 29 C.F.R. §§ 18.101 *et seq.*). There can be no real question that it constituted "significant action" for the ALJ to use those wide-ranging powers by, to name just a few examples, resolving discovery disputes (*e.g.*, A.R. 0085-87 (ruling substantially for the Agency in dispute about remote depositions of H-2A workers in Mexico)), denying dispositive motions (*see* A.R. 1729-30), or deciding the numerous procedural, evidentiary, and legal issues involved in managing a multi-day evidentiary hearing with live witnesses (*e.g.*, AR 1772-73 (overruling Sun Valley objection to H-2A worker's testimony)); AR 2611 (clarifying DOL witness's testimony and asking follow-up questions)). The ALJ took "significant action" on this case before the attempted ratification, thus the adjudication violated the Appointment Clause.

Finally, DOL cannot circumvent this conclusion by arguing that the ALJ "undoubtedly" ratified her own prior actions in the case after her re-appointment by the Secretary. *See* Opp. 22-23. To begin, the ALJ did not take any action to expressly ratify any of her prior actions after she was reappointed. Even more fundamentally, however, the argument that the ALJ could cure the

---

[15] DOL's other cited cases are likewise far off base. For instance, *Dareth T. v. Kijakazi*, 2022 WL 671540, at *2 & n.2 (C.D. Cal. Mar. 7, 2022), did not involve an Appointments Clause challenge, and the plaintiff in fact "concede[d] that the ALJ who decided his case had been properly appointed."

Appointments Clause violation by ratifying *her own* prior decisions is again inconsistent with

*Lucia*, which held that the "new hearing" must be held before a new ALJ—as the initial,

unconstitutionally appointed ALJ "cannot be expected to consider the matter as though he had

not adjudicated it before." 138 S. Ct. at 2055.[16] Thus, at a minimum, Sun Valley is entitled to a

new hearing before a new, properly appointed ALJ.

        B.      <u>The ALJ Enjoyed Impermissible Protections Against Removal.</u>

The opening brief also explained that the ALJ in this case—although not afforded the

same insulation from political and employment pressures as Article III judges—nonetheless

enjoyed greater protection from removal than is allowed under Article II for executive branch

officials. *See* Br. 30-32. This Article II violation, ultimately, confirms that adjudication of this

type of case should occur in the Article III courts, rather than the executive branch. Within the

executive branch, the removal power is essential to preserve political accountability. *See*, *e.g.*,

*Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (stating the removal power ensures "the

buck stop[s]" with the President). For adjudication of private rights disputes of the sort at issue

here, by contrast, Article III ensures truly independent decisionmaking.

In response, DOL does not dispute that its ALJs "exercise significant executive power"

and thus, under *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 513-14 (2010), cannot be protected

---

[16] Cases cited by DOL to support its contrary position are inapposite. For instance, *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 604-06 (3d Cir. 2016), involved the *express* ratification (by the actor and his superiors) of *ultra vires* (not unconstitutional) acts. *See also Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371-72 (D.C. Cir. 2017) (considering in dicta essentially the same self-ratification as in *Advanced Disposal*). Meanwhile, *CFPB v. Gordon*, 819 F.3d 1179, 1185-86, 1190-92 (9th Cir. 2016), involved the *express* ratification of the mere decision to pursue enforcement proceedings in Article III court. *See also Bureau of Consumer Fin. Prot. v. Fair Collections & Outsourcing, Inc.*, 2020 WL 7043847, at \*5 (D. Md. Nov. 30, 2020). None of these cases contradict the Supreme Court's holding in *Lucia*.

by multiple layers of good cause protection from removal.[17] DOL also acknowledges, as it must, that its ALJs can be removed "only for good cause established and determined by" the Merit Systems Protection Board (MSPB) following a hearing, while MSPB members likewise can only be removed by the president for "inefficiency, neglect of duty, or malfeasance in office." Opp. 27-28. That alone should be sufficient to resolve this Article II removal claim in Sun Valley's favor, as DOL concedes that ALJs enjoy precisely the type of multi-layered good cause removal that *Free Enterprise Fund* forbids.

DOL asserts that there is no removal violation because the Secretary of Labor—who *initiates* the removal process—is removable by the President at will. *See* Opp. 26-27. However, while it is true that the Secretary begins the removal process, it remains the case that MSPB—not the Secretary—decides whether removal is appropriate. MSPB is free to decline the Secretary's request to remove an ALJ, *see* 5 U.S.C. § 7521(a), (b), and MSPB has the power to order the Secretary to comply with its decisions, *id.* § 1204(a)(1), (2). In other words, MSPB can order the Secretary to retain an ALJ whom the Secretary wishes to remove. MSPB's removal protections thus break the "chain of command" from the President to the ALJ, *United States v. Arthrex*, 141 S. Ct. 1970, 1979 (2021), and improperly limit the removal power. DOL is no doubt correct that ALJs are in practice subject to significant political control—thus violating Article III—but that control still falls short of Article II's requirements for executive officials.

DOL also erroneously asserts that ALJs are not actually insulated from removal because the President might be able to eliminate administrative proceedings at DOL altogether. *See* Opp.

---

[17] DOL seemingly concedes this point because it must, given ALJs' significant authority. *See* Br. 31. It makes no difference for this purpose that the ALJ exercises power through an adjudication, as agency activity, even in "judicial forms," must necessarily be based on "the executive Power." *See* Br. 31 & n.37; *see also Seila*, 140 S. Ct. at 2198 n.2.

23

28-29 (claiming the President could "order the Secretary of Labor to change [the] regulatory scheme and remove ALJs"). That argument, however, is not consistent with the President's historically "unrestricted" removal power, which was subject to "only two exceptions." *See* Br. 31-32 (quoting *Seila Law*; discussing "exceptions" applied in *Humphrey's Executor*, *Perkins*, and *Morrison*).[18] The President should not have to tear down an entire regulatory apparatus in order to hold a single executive-branch official accountable.

Finally, DOL contends that even if the ALJ was improperly insulated from removal, Sun Valley is not entitled to any relief on that basis because it cannot "show any harm" from the violation. Opp. 25. This argument, however, misreads *Collins v. Yellen*, 141 S. Ct. 1761 (2021). In *Collins*, shareholders sued to unwind payments made by the FHFA director, under a by-then repealed contract, on the ground that the director was not removable at-will. The decision to enter into that contract could be overseen by supervisory officials within the executive branch in real time, notwithstanding the director's removal protections, and so it made sense to require some showing that the decision would have been different if not for those removal protections. *See id.* at 1789. By contrast, Sun Valley was forced into more than a year of adjudication before an ALJ who was not removable as required by the Constitution, and the ALJ made numerous decisions, factual findings, and credibility determinations that affected Sun Valley's rights in large and small ways. Sun Valley was plainly harmed by those decisions—which culminated in an Award of over half a million dollars—and those decisions were made under an administrative framework that did not comply with the structural requirements of Article II. As in *Lucia*, 138 S. Ct. at 2056, the appropriate remedy for such a violation is vacatur.

---

[18] Defendants do not address those exceptions, nor do they explain why this Court should add to them by excusing the multi-layer for-cause removal protections present here.

C.     Sun Valley Was Not Required To Exhaust Its Article II Claims.

DOL also argues that Sun Valley "forfeited" these Article II claims by failing to raise them in proceedings before the ALJ. Opp. 19-20. While DOL frames this argument in terms of waiver, in the administrative adjudication context this type of argument is resolved under the doctrine of administrative exhaustion—a fact that DOL implicitly acknowledges by extensively citing the Supreme Court's most recent exhaustion decision. *See id.* at 19 (citing *Carr v. Saul*, 141 S. Ct. 1352 (2021)). The opening brief, meanwhile, explained that the general rule is that constitutional claims (and particularly structural constitutional claims, like the ones at issue here) *do not* need to be exhausted before an agency judge. *See* Br. 13 n.15, 28 n.31.

DOL's contrary argument misreads the Supreme Court's decision in *Carr* and ignores the Third Circuit's decision in *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020). *Carr* held that a litigant was *not* required to exhaust an Appointments Clause challenge, but DOL tries to distinguish *Carr* on the ground that the agency's procedures there were less adversarial than the procedures here. *See* Opp. 19. However, *Carr* is not so limited; rather, *Carr* observed that "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise." 141 S. Ct. at 1360-61; *see also id.* at 1361 (stating courts do not require exhaustion where that would be "futile," such as when "adjudicators [] are powerless to grant the relief requested"). Meanwhile, DOL fails even to cite *Cirko*, although that decision likewise rejected the argument that a litigant was required to exhaust an Appointments Clause challenge and explained that "exhaustion is generally inappropriate where a claim serves to vindicate structural constitutional claims like

25

Appointments Clause challenges." 948 F.3d at 153.[19] Under both *Carr* and *Cirko*, exhaustion is not required and thus Sun Valley did not "forfeit" these claims.

**IV.     DOL's Award Fails Even The APA's Deferential Review, And DOL's Counterarguments Bolster Sun Valley's Article III Claims.**

The opening brief also raised several substantive challenges to the decision below, each of which requires invalidating a portion of the Award. *See* Br. 32-39. DOL, in response, argues that the decision below is subject only to extremely deferential review under the APA. *See* Op. 34. DOL's argument once again hammers home why this case should have been heard in the first instance in the Article III courts: A decision imposing over $550,000 in liability—much of which will go to DOL—should not be imposed on a family farm through adjudication that is subject only to such threadbare judicial review. Indeed, if DOL's arguments are accepted, then *every* judicial decisionmaker in the chain will have ultimately deferred to the decisions of the Agency's enforcement personnel. *See* Opp. 34, 38 (asking this Court to defer to DOL); A.R. 4505-06 (ARB decision giving "great deference" to the ALJ); *id.* at 4342 (ALJ upholding nearly $200,000 in back pay because the Administrator "rationally" imposed it). However, even setting that aside and viewing the case under the APA's deferential standard, the decision here should not survive.

A.   DOL Improperly Assessed More Than $400,000 In Monetary Penalties And Back Pay For The Meal-Plan And Beverages Issues.

DOL's nearly $400,000 of monetary penalties and back pay relating to the alleged breach of the contract's meal-plan and beverage provisions were not adequately justified or based on substantial evidence. Those portions of the Award should be vacated as described below.

_____

[19] DOL notably does not argue that Sun Valley was required to exhaust (or otherwise waived or forfeited) its Article III challenge. If DOL did make that argument, however, it would fail for the same reason. *See* Br. 13 n.15.

First, neither the ALJ nor the ARB independently weighed the regulatory factors for determining an appropriate penalty for the meal-plan issues, which resulted in $198,450 in monetary penalties. Br. 33 (citing 29 C.F.R. § 501.19(b)). Instead, in the purportedly "formal adversarial adjudications" that "resemble federal civil litigation," the ALJ and ARB simply upheld the penalty because Agency enforcement staff did not act irrationally or unreasonably. Opp. 36-37 (arguing this Court should defer to "the Administrator's assessment of penalties" because the ARB and ALJ did so). That is a huge problem, and an abuse of the Agency's discretion, because it cloaks a prosecutor's penalty determination in the deferential review that the APA normally reserves for the "fair and impartial proceedings" that DOL's judges are supposed to conduct in *public rights* cases before issuing a "decision" of their own. *See* Opp. 20; Br. 33-34; *cf. Lloyd Sabaudo*, 287 U.S. at 338-39 (vacating penalty where agency "arbitrarily and unfairly" relied solely on the medical opinion of agency doctors despite plaintiff's contrary evidence, "which, in an administrative proceeding, must be considered *and acted upon by the administrative officer*" (emphasis added)). The $198,450 in money penalties related to the meal-plan issue must accordingly be vacated.

Second, and relatedly, the ALJ awarded nearly $201,000 in back pay ($128,285 for the meal-plan, $73,932.61 for beverage sales) without requiring enforcement staff to prove a single instance of harm to the workers. *See* Br. 34-35. DOL does not really contest the opening brief's explanation that the workers were *not* harmed, given that the charges for the meal plan were well below the maximum set by DOL, and likely below the cost of raw food that H-2A workers would have had to purchase *and* cook without the meal plan. Instead, DOL echoes the ALJ's and ARB's assertion that paperwork violations "necessarily" cause harm by undermining workers' "reliance" on the program. Opp. 35. But the Agency's enforcement staff never offered any

27

evidence to substantiate that bare assertion.[20] Moreover, while the opening brief cited cases for the proposition that "back wages" may not be awarded "in the absence of proof of harm," Br. 35, DOL does not acknowledge those cases or attempt to distinguish them here. Without proof of harm, the award of back wages is an improper "windfall, not make-whole compensation," *City of Ann Arbor v. DOL*, 733 F.2d 429, 432 (6th Cir. 1984), and fails even deferential review.[21]

B.    The Back Pay Awarded For The Early Departure Of 19 Workers Was Not Supported By Substantial Evidence.

DOL's award of $142,728.22 in back pay related to the early departure of 19 workers also is not supported by substantial evidence. While the ALJ found that these workers were entitled to back wages because they were fired, the opening brief  surveyed the testimony of the workers, including one worker's testimony agreeing that *no one* ever told him he was fired or had to leave, and explained that no worker actually testified that they were fired. *See* Br. 36-37 & nn.43-44. DOL does not respond to that record analysis and in fact does not cite *any* portions of the transcript or the record that it contends support the ALJ's finding that the workers were fired; DOL instead simply cites the ALJ's determinations and then argues that this Court must defer to the ALJ's findings. *See* Opp. 38. Even under the APA's deferential standard of review, however, DOL must point to "substantial evidence" to support the factual findings of the ALJ on this issue. 5 U.S.C. § 706(E). DOL's bare citations to the ALJ's findings, without record support, do not meet that standard.

---

[20] DOL attempts to obscure the point by referring to the beverage sales as "illegal deductions" from the workers' pay. Opp. 35-36 & n.11. However, the sales were optional, and the workers authorized the payments. A.R. 4303-04, 4306. Merely referring to the payments as "illegal" does not alter the need to show some harm to justify an award of back wages.

[21] DOL argues that, even if the workers were not harmed, DOL *itself* was harmed because it relies on accurate information in its paperwork. *See* Opp. 35-36. However, back pay is meant to compensate harm to workers, not the Agency, and awarding back pay on this theory would result in an impermissible "windfall" to the workers. *See* Br. 35.

28

C.     Congress Did Not Authorize DOL To Award Back Pay.

Lastly, all $345,845.83 of back pay in the Award is contrary to law and must be vacated because Congress did not authorize DOL to impose back pay damages. Br. 38-39. The Supreme Court's recent decision in *AMG Capital Mgmt., LLC v. FTC* rejected a nearly identical argument to the one that DOL advances here. 141 S. Ct. 1341, 1344 (2021) (holding that a statute that authorized injunctive relief did not authorize retrospective monetary compensation). Sun Valley explained as much in its opening brief, Br. 38, but DOL does not even mention *AMG Capital*. DOL does argue that the grant of authority in Section 1188(g)(2) is "open ended," *see* Opp. 39, but this overlooks both the specific enumeration of forward-looking injunctive relief in the statute as well as the indication that DOL should "seek[]" that forward-looking relief through proceedings outside of the agency. If Congress had wanted to authorize DOL's agency judges to award retrospective damages, Congress would have said so in the statute. Moreover, while DOL asserts that it has awarded back pay for "decades," Opp. 39, that is irrelevant, as "[u]nlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2482 (2020).

\*       \*       \*

In closing, DOL's Award is an abuse of discretion, not supported by substantial evidence, and contrary to law. That DOL asks this Court to defer to the Agency's judgments confirms that this case belonged in Article III court all along, where Sun Valley would have received meaningful and impartial judicial review of DOL's enforcement decisions.

**V.     The Award Violates The Eighth Amendment's Excessive Fines Clause.**

If the Court rejects Sun Valley's claims under Article III and Article II, and if it leaves in place the money penalties and back pay concerning the meal-plan and beverage issues, then the Court should vacate the Award for violating the Eighth Amendment's Excessive Fines Clause.

Specifically, the punishment for the meal-plan and beverage issues (some $400,000 in penalties and back pay[22]) is grossly disproportionate to the underlying harm to H-2A workers, for which DOL offered *no* proof. Br. 39-40.

In response, DOL argues that the fine cannot be excessive because it is below the maximum authorized by its own regulations. *See* Opp. 40. However, that factor is not dispositive, *United States v. Bajakajian*, 524 U.S. 321, 336-39 (1998), and fines well below relevant statutory maximums have been found to violate the Eighth Amendment, *see, e.g.*, *New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 599-603 (2d Cir. 2019) (vacating as excessive fine set at "approximately half" the amount of "penalties authorized under both statutes").[23] Moreover, this argument is particularly inapposite because DOL's cited cases involve maximum *statutory* penalties, whereas the maximum penalty in this case is set by regulation.

Finally, the Complaint asked for a *de novo* trial on this Eighth Amendment issue, on the ground that only the Article III courts can permissibly adjudicate such a constitutional issue, and Sun Valley explicitly made that request in the opening brief as well. *See* Br. 39; Compl. ¶¶ 128-34. DOL notably does not respond to this portion of Sun Valley's brief.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment should be granted, and Defendants' cross-motion for summary judgment and motion to dismiss should be denied.

---

[22] The opening brief explained that the back pay awarded here is punitive insofar as it does not compensate any harm to the workers. *See* Br. 39-40. DOL does not address the cases that Sun Valley cited in support of that proposition. *Compare id.*, *with* Opp. 40 n.13.

[23] *See also, e.g.*, *United States v. Fifty Nine Thousand Dollars ($59,000.00), in U.S. Currency*, 282 F. App'x 785, 789-90, 2008 WL 2485594, at *4 (11th Cir. 2008) (reversing "order that $49,000 be forfeited" even though "well within the $250,000 statutory maximum"); *United States v. 3814 NW Thurman St., Portland, Or., A Tract of Real Prop.*, 164 F.3d 1191, 1197-98 (9th Cir.), *amended* 172 F.3d 689 (9th Cir. 1999); *United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74 (E.D. Mich. 1993).

Dated: May 18, 2022                    Respectfully submitted,

                                       WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.

                                       /s/ Scott M. Wilhelm
                                       Scott M. Wilhelm
                                       WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
                                       305 Roseberry Street, P.O. Box 800
                                       Phillipsburg, NJ 08865
                                       Tel: (908) 454-3200 Fax: (908) 454-3322
                                       Email: wilhelms@wwgrlaw.com

                                                 -and-

                                       Robert E. Johnson*
                                       INSTITUTE FOR JUSTICE
                                       16781 Chagrin Blvd., #256
                                       Shaker Heights, OH 44120
                                       Tel: (703) 682-9320 Fax: (703) 682-9321
                                       Email: rjohnson@ij.org

                                       Robert Belden*
                                       INSTITUTE FOR JUSTICE
                                       901 N. Glebe Road, Suite 900
                                       Arlington, VA 22203
                                       Tel: (703) 682-9320 Fax: (703) 682-9321
                                       Email: rbelden@ij.org

                                       *Admitted *pro hac vice*

                                       *Attorneys for Plaintiff Sun Valley Orchards, LLC*