## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SUN VALLEY ORCHARDS, LLC,

*Plaintiff,*

v.

U.S. DEPARTMENT OF LABOR,
and MARTIN J. WALSH, in his
official capacity as United States
Secretary of Labor,

*Defendants.*

Case No. 1:21-CV-16625-JHR-MJS

**PLAINTIFF'S NOTICE OF
SUPPLEMENTAL AUTHORITY**

Plaintiff Sun Valley Orchards, LLC hereby submits as supplemental authority in support of its Partial Motion for Summary Judgment (ECF 19) and in opposition to Defendants' Motion to Dismiss and Cross-Motion for Summary Judgment (ECF 22) the opinion of the Fifth Circuit in *George R. Jarkesy, Jr., et al. v. Securities & Exchange Commission*, No. 20-61007 (5th Cir.). The opinion was issued on May 18, 2022, and there was not time for Plaintiff to cite the opinion in the brief that it filed that same day (ECF 23). The opinion, which is attached as Exhibit A, provides powerful support for Sun Valley's claims.

*First*, the Fifth Circuit held that SEC's use of agency judges to adjudicate actions to impose monetary penalties violated the Seventh Amendment jury right. Slip Op. at 4-18. As DOL has acknowledged, that Seventh Amendment issue turns on the "same public-rights doctrine" as Sun Valley's Article III claim. ECF 22 at 15 n.5; *see also* ECF 23 at 6. The Fifth Circuit embraced the same "inherently historical" approach to the public/private rights analysis that Sun Valley takes here, Slip Op. at 17, and rejected the same wide-ranging arguments offered by DOL, including the argument that "the government's involvement [i]s a sufficient condition

for converting 'private rights' into public ones," *id.* at 16; *see also id.* at 5-11 (surveying relevant history); *id.* at 9 (finding *Tull v. United States*, 481 U.S. 412 (1987) to be "pointedly" relevant to the historical analysis); *id.* at 11-14 (addressing considerations similar to those briefed in Sun Valley's opening brief (ECF 19-1 at 22-23)); *id.* at 13, 17-18 (distinguishing *Atlas Roofing Co. v. OSHRC*, 430 U.S. 442 (1977), cited by DOL here). If followed by this Court, the Fifth Circuit's decision would be dispositive of Sun Valley's first claim.

*Second*, the Fifth Circuit held that SEC ALJs enjoy unconstitutional protection from removal. Slip Op. at 25-30. The grounds for this decision apply with equal force to DOL's ALJs here. *Compare id.* at 27, *with* ECF 23 at 22-23; *see also* Slip Op. at 29 nn.19-20 (noting interplay between the Article III and Article II claims); *id.* at 25 n.17 (declining to address appropriate remedy for removal violation, where Article III violation already required vacatur). If followed here, the Fifth Circuit's decision would thus also be dispositive of Sun Valley's second claim.

*Third*, the Fifth Circuit held that Congress violated the non-delegation doctrine by conferring "open-ended" authority on the SEC to "decide whether to bring securities fraud enforcement actions within the agency instead of in an Article III court." Slip Op. at 24-25. The Fifth Circuit held that the decision to authorize administrative adjudication is a "power that Congress uniquely possesses," not a power an agency can arrogate for itself. *Id.* at 24. This part of the decision is directly relevant to DOL's assertion of similarly "open ended" authority here (ECF 22 at 30, 39), and it supports Sun Valley's argument that Congress has not sufficiently authorized DOL to adjudicate these claims. *Compare* Slip Op. at 22-23, *with* ECF 23 at 18-19; *see also* ECF 1 ¶¶ 135-42; ECF 19-1 at 25-27; ECF 23 at 17-18.

Dated: May 20, 2022

Respectfully submitted,

/s/ Scott M. Wilhelm
Scott M. Wilhelm

Robert E. Johnson*
INSTITUTE FOR JUSTICE
16781 Chargin Blvd., #256
Shaker Heights, OH 44120
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rjohnson@ij.org

Robert M. Belden*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320 Fax: (703) 682-9321
Email: rbelden@ij.org

*Admitted *pro hac vice*

Scott M. Wilhelm
WINEGAR, WILHELM, GLYNN & ROEMERSMA, P.C.
305 Roseberry Street, P.O. Box 800
Phillipsburg, NJ 08865
Tel: (908) 454-3200 Fax: (908) 454-3322
Email: wilhelms@wwgrlaw.com

*Attorneys for Plaintiff Sun Valley Orchards, LLC*

# EXHIBIT "A"

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2022

Lyle W. Cayce
Clerk

No. 20-61007

GEORGE R. JARKESY, JR.; PATRIOT28, L.L.C.,

*Petitioners,*

*versus*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

Petition for Review of an Order of
the United States Securities and Exchange Commission
No. 3-15255

---

Before DAVIS, ELROD, and OLDHAM, *Circuit Judges.*

JENNIFER WALKER ELROD, *Circuit Judge*:

Congress has given the Securities and Exchange Commission substantial power to enforce the nation's securities laws. It often acts as both prosecutor and judge, and its decisions have broad consequences for personal liberty and property. But the Constitution constrains the SEC's powers by protecting individual rights and the prerogatives of the other branches of government. This case is about the nature and extent of those constraints in securities fraud cases in which the SEC seeks penalties.

No. 20-61007

The SEC brought an enforcement action within the agency against Petitioners for securities fraud. An SEC administrative law judge adjudged Petitioners liable and ordered various remedies, and the SEC affirmed on appeal over several constitutional arguments that Petitioners raised. Petitioners raise those same arguments before this court. We hold that: (1) the SEC's in-house adjudication of Petitioners' case violated their Seventh Amendment right to a jury trial; (2) Congress unconstitutionally delegated legislative power to the SEC by failing to provide an intelligible principle by which the SEC would exercise the delegated power, in violation of Article I's vesting of "all" legislative power in Congress; and (3) statutory removal restrictions on SEC ALJs violate the Take Care Clause of Article II. Because the agency proceedings below were unconstitutional, we GRANT the petition for review, VACATE the decision of the SEC, and REMAND for further proceedings consistent with this opinion.

## I.

Petitioner Jarkesy established two hedge funds and selected Petitioner Patriot28 as the investment adviser. The funds brought in over 100 investors and held about $24 million in assets. In 2011, the SEC launched an investigation into Petitioners' investing activities, and a couple of years later the SEC chose to bring an action within the agency, alleging that Petitioners (along with some former co-parties) committed fraud under the Securities Act, the Securities Exchange Act, and the Advisers Act. Specifically, the agency charged that Petitioners: (1) misrepresented who served as the prime broker and as the auditor; (2) misrepresented the funds' investment parameters and safeguards; and (3) overvalued the funds' assets to increase the fees that they could charge investors.

Petitioners sued in the U.S. District Court for the District of Columbia to enjoin the agency proceedings, arguing that the proceedings infringed on

No. 20-61007

various constitutional rights.  But the district court, and later the U.S. Court of Appeals for the D.C. Circuit, refused to issue an injunction, deciding that the district court had no jurisdiction and that Petitioners had to continue with the agency proceedings and petition the court of appeals to review any adverse final order.  *See Jarkesy v. SEC*, 48 F. Supp. 3d 32, 40 (D.D.C. 2014), *aff'd*, 803 F.3d 9, 12 (D.C. Cir. 2015).

Petitioners' proceedings moved forward.   The ALJ held an evidentiary hearing and concluded that Petitioners committed securities fraud.  Petitioners then sought review by the Commission.  While their petition for Commission review was pending, the Supreme Court held that SEC ALJs had not been properly appointed under the Constitution.  *Lucia v. SEC*, 138 S. Ct. 2044, 2054–55 (2018).  In accordance with that decision, the SEC assigned Petitioners' proceeding to an ALJ who was properly appointed. But Petitioners chose to waive their right to a new hearing and continued under their original petition to the Commission.

The Commission affirmed that Petitioners committed various forms of securities fraud.  It ordered Petitioners to cease and desist from committing further violations and to pay a civil penalty of $300,000, and it ordered Patriot28 to disgorge nearly $685,000 in ill-gotten gains.   The Commission also barred Jarkesy from various securities industry activities: associating with brokers, dealers, and advisers; offering penny stocks; and serving as an officer or director of an advisory board or as an investment adviser.

Critical to this case, the Commission rejected several constitutional arguments Petitioners raised.  It determined that: (1) the ALJ was not biased against Petitioners; (2) the Commission did not inappropriately prejudge the case; (3) the Commission did not use unconstitutionally delegated legislative power—or violate Petitioners' equal protection rights—when it decided to

No. 20-61007

pursue the case within the agency instead of in an Article III court; (4) the removal restrictions on SEC ALJs did not violate Article II and separation-of-powers principles; and (5) the proceedings did not violate Petitioners' Seventh Amendment right to a jury trial. Petitioners then filed a petition for review in this court.

## II.

Petitioners raise several constitutional challenges to the SEC enforcement proceedings.[1] We agree with Petitioners that the proceedings suffered from three independent constitutional defects: (1) Petitioners were deprived of their constitutional right to a jury trial; (2) Congress unconstitutionally delegated legislative power to the SEC by failing to provide it with an intelligible principle by which to exercise the delegated power; and (3) statutory removal restrictions on SEC ALJs violate Article II.

## A.

Petitioners challenge the agency's rejection of their constitutional arguments. We review such issues *de novo*. *See Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016); *Trinity Marine Prods., Inc. v. Chao*, 512 F.3d 198, 201 (5th Cir. 2007).

## B.

Petitioners argue that they were deprived of their Seventh Amendment right to a jury trial. The SEC responds that the legal interests at issue in this case vindicate distinctly public rights, and that Congress therefore appropriately allowed such actions to be brought in agency

---

[1] Multiple *amici* have filed briefs with this court as well: the Cato Institute, Phillip Goldstein, Mark Cuban, Nelson Obus, and the New Civil Liberties Alliance. Each argues that the SEC proceedings exceeded constitutional limitations for reasons that Petitioners raise.

No. 20-61007

proceedings without juries.   We agree with Petitioners.   The Seventh Amendment guarantees Petitioners a jury trial because the SEC's enforcement action is akin to traditional actions at law to which the jury-trial right attaches.  And Congress, or an agency acting pursuant to congressional authorization, cannot assign the adjudication of such claims to an agency because such claims do not concern public rights alone.

1.

Thomas Jefferson identified the jury "as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."   Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in* The Papers of Thomas Jefferson 267 (Julian P. Boyd ed., 1958).  And John Adams called trial by jury (along with popular elections) "the heart and lungs of liberty."  The Revolutionary Writings of John Adams 55 (C. Bradley Thompson ed., 2000); *see also* Jennifer W. Elrod, *Is the Jury Still Out?: A Case for the Continued Viability of the American Jury*, 44 Tex. Tech L. Rev. 303, 303–04 (2012) (explaining that the jury is "as central to the American conception of the consent of the governed as an elected legislature or the independent judiciary").[2]

---

[2] Veneration of the jury as safeguard of liberty predates the American Founding. Our inherited English common-law tradition has long extolled the jury as an institution. William Blackstone said that trial by jury is "the glory of the English law" and "the most transcendent privilege which any subject can enjoy or wish for, that he cannot be affected, either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." *Mitchell v. Harmony*, 54 U.S. 115, 142–43 (1851) (quoting 4 William Blackstone, Commentaries on the Laws of England 227–29 (Oxford, Clarendon Pr. 1992) (1765)); *see also* Jennifer W. Elrod, *W(h)ither The Jury? The Diminishing Role of the Jury Trial in Our Legal System*, 68 Wash. & Lee L. Rev. 3, 7 (2011).  Indeed, King George III's attempts to strip colonists of their right to trial by jury was one of the chief grievances aired against him and was a catalyst for declaring independence.  The Declaration of Independence para. 20 (U.S. 1776).

No. 20-61007

Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the time of the Founding that the Constitution likely would not have been ratified absent assurance that the institution would be protected expressly by amendment. 2 The Debate on the Constitution 549, 551, 555, 560, 567 (Bernard Bailyn ed. 1993) (collecting various state ratification convention documents calling for the adoption of a civil jury trial amendment); The Federalist No. 83 (Alexander Hamilton) ("The objection to the plan of the convention, which has met with most success in this State [i.e., New York], and perhaps in several of the other States, is that relative to the want of a constitutional provision for the trial by jury in civil cases."); Mercy Otis Warren, Observations on the Constitution (1788), *in* 2 The Debate on the Constitution 290 (Bernard Bailyn ed. 1993) (worrying that the unamended Constitution would lead to "[t]he abolition of trial by jury in civil causes"); *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446 (1830) ("One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases.").[3]

Trial by jury therefore is a "fundamental" component of our legal system "and remains one of our most vital barriers to governmental arbitrariness." *Reid v. Covert*, 354 U.S. 1, 9–10 (1957). "Indeed, '[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions . . . .'" *Parklane Hosiery Co., Inc. v. Shore*, 439

---

[3] *See also* Kenneth Klein, *The Validity of The Public Rights Doctrine in Light of the Historical Rationale of the Seventh Amendment*, 21 Hastings Const. L.Q. 1013, 1015 (1994) ("At the time the Constitution was proposed, the people of the United States greatly distrusted government, and saw the absence of a guaranteed civil jury right as a reason, standing alone, to reject adoption of the Constitution; only by promising the Seventh Amendment did the Federalists secure adoption of the Constitution in several of the state ratification debates.").

No. 20-61007

U.S. 322, 341 (1979) (Rehnquist, J., dissenting) (quoting Leonard Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960)). Because "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence[,] . . . any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

The Seventh Amendment protects that right. It provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Supreme Court has interpreted "Suits at common law" to include all actions akin to those brought at common law as those actions were understood at the time of the Seventh Amendment's adoption. *Tull v. United States*, 481 U.S. 412, 417 (1987). The term can include suits brought under a statute as long as the suit seeks common-law-like legal remedies. *Id.* at 418–19. And the Court has specifically held that, under this standard, the Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties. *Id.* at 418–24.

That is not to say, however, that Congress may never assign adjudications to agency processes that exclude a jury. *See Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977). "[W]hen Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1379 (2018) (internal quotations omitted).

No. 20-61007

Whether Congress may properly assign an action to administrative adjudication depends on whether the proceedings center on "public rights." *Atlas Roofing*, 430 U.S. at 450. "[I]n cases in which 'public rights' are being litigated[,] e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact[,] the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible." *Id.* Describing proper assignments, the Supreme Court identified situations "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, [and] a vast range of other cases as well are not at all implicated." *Id.* at 458.

The Supreme Court refined the public-right concept as it relates to the Seventh Amendment in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). There, the Court clarified that Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns "traditional legal claims" to an administrative tribunal. *Id.* at 52. Public rights, the Court explained, arise when Congress passes a statute under its constitutional authority that creates a right so closely integrated with a comprehensive regulatory scheme that the right is appropriate for agency resolution. *Id.* at 54.

The analysis thus moves in two stages. First, a court must determine whether an action's claims arise "at common law" under the Seventh Amendment. *See Tull*, 481 U.S. at 417. Second, if the action involves common-law claims, a court must determine whether the Supreme Court's public-rights cases nonetheless permit Congress to assign it to agency adjudication without a jury trial. *See Granfinanciera*, 492 U.S. at 54; *Atlas Roofing*, 430 U.S. at 455. Here, the relevant considerations include:

No. 20-61007

(1) whether "Congress 'creat[ed] a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem"; and (2) whether jury trials would "go far to dismantle the statutory scheme" or "impede swift resolution" of the claims created by statute. *Granfinanciera*, 492 U.S. at 60–63 (quoting *Atlas Roofing*, 430 U.S. at 454 n.11, 461 (first and second quotations)).

2.

The rights that the SEC sought to vindicate in its enforcement action here arise "at common law" under the Seventh Amendment. Fraud prosecutions were regularly brought in English courts at common law. *See* 3 William Blackstone, Commentaries on the Laws of England *42 (explaining the common-law courts' jurisdiction over "actions on the case which allege any falsity or fraud; all of which savour of a criminal nature, although the action is brought for a civil remedy; and make the defendant liable in strictness to pay a fine to the king, as well as damages to the injured party"). And even more pointedly, the Supreme Court has held that actions seeking civil penalties are akin to special types of actions in debt from early in our nation's history which were distinctly legal claims. *Tull*, 481 U.S. at 418–19. Thus, "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 422.

Applying that principle, the Court in *Tull* held that the right to a jury trial applied to an action brought by an agency seeking civil penalties for violations of the Clean Water Act. *Id.* at 425. Likewise here, the actions the SEC brought seeking civil penalties under securities statutes are akin to those same traditional actions in debt. Under the Seventh Amendment, both as originally understood and as interpreted by the Supreme Court, the jury-trial right applies to the penalties action the SEC brought in this case.

No. 20-61007

That conclusion harmonizes with the holdings of other courts applying *Tull*. The Seventh Circuit followed the Supreme Court's lead in that case and has specifically said that when the SEC brings an enforcement action to obtain civil penalties under a statute, the subject of the action has the right to a jury trial. *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) ("Because the SEC was seeking both legal and equitable relief (the former under the Insider Trading Sanctions Act, 15 U.S.C. § 78u-1, which (in subsection (a)(1)) authorizes the imposition of civil penalties for insider trading at the suit of the SEC[)] . . . [the defendant] was entitled to and received a jury trial."); *see also id.* (explaining that another circuit was wrong to tacitly assume "that civil penalties in SEC cases are not a form of legal relief"[4]). Some district courts have applied *Tull* similarly. *See, e.g., SEC v. Badian*, 822 F. Supp. 2d 352, 365 (S.D.N.Y. 2011) (explaining that "whether the facts are such that the defendants can be subjected to a civil penalty . . . is a question for the jury, [and] the determination of the severity of the civil penalty to be imposed . . . is a question for the Court, once liability is established"); *SEC v. Solow*, 554 F. Supp. 2d 1356, 1367 (S.D. Fla. 2008) (applying *Tull* for the proposition that civil penalties are "legal, as opposed to equitable, in nature," and that it therefore "was [the defendant's] constitutional right to have a jury determine his liability, with [the court] thereafter determining the amount of penalty, if any").

Other elements of the action brought by the SEC against Petitioners are more equitable in nature, but that fact does not invalidate the jury-trial right that attaches because of the civil penalties sought. The Supreme Court has held that the Seventh Amendment applies to proceedings that involve a mix of legal and equitable claims—the facts relevant to the legal claims

---

[4] The Seventh Circuit was referring to the Ninth Circuit's opinion in *SEC v. Clark*, 915 F.2d 439, 442 (9th Cir. 1990). *Clark* did not address the issue whatsoever.

No. 20-61007

should be adjudicated by a jury, even if those facts relate to equitable claims too. *See Ross v. Bernhard*, 396 U.S. 531, 537–38 (1970); *see also Lipson*, 278 F.3d at 662 (noting that the defendant was entitled to a jury trial because the SEC sought legal relief in the form of penalties, even though the SEC also sought equitable relief). Here, the SEC sought to ban Jarkesy from participation in securities industry activities and to require Patriot28 to disgorge ill-gotten gains—both equitable remedies. Even so, the penalty facet of the action suffices for the jury-trial right to apply to an adjudication of the underlying facts supporting fraud liability.

### 3.

Next, the action the SEC brought against Petitioners is not the sort that may be properly assigned to agency adjudication under the public-rights doctrine. Securities fraud actions are not new actions unknown to the common law. Jury trials in securities fraud suits would not "dismantle the statutory scheme" addressing securities fraud or "impede swift resolution" of the SEC's fraud prosecutions. And such suits are not uniquely suited for agency adjudication.

Common-law courts have heard fraud actions for centuries, even actions brought by the government for fines. *See* Blackstone, *supra* at *42; *see also Tull*, 481 U.S. at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). Naturally, then, the securities statutes at play in this case created causes of action that reflect common-law fraud actions. The traditional elements of common-law fraud are (1) a knowing or reckless material misrepresentation, (2) that the tortfeasor intended to act on, and (3) that harmed the plaintiff. *In re Deepwater Horizon*, 857 F.3d 246, 249 (5th Cir. 2017). The statutes under which the SEC brought securities fraud actions use terms like "fraud" and "untrue statement[s] of material fact" to describe the prohibited conduct.

No. 20-61007

*See* 15 U.S.C. §§ 77a–77aa, 78j(b), 80b-6. When "Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989)); *see also* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) (explaining that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it").

Accordingly, the Supreme Court has often looked to common-law principles to interpret fraud and misrepresentation under securities statutes. *See, e.g, Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (considering the Restatement (Second) of Torts to determine whether material omissions are actionable under a securities statute); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005) (relying on "the common-law roots of the securities fraud action" in "common-law deceit and misrepresentation actions" to interpret the statutory securities-fraud action); *SEC v. Cap. Gains Rsch. Bureau*, 375 U.S. 180, 192–95 (1963) (considering the principles of common-law fraud to determine the requirements of fraud under the Advisers Act). Thus, fraud actions under the securities statutes echo actions that historically have been available under the common law.

Next, jury trials would not "go far to dismantle the statutory scheme" or "impede swift resolution" of the statutory claims. *See Granfinanciera*, 492 U.S. at 60–63. For one, the statutory scheme itself allows the SEC to bring enforcement actions either in-house or in Article III courts, where the jury-trial right would apply. *See* Dodd–Frank Act § 929P(a), 15 U.S.C. § 78u-2(a). If Congress has not prevented the SEC from bringing claims in Article III

No. 20-61007

courts with juries as often as it sees fit to do so, and if the SEC has in fact brought many such actions to jury trial over the years,[5] then it is difficult to see how jury trials could "dismantle the statutory scheme." Congress could have purported to assign such proceedings *solely* to administrative tribunals, but it did not. And there also is no evidence that jury trials would impede swift resolution of the claims.[6] In this case, for example, the SEC took seven years to dispose of Petitioners' case and makes no argument that proceedings with a jury trial would have been less efficient.

Relatedly, securities-fraud enforcement actions are not the sort that are uniquely suited for agency adjudication. Again, Congress has not limited the SEC's ability to bring enforcement actions in Article III courts. Consider the statutory scheme in *Atlas Roofing* for contrast. The statutes in that case were new and somewhat unusual. They provided elaborate enforcement mechanisms for the sorts of claims that likely could not have been brought in legal actions before that point. *See Atlas Roofing*, 430 U.S. at 445 (describing how the statutes required factfinders to undertake detailed assessments of workplace safety conditions and to make unsafe-conditions findings even if no injury had occurred). But the federal courts have dealt with actions under

---

[5] Indeed, the SEC regularly brings securities-fraud actions in Article III courts and adjudicates them through jury trials. *See, e.g., SEC v. Fowler*, 6 F.4th 255, 258–60 (2d Cir. 2021); *SEC v. Johnston*, 986 F.3d 63, 71 (1st Cir. 2021); *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 772 (5th Cir. 2017); *SEC v. Quan*, 817 F.3d 583, 587 (8th Cir. 2016); *SEC v. Miller*, 808 F.3d 623, 626 (2d Cir. 2015); *SEC v. Jasper*, 678 F.3d 1116, 1119, 1121–22 (9th Cir. 2012); *SEC v. Seghers*, 298 F. App'x 319, 321 (5th Cir. 2008).

[6] The dissenting opinion contends that these considerations are "not decisive" (that the SEC has for decades sued in Article III courts under securities statutes) or "not determinative" (that those same suits are not unique to agency adjudication). To disregard these facts is to ignore the Supreme Court's explanation for what public rights are made of. And in any event, though the facts may not in isolation make up a private right, they together establish (along with the other considerations discussed above) that the right being vindicated here is a private right, not a public one.

No. 20-61007

the securities statutes for many decades, and there is no reason to believe that such courts are suddenly incapable of continuing that work just because an agency may now share some of the workload. In fact, for the first decades of the SEC's existence, securities-fraud actions against nonregistered parties could be brought *only* in Article III courts. Thomas Glassman, *Ice Skating Uphill: Constitutional Challenges to SEC Administrative Proceedings*, 16 J. Bus. & Sec. L. 47, 50–52 (2015).[7]

The SEC counters that the securities statutes are designed to protect the public at large, and that some circuits have identified SEC enforcement actions as vindicating rights on behalf of the public. Indeed, the SEC says, the statutes allow for enforcement proceedings based on theories broader than actions like fraud that existed at common law.

Those facts do not convert the SEC's action into one focused on public rights. Surely Congress believes that the securities statutes it passes serve the public interest and the U.S. economy overall, not just individual parties. Yet Congress cannot convert any sort of action into a "public right" simply by finding a public purpose for it and codifying it in federal statutory law. *See Granfinanciera*, 492 U.S. at 61 (explaining that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity"). Purely private suits for securities fraud likely would have a similar public purpose—they too would serve to discourage and remedy fraudulent

---

[7] Moreover, the Supreme Court has noted that agency adjudicators generally do not have special expertise to address structural constitutional claims—precisely the issues central to this case. *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021) ("[T]his Court has often observed that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise.").

No. 20-61007

behavior in securities markets. That does not mean such suits concern public rights at their core. Granted, some actions provided for by the securities statutes may be new and not rooted in any common-law corollary. The fact remains, though, that the enforcement action seeking penalties in this case was one for securities fraud, which is nothing new and nothing foreign to Article III tribunals and juries.

That being so, Petitioners had the right for a jury to adjudicate the facts underlying any potential fraud liability that justifies penalties. And because those facts would potentially support not only the civil penalties sought by the SEC, but the injunctive remedies as well, Petitioners had a Seventh Amendment right to a jury trial for the liability-determination portion of their case.

4.

The dissenting opinion cannot define a "public right" without using the term itself in the definition. That leads to a good bit of question-begging. It says at times that the "SEC's enforcement action" is itself "a 'public right' because it is a case 'in which the Government sues in its sovereign capacity to enforce public rights." *Post* at 37. So the action is a public right because (1) the SEC is the government, and (2) it is vindicating a public right. And what is that public right being vindicated? The dissenting opinion does not say. In reality, the dissenting opinion's rule is satisfied by the first step alone: The action is itself a "public right" because the SEC is the government. And the not-so-far-removed consequences that flow from that conclusion: When the federal government sues, no jury is required. This is perhaps a runner-up in the competition for the "Nine Most Terrifying

No. 20-61007

Words in the English Language."[8]  But fear not, the dissenting opinion's proposal runs headlong into *Granfinanciera*:  "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity" 492 U.S. at 61.  With that limit in place, the dissenting opinion's bright-line rule burns out. Congress cannot change the nature of a right, thereby circumventing the Seventh Amendment, by simply giving the keys to the SEC to do the vindicating.

In this light, this approach treats the government's involvement as a sufficient condition for converting "private rights" into public ones.  But from 1856 to 1989, the government's involvement in a suit was only a necessary condition, *not* a sufficient condition, for determining whether a suit vindicated public rights.  *See Granfinanciera*, 492 U.S. at 65–66, 68–69 (Scalia, J., concurring in part) (referring to *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 U.S. (How.) 272, 283 (1856), and *N. Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 68–69 (1982) (plurality op.)); *cf. N. Pipeline Constr. Co.*, 458 U.S. at 69 n.23 ("It is thus clear that the presence of the United States as a proper party to the proceeding is a necessary but not sufficient means of distinguishing 'private rights' from 'public rights.'").  Then *Granfinanciera* said that a dispute between two private parties could still vindicate "public rights," such that the government was no longer a *necessary* condition for such suits.  *See* 492 U.S. at 53–55.  The dissenting opinion thus says that, after *Granfinanciera*, the government is no longer a necessary condition, but it is now a *sufficient* condition.  That is at odds with *Granfinanciera* and does not follow from any of the Court's previous

---

[8]  *Cf.* Ronald Reagan, Presidential News Conference (Aug. 12, 1986), https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-957.

No. 20-61007

decisions, which stressed that the government's involvement alone does not convert a suit about private rights into one about public rights.

The question is not just whether the government is a party, but also whether the right being vindicated is public or private, and how it is being vindicated. Tracing the roots of, and justification for, the public-rights doctrine, the Supreme Court has explained "that certain prerogatives were [historically] reserved to the political Branches of Government." *N. Pipeline Constr. Co.*, 458 U.S. at 67. Specifically, "[t]he public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are 'inherently . . . judicial.'" *Id.* at 68 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 458 (1929)).

The inquiry is thus inherently historical. The dissenting opinion tries to avoid the history by again emphasizing that *Granfinanciera* dealt with private parties, not the government. But again, if the right being vindicated is a private one, it is not enough that the government is doing the suing. That means we must consider whether the form of the action—whether brought by the government or by a private entity—is historically judicial, or if it reflects the sorts of issues which courts of law did not traditionally decide.

As discussed in Part II.B.2, history demonstrates that fraud claims like these are "traditional legal claims" that arose at common law. Even aside from post-*Atlas Roofing* refinements of the "public rights" doctrine, this fact, among others, distinguishes that case. In *Atlas Roofing*, OSHA empowered the government to pursue civil penalties and abatement orders whether or not any employees were "actually injured or killed as a result of the [unsafe working] condition." 430 U.S. at 445; *see also id.* at 461 ("[Congress] created a new cause of action, and remedies therefor, unknown to the common law

17

No. 20-61007

. . . ."). The government's right to relief was exclusively a creature of statute and was therefore distinctly public in nature.

In contrast, fraud claims, including the securities-fraud claims here, are quintessentially about the redress of private harms. Indeed, the government alleges that Petitioners defrauded particular investors. *Cf.* 15 U.S.C. §§ 77q(a), 78j(b), 80b-6. As explained above, these fraud claims and civil penalties are analogous to traditional fraud claims at common law in a way that the "new" claims and remedies in *Atlas Roofing* were not. *See Atlas Roofing*, 430 U.S. at 461.

That being so, *Granfinanciera*'s considerations about whether Congress created a new action unfamiliar to the common law, and whether jury trial rights are incompatible with the statutory scheme, are appropriate for us to address even if the suit involves the federal government. And as discussed above: (1) this type of action was commonplace at common law, (2) jury trial rights are consistent and compatible with the statutory scheme, and (3) such actions are commonly considered by federal courts with or without the federal government's involvement. Thus, the agency proceedings below violated Petitioners' Seventh Amendment rights, and the SEC's decision must be vacated.

## C.

Petitioners next argue that Congress unconstitutionally delegated legislative power to the SEC when it gave the SEC the unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency. Because Congress gave the SEC a significant legislative power

No. 20-61007

by failing to provide it with an intelligible principle to guide its use of the delegated power, we agree with Petitioners.[9]

"We the People" are the fountainhead of all government power. Through the Constitution, the People delegated some of that power to the federal government so that it would protect rights and promote the common good. *See* The Federalist No. 10 (James Madison) (explaining that one of the defining features of a republic is "the delegation of the government . . . to a small number of citizens elected by the rest"). But, in keeping with the Founding principles that (1) men are not angels, and (2) "[a]mbition must be made to counteract ambition," *see* The Federalist No. 51 (James Madison), the People did not vest all governmental power in one person or entity. It separated the power among the legislative, executive, and judicial branches. *See* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."). The legislative power is the greatest of these powers, and, of course, it was given to Congress. U.S. Const. art. I, § 1.

The Constitution, in turn, provides strict rules to ensure that Congress exercises the legislative power in a way that comports with the People's will. Every member of Congress is accountable to his or her constituents through regular popular elections. U.S. Const. art I, §§ 2, 3; *id.* amend. XVII, cl. 1. And a duly elected Congress may exercise the legislative power only through the assent of two separately constituted chambers

---

[9] This is an alternative holding that provides ground for vacating the SEC's judgment. "This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) (quoting *United States v. Potts*, 644 F.3d 233, 237 n.3 (5th Cir. 2011)).

No. 20-61007

(bicameralism) and the approval of the President (presentment). U.S. Const. art. I, § 7. This process, cumbersome though it may often seem to eager onlookers,[10] ensures that the People can be heard and that their representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life. *Cf.* Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1017 (2006). ("[T]he Framers weighed the need for federal government efficiency against the potential for abuse and came out heavily in favor of limiting federal government power over crime.").

But that accountability evaporates if a person or entity other than Congress exercises legislative power. *See Gundy v. United States*, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting) ("[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow."). Thus, sequestering that power within the halls of Congress was essential to the Framers. As John Locke—

---

[10] Indeed, President Woodrow Wilson, the original instigator of the agency that became the SEC, believed agencies like that one could solve the "problem" of congressional gridlock and the burden of popular accountability. *See Cochran v. SEC*, 20 F.4th 194, 218 (5th Cir. 2021) (Oldham, J., concurring) ("Wilson's 'new constitution' would ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration, which w[ould] enable the bureaucracy to tend to the details of administering progress without being encumbered by the inefficiencies of politics.'" (quoting Ronald J. Pestritto, Woodrow Wilson and the Roots of Modern Liberalism 227 (2005))), *cert. granted sub nom.*, *SEC v. Cochran*, 21-1239, 2022 WL 1528373 (U.S. May 16, 2022); *see also id.* ("Wilson's goal was to completely separate 'the province of constitutional law' from 'the province of administrative function.'" (quoting Philip Hamburger, Is Administrative Law Unlawful? 464 (2014))).

No. 20-61007

a particularly influential thinker at the Founding—explained, not even the legislative branch itself may give the power away:

> The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others.  The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be.  And when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them.

*Id.* at 2133–34 (quoting John Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 141, p. 71 (1947)).[11]

Article I of the Constitution thus provides that "[*a*]*ll* legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1 (emphasis added).  In keeping with Founding conceptions of separation of powers,[12] the Supreme Court has made clear that Congress cannot "delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825); *see also A.L.A. Schechter Poultry Corp. v.*

---

[11] Locke's perspective on the legislature's delegation of its power was influential in the United States around the time of the framing of the Constitution. *See* Hamburger, *supra* at 384.

[12] Principles of non-delegation had even taken hold in England before the American Founding.  *See* Hamburger, *supra* at 381 (explaining that "even under [King] James I, the judges recognized that the king's prerogative power came from his subjects—that he was exercising a power delegated by the people" and, as a result, he could not transfer the royal powers to anyone else); *see also id.* ("[P]arliamentary subdelegations were widely understood to be unlawful.").

No. 20-61007

*United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."). According to the Supreme Court's more recent formulations of that longstanding rule,[13] Congress may grant regulatory power to another entity only if it provides an "intelligible principle" by which the recipient of the power can exercise it. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). The two questions we must address, then, are (1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power.[14]

We first conclude that Congress has delegated to the SEC what would be legislative power absent a guiding intelligible principle. Government actions are "legislative" if they have "the purpose and effect of altering the legal rights, duties and relations of persons . . . outside the legislative branch." *INS v. Chadha*, 462 U.S. 919, 952 (1983). The Supreme Court has noted that the power to assign disputes to agency adjudication is "peculiarly

---

[13] Some contemporary academics have argued that the non-delegation doctrine lacks a sound historical basis. *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021); *but see* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021) (arguing that the doctrine was present at the Founding); Philip Hamburger, *Delegating or Divesting?*, 115 Nw. U. L. Rev. Online 88 (2020) (similar). Of course, our role as an inferior court is to faithfully apply Supreme Court precedent, so we do not reach the proper historical scope of the non-delegation doctrine. *See Morrow v. Meachum*, 917 F.3d 870, 874 n.4 (5th Cir. 2019).

[14] Adrian Vermeule, *No*, 93 Tex. L. Rev. 1547, 1558 (2015) ("[T]here is [no] delegation of legislative power at all so long as the legislature has supplied an 'intelligible principle' to guide the exercise of delegated discretion. Where there is such a principle, the delegatee is exercising executive power, not legislative power." (emphasis and footnote omitted)).

No. 20-61007

within the authority of the legislative department." *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909).[15] And, as discussed above, in some special circumstances *Congress* has the power to assign to agency adjudication matters traditionally at home in Article III courts. *Atlas Roofing*, 430 U.S. at 455. Through Dodd–Frank § 929P(a), Congress gave *the SEC* the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so. *See* 15 U.S.C. § 78u-2(a). Thus, it gave the SEC the ability to determine which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not. That was a delegation of legislative power. As the Court said in *Crowell v. Benson*, "the mode of determining" which cases are assigned to administrative tribunals "is completely within congressional control." 285 U.S. 22, 50 (1932) (quoting *Ex parte Bakelite Corp.*, 279 U.S. at 451).

The SEC argues that by choosing whether to bring an action in an agency tribunal instead of in an Article III court it merely exercises a form of prosecutorial discretion—an executive, not legislative, power. That position reflects a misunderstanding of the nature of the delegated power. Congress did not, for example, merely give the SEC the power to decide whether to bring enforcement actions in the first place, or to choose where to bring a case among those district courts that might have proper jurisdiction. It instead effectively gave the SEC the power to decide which defendants should

---

[15] Moreover, at the Virginia Ratifying Convention in 1788, then-delegate John Marshall suggested that it is proper to the legislative power to determine the expedience of assigning particular matters for jury trial. *See* John Marshall on the Fairness and Jurisdiction of the Federal Courts, *in* 2 The Debate on the Constitution 740 (Bernard Bailyn ed. 1993) ("The Legislature of Virginia does not give a trial by jury where it is not necessary. But gives it wherever it is thought expedient. The Federal Legislature will do so too, as it is formed on the same principles.").

No. 20-61007

receive *certain legal processes* (those accompanying Article III proceedings) and which should not. Such a decision—to assign certain actions to agency adjudication—is a power that Congress uniquely possesses. *See id.*

Next, Congress did not provide the SEC with an intelligible principle by which to exercise that power. We recognize that the Supreme Court has not in the past several decades held that Congress failed to provide a requisite intelligible principle. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474–75 (2001) (cataloguing the various congressional directives that the Court has found to be "intelligible principle[s]"). But neither in the last eighty years has the Supreme Court considered the issue when Congress offered *no guidance* whatsoever. The last time it did consider such an open-ended delegation of legislative power, it concluded that Congress had acted unconstitutionally: In *Panama Refining Co. v. Ryan*, 293 U.S. 388, 405–06 (1935), the Court considered a statutory provision granting the President the authority to prohibit the transportation in interstate commerce of petroleum and related products. The Court scoured the statute for directives to guide the President's use of that authority, but it found none. *Id.* at 414–20. It therefore explained:

> [I]n every case in which the question has been raised, the Court has recognized that there are limits of delegation which there is no constitutional authority to transcend. We think that section 9(c) goes beyond those limits. As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule.

*Id.* at 430.

Congress's grant of authority to the SEC here is similarly open-ended. Even the SEC agrees that Congress has given it exclusive authority and absolute discretion to decide whether to bring securities fraud enforcement

24

No. 20-61007

actions within the agency instead of in an Article III court. Congress has said nothing at all indicating how the SEC should make that call in any given case. If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution.[16] *See Gundy*, 139 S. Ct. at 2123 (Kagan, J., plurality op.) (noting that "we *would* face a nondelegation question" if the statutory provision at issue had "grant[ed] the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time" (emphasis added)). We therefore vacate the SEC's judgment on this ground as well.

## D.

The SEC proceedings below suffered from another constitutional infirmity: the statutory removal restrictions for SEC ALJs are unconstitutional.[17] SEC ALJs perform substantial executive functions. The President therefore must have sufficient control over the performance of their functions, and, by implication, he must be able to choose who holds the

---

[16] As a member of this court aptly noted just last year, the fact that the modern administrative state is real and robust does not mean courts are never called to declare its limits. *See Cochran*, 20 F.4th at 222 (Oldham, J., concurring) ("If administrative agencies 'are permitted gradually to extend their powers by encroachments—even petty encroachments—upon the fundamental rights, privileges and immunities of the people,' the Court warned that 'we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties.'" (quoting *Jones v. SEC*, 298 U.S. 1, 24–25 (1936))).

[17] Because we vacate the SEC's judgment on various other grounds, we do not decide whether vacating would be the appropriate remedy based on this error alone. *See Collins v. Yellen*, 27 F.4th 1068, 1069 (5th Cir. 2022) (remanding to the district court to determine what remedy, if any, is appropriate in light of the Supreme Court's holding that removal restrictions applicable to the Director of the Federal Housing Finance Agency were unconstitutional).

No. 20-61007

positions.  Two layers of for-cause protection impede that control; Supreme Court precedent forbids such impediment.

Article II provides that the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.   The Supreme Court has held that this provision guarantees the President a certain degree of control over executive officers; the President must have adequate power over officers' appointment and removal.[18]  *Myers v. United States*, 272 U.S. 52, 117 (1926).   Only then can the People, to whom the President is directly accountable, vicariously exercise authority over high-ranking executive officials.  *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010).   Yet not all removal restrictions are constitutionally problematic.   "Inferior officers" may retain some amount of for-cause protection from firing.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 691–92 (1988).   Likewise, even principal officers may retain for-cause protection when they act as part of an expert board.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192 (2020).

But a problem arises when both of those protections act in concert.  In *Free Enterprise Fund*, the Supreme Court considered the constitutionality of two layers of for-cause protection for members of the Public Company Accounting Oversight Board (PCAOB).  561 U.S. at 492.  The members of the board answered to the SEC Commissioners.  But the SEC could remove them only for "willful violations of the [Sarbanes–Oxley] Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance—as determined in a formal Commission order, rendered on the record and after notice and an opportunity for a hearing."  *Id.* at 503.

---

[18] Of course, the President's authority over appointments derives from the Appointments Clause as well.  *See* U.S. Const. art. II, § 2, cl. 2.

No. 20-61007

On top of that, the President could only remove SEC Commissioners for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 486–87, 502. The Supreme Court held that this extensive system insulating PCAOB members from removal deprived the President of the ability to adequately oversee the Board's actions. *Id.* at 492, 496.

The question here is whether SEC ALJs serve sufficiently important executive functions, and whether the restrictions on their removal are sufficiently onerous, that the President has lost the ability to take care that the laws are faithfully executed. Petitioners' argument on this point is straightforward: SEC ALJs are inferior officers; they can only be removed by the SEC Commissioners if good cause is found by the Merits Systems Protection Board; SEC Commissioners and MSPB members can only be removed by the President for cause; so, SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under *Free Enterprise Fund*. The SEC responds that this case is not like *Free Enterprise Fund*. First, it contends that SEC ALJs primarily serve an adjudicatory role. Second, it asserts that the for-cause protections for ALJs are not as stringent as those which applied to PCAOB members at the time of *Free Enterprise Fund*—or, at least, that this court should read the removal protections for ALJs that way to avoid constitutional problems.

We agree with Petitioners and hold that the removal restrictions are unconstitutional. The Supreme Court decided in *Lucia* that SEC ALJs are "inferior officers" under the Appointments Clause because they have substantial authority within SEC enforcement actions. *Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018). And in *Free Enterprise Fund* it explained that the President must have adequate control over officers and how they carry out their functions. 561 U.S. at 492, 496. If principal officers cannot intervene in their inferior officers' actions except in rare cases, the President lacks the

No. 20-61007

control necessary to ensure that the laws are faithfully executed. So, if SEC ALJs are "inferior officers" of an executive agency, as the Supreme Court in *Lucia* indicated was the case at least for the purposes of the Appointments Clause, they are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions. Specifically, SEC ALJs exercise considerable power over administrative case records by controlling the presentation and admission of evidence; they may punish contemptuous conduct; and often their decisions are final and binding. *Lucia*, 138 S. Ct. at 2053–54. But 5 U.S.C. § 7521(a) provides that SEC ALJs may be removed by the Commission "only for good cause established and determined by the Merit Systems Protection Board (MSPB) on the record after opportunity for hearing before the Board." (Parenthetical not in original.) And the SEC Commissioners may only be removed by the President for good cause.

The dissenting opinion's response is all built on dicta from *Free Enterprise Fund*. There, in noting what issues the Court was leaving open, the Court identified characteristics that were true of ALJs that were not true of PCAOB members: "[U]nlike members of the [PCAOB], many" ALJs "perform adjudicative rather than enforcement or policymaking functions." *Free Enterprise Fund*, 561 U.S. at 507 n.10. Far from "stat[ing]" that this "may justify multiple layers of removal protection," *post* at 22, the Court merely identified that its decision does not resolve the issue presented here. In any event, the Court itself said in *Myers* that "quasi[-]judicial" executive officers must nonetheless be removable by the President "on the ground that the discretion regularly entrusted to that officer by statute has not been on

No. 20-61007

the whole intelligently or wisely exercised." 272 U.S. at 135.[19] So even if ALJs' functions are more adjudicative than PCAOB members, the fact remains that two layers of insulation impedes the President's power to remove ALJs based on their exercise of the discretion granted to them.[20]

Finally, the SEC urges us to interpret the for-cause protections for ALJs to instead allow removal for essentially any reason. Even if we could do so (and the statutory language likely does not give us that flexibility), that

---

[19] The dissenting opinion deems this proposition from *Myers* to be *obiter dicta* that the Court subsequently disregarded in *Humphrey's Executor v. United States*, 295 U.S. 602, 626–28 (1935). *Post* at 54 n.113. But that itself is to disregard the Supreme Court's more recent guidance, which fortifies the Court's "landmark decision" in *Myers* and narrowed *Humphrey's Executor*. *See Seila Law*, 140 S. Ct. at 2191–92, 2197–99 & n.2 (limiting the *Humphrey's Executor* exception to *Myers* to cases involving "for-cause removal protections [given] to a multimember body of experts, balanced along partisan lines, that perform[] legislative and judicial functions and [are] said not to exercise any executive power," while casting doubt on the existence of wholly non-executive, quasi-legislative or quasi-judicial agency powers altogether); *see also City of Arlington v. F.C.C.*, 569 U.S. 290, 305 n.4 (2013) (noting that "'[agency] activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power'" (citing U.S. Const. art. II, § 1, cl. 1)).

[20] In the next breath, the dissenting position draws from a law review article that "[t]he ALJs' role is similar to that of a federal judge." *Post* at 52. It then concludes that they must be insulated from removal by the president to maintain their independence. But that analogy runs out under a little scrutiny. The SEC's ALJs are not mere neutral arbiters of federal securities law; they are integral pieces within the SEC's powerful enforcement apparatus. The ALJs report to the Commission itself and act under authority delegated by it. SEC Organization Chart (2020), https://www.sec.gov/about/secorg.pdf; 15 U.S.C. § 78d-1(a); 17 C.F.R. § 200.30-10. As the amicus brief by the Cato Institute points out, these administrative proceedings differ significantly from cases resolved in federal district courts and reviewed by federal courts of appeals. Cato Amicus Br. at 19–31. First, the Commission has *ex parte* discussions with the prosecutors to determine whether to pursue securities-fraud claims. Then the Commission itself decides what claims should be brought by the prosecutors. Only then do ALJs resolve the claims, which are then again reviewed by the Commission. Suffice it to say, even if ALJs have some of the same "tools of federal trial judges," *Lucia*, 138 S. Ct. at 2053, they use those tools at the direction of and with the power delegated to them by the Commission.

No. 20-61007

would not solve the Article II problem. As noted above, the MSPB is part of the mix as well. Furthermore, MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). So, for an SEC ALJ to be removed, the MSPB must find good cause and the Commission must choose to act on that finding. And members of both the MSPB and the Commission have for-cause protection from removal by the President. Simply put, if the President wanted an SEC ALJ to be removed, at least two layers of for-cause protection stand in the President's way.

Thus, SEC ALJs are sufficiently insulated from removal that the President cannot take care that the laws are faithfully executed. The statutory removal restrictions are unconstitutional.

### III.

In sum, we agree with Petitioners that the SEC proceedings below were unconstitutional. The SEC's judgment should be vacated for at least two reasons: (1) Petitioners were deprived of their Seventh Amendment right to a civil jury; and (2) Congress unconstitutionally delegated legislative power to the SEC by failing to give the SEC an intelligible principle by which to exercise the delegated power. We also hold that the statutory removal restrictions for SEC ALJs are unconstitutional, though we do not address whether vacating would be appropriate based on that defect alone.[21]

We GRANT the petition for review, VACATE the decision of the SEC, and REMAND for further proceedings consistent with this opinion.

---

[21] Petitioners also argue that the SEC violated their equal protection rights, and that its decision was infected with bias and violated their due process rights. Because we vacate the SEC's decision on other grounds, we decline to reach these issues.

No. 20-61007

W. EUGENE DAVIS, *Circuit Judge*, dissenting:

The majority holds that (1) administrative adjudication of the SEC's enforcement action violated Petitioners' Seventh Amendment right to a jury trial; (2) Congress unconstitutionally delegated an Article I legislative power to the executive branch when it gave the SEC the discretion to choose between bringing its enforcement action in an Article III court or before the agency without providing an intelligible principle to guide the SEC's decision; and (3) the removal protections on SEC administrative law judges violate Article II's requirement that the President "take Care that the Laws be faithfully executed." I respectfully disagree with each of these conclusions.

## I.

The majority holds that the Seventh Amendment grants Petitioners the right to a jury trial on the facts underlying the SEC's enforcement action, and administrative adjudication without a jury violated that right. In reaching this conclusion, the majority correctly recognizes that a case involving "public rights" may be adjudicated in an agency proceeding without a jury notwithstanding the Seventh Amendment.[1] But, the majority then erroneously concludes that the SEC's enforcement action does not involve "public rights." In my view, the majority misreads the Supreme Court's decisions addressing what are and are not "public rights."

---

[1] *See, e.g., Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 n.4 (1989) ("If a claim that is legal in nature asserts a 'public right,' . . . then the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency or specialized court of equity. The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.'" (citation omitted)).

No. 20-61007

## A.

As declared by Professors Wright and Miller, "A definitive statement by the Supreme Court regarding congressional authority in this context is found in *Atlas Roofing v. Occupational Safety & Health Review Commission.*"[2] That case concerned the Occupational Safety and Health Act ("OSHA" or "the Act"), which created a new statutory duty on employers to avoid maintaining unsafe or unhealthy working conditions. OSHA also empowered the Federal Government, proceeding before an administrative agency without a jury, to impose civil penalties on those who violated the Act.[3] Two employers who had been cited for violating the Act argued that a suit in a federal court by the Government seeking civil penalties for violation of a statute is classically a suit at common law for which the Seventh Amendment provides a right to a jury trial; therefore, Congress cannot deprive them of that right by simply assigning the function of adjudicating the Government's right to civil penalties to an administrative forum where no jury is available.[4] The Court, in a unanimous opinion, disagreed:

> At least in cases in which "public rights" are being litigated—
> *e.g.,* ***cases in which the Government sues in its sovereign
> capacity to enforce public rights created by statutes within the
> power of Congress to enact***—the Seventh Amendment does
> not prohibit Congress from assigning the factfinding function
> and initial adjudication to an administrative forum with which
> the jury would be incompatible. . . . This is the case even if the
> Seventh Amendment would have required a jury where the

---

[2] 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2302.2, at 59 (4th ed. 2020) (citing *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n,* 430 U.S. 442 (1977)) (italics added).

[3] *Atlas Roofing,* 430 U.S. at 445.

[4] *Id.* at 449–50.

No. 20-61007

adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.[5]

*Atlas Roofing* drew its definition of "public rights" from, inter alia, *Crowell v. Benson*, which described "public rights" in slightly broader terms: matters "*which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.*"[6]

The Supreme Court has never retreated from its holding in *Atlas Roofing*.[7] In fact, the Court implicitly re-affirmed *Atlas Roofing*'s definition of "public rights" as recently as 2018, when it decided *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*.[8] That case involved the Leahy-Smith America Invents Act, which granted the Patent and Trademark Office ("PTO") the power to reconsider a previously-issued patent via an administrative process called "inter partes review."[9] This was a departure from historical practice, which placed this function in Article III courts alone.[10] The petitioner argued that inter partes review violated both Article

---

[5] *Id.* at 450, 455 (emphasis added; paragraph break omitted); *see also id.* at 458 ("Our prior cases support administrative factfinding in only those situations involving 'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights.").

[6] *Id.* at 452 (quoting *Crowell v. Benson*, 285 U.S. 22, 50 (1932)) (emphasis added); *see also id.* at 456, 457, 460 (citing *Crowell*, 285 U.S. 22).

[7] Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 U. Pa. J. Const. L. 45, 95 (2016).

[8] 138 S. Ct. 1365 (2018).

[9] *Id.* at 1370–72.

[10] *Id.* at 1384 (Gorsuch, J., dissenting) ("[F]rom the time it established the American patent system in 1790 until about 1980, Congress left the job of invalidating patents at the federal level to courts alone.").

No. 20-61007

III and the Seventh Amendment.[11] The Court disagreed and explained that Congress has "significant latitude" to assign adjudication of "public rights" to non-Article III tribunals that do not use a jury.[12] Moreover, the Court, quoting *Crowell*, defined "public rights" as "matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'"[13]

As mentioned, *Atlas Roofing*'s definition of "public rights" is a slightly narrower version of *Crowell*'s definition. Thus, when *Oil States* re-affirmed *Crowell*, it necessarily re-affirmed *Atlas Roofing*'s definition as well.[14]

*Oil States* is also significant because it held that historical practice is not determinative in matters governed by the public rights doctrine, as such matters "'from their nature' can be resolved in multiple ways."[15] Accordingly, the Court rejected the view that "because courts have traditionally adjudicated patent validity in this country, courts must forever continue to do so."[16]

---

[11] *Id.* at 1372.

[12] *Id.* at 1373, 1379.

[13] *Id.* at 1373 (quoting *Crowell*, 285 U.S. at 50).

[14] *Oil States* did not purport to provide an exhaustive definition of "public rights," and the opinion alludes to the possibility that, under certain circumstances, matters not involving the Government may also fall within the realm of "public rights." *See id.* However, the Court did not need to address these other, "various formulations" of "public rights," because inter partes review fell squarely within *Crowell*'s definition. *See id.* This court reached a similar conclusion in *Austin v. Shalala*, discussed below.

[15] *Id.* at 1378 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929)).

[16] *Id.*; *see also id.* ("That Congress chose the courts in the past does not foreclose its choice of the PTO today.").

34

No. 20-61007

Like *Oil States*, this court relied on *Crowell* to define "public rights" in *Austin v. Shalala*.[17] That case involved the Government's action to recover overpayment of social security benefits via an administrative proceeding before the Social Security Administration.[18] *Austin* rejected the plaintiff's argument that the proceeding violated her Seventh Amendment right, explaining that "if Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws"—as was done in *Atlas Roofing* and in the securities statutes at issue here—"it plainly may employ such a body to recover overpayments of government largess."[19]

Consistent with the above cases, our sister circuits routinely hold that an enforcement action by the Government for violations of a federal statute or regulation is a "public right" that Congress may assign to an agency for adjudication without offending the Seventh Amendment.[20] For example, the Eleventh Circuit relied solely on *Atlas Roofing* when it rejected a Seventh Amendment challenge to administrative adjudication of an *SEC* enforcement action and declared "it is well-established that the Seventh

---

[17] 994 F.2d 1170, 1177 (5th Cir. 1993).

[18] *Id.* at 1173.

[19] *Id.* at 1177-78 (citing *Oceanic Steam Navigation Co. v. Stranahan*, 412 U.S. 320, 339 (1909)).

[20] *See, e.g., Imperato v. SEC*, 693 F. App'x 870, 876 (11th Cir. 2017) (unpublished) (administrative adjudication for violations of the Securities Exchange Act); *Crude Co. v. FERC*, 135 F.3d 1445, 1454-55 (Fed. Cir. 1998) (Mandatory Petroleum Allocation Regulations); *Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995) (Financial Institutions Reform, Recovery and Enforcement Act); *Sasser v. Adm'r EPA*, 990 F.2d 127, 130 (4th Cir. 1993) (Clean Water Act).

No. 20-61007

Amendment does not require a jury trial in administrative proceedings designed to adjudicate statutory 'public rights.'"[21]

The SEC's enforcement action satisfies *Atlas Roofing*'s definition of a "public right," as well as the slightly broader definition set forth in *Crowell* and applied in *Oil States* and *Austin*. The broad congressional purpose of the securities laws is to "protect investors."[22] For example, the Securities Act of 1933 was "designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."[23] The Dodd-Frank Act, which, inter alia, expanded the SEC's authority to pursue civil penalties in administrative proceedings,[24] was "intended to improve investor protection," particularly in light of the Bernard Madoff Ponzi scheme.[25] Other circuits have consistently recognized that "[w]hen the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's

---

[21] *Imperato*, 693 F. App'x at 876 (citing *Atlas Roofing*, 430 U.S. at 455–56).

[22] *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 592 (5th Cir. 1974).

[23] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). In a similar vein, the Investment Advisers Act of 1940 seeks to "protect[] investors through the prophylaxis of disclosure," in order to eliminate "the darkness and ignorance of commercial secrecy," which "are the conditions upon which predatory practices best thrive." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 200 (1963).

[24] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Sec. 929P, 124 Stat. 1376, 1862–64 (2010) (codified at 15 U.S.C. §§ 77h-1(g), 78u-2(a), 80a-9(d), 80b-3(i)).

[25] Mark Jickling, Congressional Research Service, R41503 *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Title IX, Investor Protection* at i (2010).

No. 20-61007

sovereign capacity."[26] Thus, the SEC's enforcement action is a "public right" because it is a case "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact."[27] It is also a matter "which arise[s] between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."[28]

Because the SEC's enforcement action is a "public right," the Seventh Amendment does not prohibit Congress from assigning its adjudication to an administrative forum that lacks a jury.[29] As discussed below, the fact that the securities statutes at issue resemble (but are not identical to) common-law fraud does not change this result.[30] It also makes

---

[26] *SEC v. Diversified*, 378 F.3d 1219, 1224 (11th Cir. 2004), *abrogated on other grounds by Kokesh v. SEC*, 137 S. Ct. 1635 (2017); *see also SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993); *United States v. Badger*, 818 F.3d 563, 566 (10th Cir. 2016).

[27] *Atlas Roofing*, 430 U.S. at 450.

[28] *Crowell*, 285 U.S. at 22; *Oil States*, 138 S. Ct. at 1373; *Austin*, 994 F.2d at 1177.

The majority asserts that "[t]he dissenting opinion cannot define a 'public right' without using the term itself in the definition." First, I rely on definitions the Supreme Court has provided. Second, while *Atlas Roofing* does use "public rights" to define "public rights," *Crowell* does not. Furthermore, *Granfinanciera* observed that *Atlas Roofing* "left the term 'public rights' undefined" and so looked to *Crowell* to fill in any perceived gap. *Granfinanciera*, 492 U.S. at 51 n.8; *see also id.* at 53 (noting that, under *Atlas Roofing*, a "public right" is simply "a statutory cause of action [that] inheres in, or lies against, the Federal Government in its sovereign capacity").

[29] *Atlas Roofing*, 430 U.S. at 450; *Granfinanciera*, 492 U.S. at 52–54; *Oil States*, 138 S. Ct. at 1379.

[30] *See Granfinanciera*, 492 U.S. at 52 ("Congress may fashion causes of action that are closely **analogous** to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable" if the action involves "public rights.").

No. 20-61007

no difference that federal courts have decided claims under the securities statutes for decades.[31]

## B.

The majority's conclusion that the SEC's enforcement action is not a "public right" is based primarily on an erroneous reading of *Granfinanciera, S.A. v. Nordberg.*[32] Specifically, the majority interprets that case as abrogating *Atlas Roofing*. *Granfinanciera* did nothing of the sort.

In *Granfinanciera*, a bankruptcy trustee sued in bankruptcy court (where a jury was unavailable) to avoid allegedly fraudulent transfers the defendants had received from the debtor.[33] The defendants argued that they were entitled to a jury trial under the Seventh Amendment.[34] A key issue was whether the trustee's claim involved "public" or "private" rights. The Court held that the action was a private right.[35]

Unlike *Atlas Roofing, Granfinanciera* did not involve a suit by or against the Federal Government. This distinction is important. In discussing what constitutes a "public right," *Granfinanciera*, citing *Atlas Roofing*, recognized that "Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action *inheres in, or lies*

---

[31] *See Oil States*, 138 S. Ct. at 1378 ("[W]e disagree with the dissent's assumption that, because courts have traditionally adjudicated patent validity in this country, courts must forever continue to do so. Historical practice is not decisive . . . [in] matters governed by the public-rights doctrine . . . . That Congress chose the courts in the past does not foreclose its choice of the PTO today.")

[32] 492 U.S. 33.

[33] *Id.* at 36.

[34] *Id.* at 40.

[35] *Id.* at 55, 64.

No. 20-61007

*against, the Federal Government in its sovereign capacity*."[36] *Granfinanciera* then clarified that "the class of 'public rights' whose adjudication Congress may assign to administrative agencies . . . *is more expansive* than *Atlas Roofing*'s discussion suggests";[37] i.e., the "Government need not be a party for a case to revolve around 'public rights'" provided certain other criteria are met.[38] Nevertheless, and contrary to what is implied by the majority, *Granfinanciera*'s recognition that the public-rights doctrine can extend to cases where the Government is not a party in no way undermines or alters *Atlas Roofing*'s holding that a case where the Government sues in its sovereign capacity to enforce a statutory right is a case involving "public rights."[39]

Because the bankruptcy trustee's suit involved only private parties and not the Government, *Granfinanciera*'s analysis is solely concerned with whether the action was one of the "seemingly 'private' right[s]" that are

---

[36] *Granfinanciera*, 492 U.S. at 53 (citing *Atlas Roofing*, 430 U.S. at 458) (emphasis added).

[37] *Id.* at 53 (emphasis added).

[38] *Id.* at 54 (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 586, 596–99 (1985)).

[39] *Granfinanciera* itself makes this clear when it states:

The crucial question, *in cases not involving the Federal Government*, is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, *and if that right neither belongs to nor exists against the Federal Government*, then it must be adjudicated by an Article III court.

*Id.* at 54-55 (quoting *Thomas*, 473 U.S. at 593–94) (footnote omitted; emphasis added; bracketed alterations in original).

No. 20-61007

within the reach of the public-rights doctrine. Thus, any considerations or requirements discussed in *Granfinanciera* that go beyond *Atlas Roofing* or *Crowell* apply only to cases not involving the Government.

This understanding of *Granfinanciera* is supported by our subsequent decision in *Austin*, which stated:

> Although the definition is somewhat nebulous, at a minimum, suits involving public rights are those "which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell v. Benson*, 285 U.S. 22, 50, 52 S. Ct. 285, 292, 76 L.Ed. 598 (1932). ***Beyond that***, certain ***other cases*** are said to involve public rights where Congress has created a "seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." *Granfinanciera*, 492 U.S. at 54 . . . .[40]

Similarly, while *Oil States* acknowledged that *Crowell* did not provide the sole definition of what constitutes a "public right," it did not discuss any of the other "formulations" because *Crowell*'s definition was met.[41]

The majority overlooks the fact that *Granfinanciera*'s expansion of the public-rights doctrine applies only when the Government is not a party to the case. As a result, the majority applies "considerations" that have no relevance here. For example, the majority, quoting *Granfinanciera*, states that "jury trials would not 'go far to dismantle the statutory scheme' or 'impede swift resolution' of statutory claims." Again, *Granfinanciera* discussed these considerations in the context of a suit between private

---

[40] *Austin*, 994 F.2d at 1177 (emphasis added).

[41] *Oil States*, 138 S. Ct. at 1373.

40

No. 20-61007

persons, not a case involving the Government acting in its sovereign capacity under an otherwise valid statute creating enforceable public rights.[42] Indeed, neither *Austin* nor *Oil States*, both of which were decided after *Granfinanciera* and which found public rights to exist, mentions these considerations.[43]

The majority also states that the securities statutes at issue created causes of action that "reflect" and "echo" common-law fraud. But this does not matter, because, as *Granfinanciera* itself recognized, the public-rights doctrine allows Congress to "fashion causes of action that are closely *analogous* to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable."[44]

The majority asserts that *Atlas Roofing* is distinguishable from the SEC's enforcement action because "OSHA empowered the government to pursue civil penalties regardless of whether any employe[e]s were 'actually injured or killed as a result of the [unsafe working] condition.'"[45] But the securities statutes share this feature: The SEC may impose civil penalties on

---

[42] *Granfinanciera*, 492 U.S. at 61, 63.

[43] The same goes for the out-of-circuit decisions cited in footnote 20 above. *Atlas Roofing*, in a footnote, does make a passing reference to "go far to dismantle the statutory scheme." 430 U.S. at 454 n.11. But the Court was merely describing its reasoning in another bankruptcy case. Nothing in *Atlas Roofing* suggests that this consideration is relevant to whether Congress may assign the Government's enforcement action to an administrative proceeding lacking a jury.

[44] *Granfinanciera*, 492 U.S. at 52 (citations omitted); *see also id.* at 53 ("Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity." (citing *Atlas Roofing*, 430 U.S. at 458)); *accord Crude Co.*, 135 F.3d at 1455 ("The public right at issue is not converted into a common law tort simply because the theory of liability underlying the enforcement action is analogous to a common law tort theory of vicarious liability.").

[45] Majority Op. at 17–18 (quoting *Atlas Roofing*, 430 U.S. at 445).

No. 20-61007

a person who makes a material misrepresentation even if no harm resulted from the misrepresentation.[46] The statutory cause of action created by the securities statutes is as "new" to the common law as the one created by OSHA.[47]

Relatedly, the majority harps on the fact that federal courts have dealt with actions under the securities statutes for decades. But *Oil States* makes clear that "[h]istorical practice is not decisive here."[48] "That Congress chose the courts in the past does not foreclose its choice of [an administrative adjudication] today."[49]

The majority also states that "securities-fraud enforcement actions are not the sort that are uniquely suited for agency adjudication." Again, this is not relevant. As *Oil States* explained, "the public-rights doctrine applies to matters 'arising between the government and others, which from their nature

---

[46] *See* 15 U.S.C. §§ 78u-2(c), 77h-1(g)(1), 80a-9(d)(3), 80b-3(i)(3).

[47] *Atlas Roofing* recognized that, before (and after) OSHA, a person injured by an unsafe workplace condition may have an action at common law for negligence. *See Atlas Roofing*, 430 U.S. at 445. Through OSHA, specific safety standards were promulgated, and the Government could bring an enforcement action for a violation even if no one was harmed by the violation. *Id.* Similarly, before enactment of the securities statutes, an investor who was defrauded in the course of a securities transaction had a common-law action for fraud. Like OSHA, the securities statutes expressly prohibited certain conduct and empowered the SEC to bring an enforcement action for a violation, even if no one was actually harmed by the violation.

[48] 138 S. Ct. at 1378.

[49] *Id. Oil States* likewise refutes the majority's assertion that "[t]he inquiry is thus inherently historical." I add that the majority's support for this proposition consists of a concurring opinion in *Granfinanciera* and the plurality opinion in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50 (1982) (plurality), which addressed whether a bankruptcy court may decide a breach of contract action between two private parties.

No. 20-61007

do not require judicial determination *and yet are susceptible of it*.'"[50] Indeed, "matters governed by the public-rights doctrine 'from their nature' can be resolved in multiple ways."[51]

Finally, it should be emphasized that *Tull v. United States*[52] does not control the outcome here. That case concerned the Government's suit *in district court* seeking civil penalties and an injunction for violations of the Clean Water Act.[53] *Tull* did not involve an administrative proceeding. Thus, while *Tull* concluded that the Government's claim was analogous to a "Suit at common law" for Seventh Amendment purposes,[54] the Court did not engage in the "quite distinct inquiry" into whether the claim was also a "public right" that Congress may assign to a non-Article III forum where juries are unavailable.[55] *Tull* itself acknowledges in a footnote prior decisions "holding that the Seventh Amendment is not applicable to administrative proceedings," making clear that it was not deciding whether the defendant would be entitled to a jury in an administrative adjudication.[56]

## C.

In summary, the SEC's enforcement action against Petitioners for violations of the securities laws is a "public right" under Supreme Court precedent as well as our own. Accordingly, Congress could and did validly

---

[50] *Id.* at 1373 (citing *Crowell*, 285 U.S. at 50) (emphasis added).

[51] *Id.* at 1378 (quoting *Ex parte Bakelite Corp.*, 279 U.S. at 451).

[52] 481 U.S. 412 (1987).

[53] *Id.* at 414–15.

[54] *Id.* at 425.

[55] *Granfinanciera*, 492 U.S. at 42 n.4; *accord Sasser*, 990 F.2d at 130.

[56] *Tull*, 481 U.S. at 418 n.4 (citing *Atlas Roofing*, 430 U.S. at 454; *Pernell v. Southall Realty*, 416 U.S. 363, 383 (1974)).

No. 20-61007

assign adjudication of that action to an administrative forum where the Seventh Amendment does not require a jury.

## II.

I also disagree with the majority's alternative holding that Congress exceeded its power by giving the SEC the authority to choose to bring its enforcement action in either an agency proceeding without a jury or to a court with a jury. The majority reasons that giving the SEC this power without providing guidelines on the use of that power violates Article I by delegating its legislative authority to the agency. The majority's position runs counter to Supreme Court precedent. As set forth below, by authorizing the SEC to bring enforcement actions either in federal court or in agency proceedings, Congress fulfilled its legislative duty.

In support of its determination that Congress unconstitutionally delegated its authority to the SEC, the majority relies on *Crowell v. Benson*, wherein the Supreme Court explained that "the mode of determining" cases involving public rights "is completely within congressional control."[57] *Crowell* did not state that Congress cannot authorize that a case involving public rights may be determined in either of two ways. By passing Dodd-Frank § 929P(a), Congress established that SEC enforcement actions can be brought in Article III courts or in administrative proceedings. In doing so, Congress fulfilled its duty of controlling the mode of determining public rights cases asserted by the SEC.

The majority maintains that because the SEC has "the power to decide which defendants should receive certain legal processes (those accompanying Article III proceedings) and which should not," then such a

---

[57] 285 U.S. at 50 (quoting *Ex parte Bakelite Corp.*, 279 U.S. at 451).

44

No. 20-61007

decision falls under Congress's legislative power. The Supreme Court's decision in *United States v. Batchelder*[58] demonstrates that the majority's position on this issue is incorrect.

In *Batchelder*, the issue presented was whether it was constitutional for Congress to allow the Government, when prosecuting a defendant, to choose between two criminal statutes that "provide[d] different penalties for essentially the same conduct."[59] The defendant had been convicted under the statute with the higher sentencing range, and the Court of Appeals determined that the delegation of authority to prosecutors to decide between the two statutes, and thus choose a higher sentencing range for identical conduct, was a violation of due process and the nondelegation doctrine.[60] Specifically, the Court of Appeals determined that "such prosecutorial discretion could produce 'unequal justice'" and that it might be "impermissibl[e] [to] delegate to the Executive Branch the Legislature's responsibility to fix criminal penalties."[61]

The Supreme Court disagreed. The Court explained that "[t]he provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose."[62] The Court further stated: "In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws."[63] The Court concluded: "Having informed the courts, prosecutors,

--------

[58] 442 U.S. 114 (1979).

[59] *Id.* at 116.

[60] *Id.* at 123, 125–26.

[61] *Id.* at 125–26.

[62] *Id.* at 126.

[63] *Id.*

No. 20-61007

and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty."[64]

The Supreme Court has analogized agency enforcement decisions to prosecutorial discretion exercised in criminal cases.[65] If the Government's prosecutorial authority to decide between two criminal statutes that provide for different sentencing ranges for essentially the same conduct does not violate the nondelegation doctrine, then surely the SEC's authority to decide between two forums that provide different legal processes does not violate the nondelegation doctrine. Thus, the SEC's forum-selection authority is part and parcel of its prosecutorial authority.[66]

Although no other circuit court appears to have addressed the particular nondelegation issue presented in this case, a district court did so in *Hill v. SEC*.[67] Like the majority does here, the plaintiff in *Hill* relied on *I.N.S. v. Chadha*[68] to assert that the SEC's choice of forum is a legislative action because it "alter[s] the rights, duties, and legal relations of individuals."[69] *Chadha* addressed the question whether a provision in the Immigration and

---

[64] *Id.* (citation omitted).

[65] *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch . . . .").

[66] *Cf. SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.") (citation omitted).

[67] 114 F. Supp. 3d 1297 (N.D. Ga. 2015) (holding that SEC's forum-selection authority does not violate the nondelegation doctrine), *vacated and remanded on other grounds*, 825 F.3d 1236 (11th Cir. 2016).

[68] 462 U.S. 919 (1983).

[69] *Hill*, 114 F. Supp. 3d at 1312 (quoting *Chadha*, 462 U.S. at 952).

No. 20-61007

Nationality Act (INA) allowing one House of Congress to veto the Attorney General's decision to allow a particular deportable alien to remain in the United States violated the Presentment Clauses and bicameral requirement of Article I.[70] Specifically, it addressed whether Congress, after validly delegating authority to the Executive, can then alter or revoke that valid delegation of authority through the action of just one House.

I agree with the district court in *Hill* that if *Chadha*'s definition of legislative action is interpreted broadly and out of context, then any SEC decision which affected a person's legal rights—including charging decisions—would be legislative actions, which is contrary to the Supreme Court's decision in *Batchelder*.[71] *Chadha*, one of the primary authorities the majority relies on, does not touch on any issue involved in this case.

I agree with the persuasive and well-reasoned decision of the district court in *Hill* that "Congress has properly delegated power to the executive branch to make the forum choice for the underlying SEC enforcement action."[72] In sum, it is clear to me that Congress's decision to give prosecutorial authority to the SEC to choose between an Article III court and an administrative proceeding for its enforcement actions does not violate the nondelegation doctrine.

## III.

Finally, the majority concludes that the statutory removal restrictions applicable to SEC administrative law judges are unconstitutional because they violate Article II's requirement that the President "take Care that the

---

[70] 462 U.S. at 923, 946.

[71] *Hill*, 114 F. Supp. 3d at 1313.

[72] *Id.*

No. 20-61007

Laws be faithfully executed." Specifically, the majority determines that SEC ALJs enjoy at least two layers of for-cause protection, and that such insulation from the President's removal power is unconstitutional in light of the Supreme Court's decisions in *Free Enterprise Fund v. Public Company Accounting Oversight Board*[73] and *Lucia v. SEC*.[74] I disagree. Rather than support the majority's conclusion, these cases explain why the SEC ALJs' tenure protections are constitutional: ALJs perform an adjudicative function.

*Free Enterprise* concerned the Public Company Accounting Oversight Board ("PCAOB"), which Congress created in 2002 to regulate the accounting industry.[75] The PCAOB's powers included promulgating standards, inspecting accounting firms, initiating formal investigations and disciplinary proceedings, and issuing sanctions.[76] In other words, PCAOB members were inferior officers who exercised "significant executive power."[77] The President could not remove the members of the PCAOB; rather, they could be removed by the Securities and Exchange Commission under certain, limited circumstances.[78] Furthermore, SEC Commissioners cannot themselves be removed by the President except for inefficiency, neglect of duty, or malfeasance in office.[79] While prior cases upheld restrictions on the President's removal power that imposed one level of protected tenure, *Free Enterprise* held that these dual for-cause limitations on

---

[73] 561 U.S. 477 (2010).

[74] 138 S. Ct. 2044 (2018).

[75] *Id.* at 484-85.

[76] *Id.* at 485.

[77] *Id.* at 514.

[78] *Id.* at 486, 503.

[79] *Id.* at 487.

No. 20-61007

the removal of PCAOB members unconstitutionally impaired the President's ability to ensure that the laws are faithfully executed, because "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the [PCAOB]."[80]

*Free Enterprise*, however, "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional."[81] Furthermore, the Court expressly declined to address "that subset of independent agency employees who serve as administrative law judges."[82] The Court made two observations about ALJs that potentially distinguished them from the PCAOB: (1) whether ALJs are "Officers of the United States" was, at that time, a disputed question, and (2) "unlike members of the [PCAOB], many administrative law judges of course perform *adjudicative rather than enforcement or policymaking functions or possess purely recommendatory powers*."[83]

The Supreme Court subsequently addressed the first observation in *Lucia v. SEC*.[84] There, the Court held that SEC ALJs are "inferior officers" within the meaning of the Appointments Clause in Article II.[85] However, the Court again expressly declined to decide whether multiple layers of statutory removal restrictions on SEC ALJs violate Article II.[86]

---

[80] *Id.* at 496.

[81] *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1122 (9th Cir. 2021).

[82] *Free Enter. Fund*, 516 U.S. at 507 n.10.

[83] *Id.* (citations omitted; emphasis added).

[84] 138 S. Ct. 2044 (2018).

[85] *Id.* at 2055.

[86] *Id.* at 2051 & n.1.

No. 20-61007

Thus, neither *Free Enterprise* nor *Lucia* decided the issue raised here: whether multiple layers of removal restrictions for SEC ALJs violate Article II. As the Ninth Circuit recently concluded, the question is open.[87]

It is important to recognize that the Constitution does not expressly prohibit removal protections for "Officers of the United States."[88] The concept that such protections may be unconstitutional is drawn from the fact that "Article II vests '[t]he executive Power . . . in a President of the United States of America,' who must 'take Care that the Laws be faithfully executed.'"[89] The test is functional, not categorical:

> The analysis contained in our removal cases is designed ***not*** to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II.[90]

Consistent with this standard, *Free Enterprise* thoroughly explained why two levels of removal protection for the PCAOB interfered with the executive power.[91] The first step in the Court's analysis focused on the fact that the PCAOB exercised "significant executive power"[92] as it

---

[87] *See Decker Coal Co.*, 8 F.4th at 1122.

[88] Erwin Chemerinsky, Constitutional Law § 4.2 (5th ed. 2015) ("No constitutional provision addresses the [President's] removal power.").

[89] *Free Enter. Fund*, 561 U.S. at 483 (quoting U.S. Const. , art. II §§ 1 & 3).

[90] *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988) (footnote omitted; emphasis added).

[91] *Free Enter. Fund*, 561 U.S. at 495–96.

[92] *Id.* at 514.

No. 20-61007

"determine[d] the policy and enforce[d] the laws of the United States."[93] Then the Court explained how the PCAOB's removal protections subverted the President's ability to oversee this power.[94] The point here is that the function performed by the officer is critical to the analysis—the Court did not simply conclude that because members of the PCAOB were "Officers of the United States" (which was undisputed)[95] that dual for-cause protections were unconstitutional.

Unlike the PCAOB members who determine policy and enforce laws, SEC ALJs perform solely adjudicative functions. As the *Lucia* Court stated, "an SEC ALJ exercises authority 'comparable to' that of a federal district judge conducting a bench trial."[96] Their powers include supervising discovery, issuing subpoenas, deciding motions, ruling on the admissibility of evidence, hearing and examining witnesses, generally regulating the course of the proceeding, and imposing sanctions for contemptuous conduct or procedural violations.[97] After a hearing, the ALJ issues an initial decision that is subject to review by the Commission.[98] Commentators have similarly observed that "SEC ALJs do not engage in enforcement or rulemaking"[99]

---

[93] *Id.* at 484; *see also id.* at 508 (describing the PCAOB as "the regulator of first resort and the primary law enforcement authority for a vital sector of our economy").

[94] *Id.* at 498.

[95] *Id.* at 506.

[96] *Lucia*, 138 S. Ct. at 2049 (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)).

[97] *Id.*

[98] *Id.*

[99] Mark, *supra*, at 107.

No. 20-61007

and proceedings before them are "analogous to that which would occur before a federal judge."[100]

Free Enterprise stated, albeit in dicta, that the fact that an ALJ performs adjudicative rather than enforcement or policymaking functions may justify multiples layers of removal protection.[101] I believe this to be the case. The ALJs' role is similar to that of a federal judge;[102] it is not central to the functioning of the Executive Branch for purposes of the Article II removal precedents.[103] As the Southern District of New York concluded, invalidating the "good cause" removal restrictions enjoyed by SEC ALJs would only "undermine the ALJs' clear adjudicatory role and their ability to 'exercise[ ] ... independent judgment on the evidence before [them], free from pressures by the parties or other officials within the agency.'"[104]

In fact, the Ninth Circuit recently employed similar reasoning in Decker Coal Co. v. Pehringer, which held that two layers of removal protection for ALJs in the Department of Labor do not violate Article II.[105] Like SEC ALJs, the ALJs in Decker Coal performed "a purely adjudicatory

---

[100] David Zaring, Enforcement Discretion at the SEC, 94 Tex. L. Rev. 1155, 1166 (2016).

[101] 561 U.S. at 507 n.10.

[102] Lucia, 138 S. Ct. at 2049.

[103] Free Enter. Fund v. Public Co. Accounting Oversight Bd., 537 F.3d 667, 669 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (citing Morrison, 487 U.S. at 691–92).

[104] Duka v. SEC, 103 F. Supp.3d 382, 395–96 (S.D.N.Y. 2015), abrogated on other grounds by Tilton v. SEC, 824 F.3d 276 (2d Cir. 2016) (quoting Butz, 438 U.S. at 513–14). See also Mark, supra, at 102–08 (arguing that multiple layers of removal protection for SEC ALJs do not violate Article II); Zaring, supra, at 1191–95 (same).

[105] Decker Coal Co., 8 F.4th at 1133.

No. 20-61007

function."[106] The majority's decision is in tension, if not direct conflict, with *Decker Coal*.

*Free Enterprise* also noted that the exercise of "purely recommendatory powers" may justify multiple removal protections.[107] When an SEC ALJ issues a decision in an enforcement proceeding, that decision is essentially a recommendation as the Commission can review it de novo.[108] Even when the Commission declines review, the ALJ's decision is "deemed the action of the Commission."[109] Furthermore, the Commission is not required to use an ALJ and may elect to preside over the enforcement action itself.[110] This further supports the conclusion that the SEC ALJs' removal protections do not interfere with the President's executive power.

The majority reasons that because *Lucia* determined that SEC ALJs are inferior officers under the Appointments Clause, "they are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions," and, consequently, multiple for-cause protections inhibit the President's ability to take care that the laws be faithfully executed. But nowhere does the majority explain *how* the ALJs' tenure protections interfere with the President's ability to execute the laws. The majority does not mention *Free Enterprise*'s observation that the performance of "adjudicative rather than enforcement or policymaking functions" or "possess[ing] purely recommendatory powers" distinguishes ALJs from the PCAOB and may justify multiples

---

[106] *Id.*

[107] *Free Enter. Fund*, 561 U.S. at 507 n.10.

[108] *See Lucia*, 138 S. Ct. at 2049 (citing 17 C.F.R. § 201.360(d)); 5 U.S.C. § 557(b).

[109] *Lucia*, 138 S. Ct. at 2049 (quoting 15 U.S.C. § 78d-1(c)).

[110] *Id.* (citing 17 C.F.R. § 201.110).

No. 20-61007

layers of removal protection for ALJs.[111] The majority does not mention that *Lucia* found SEC ALJs to be similar to a federal judge.[112] The majority does not mention *Decker Coal*. Instead, the majority applies what is essentially a rigid, categorical standard, not the functional analysis required by the Supreme Court's precedents.[113]

Accordingly, I disagree with the majority that multiple layers of removal protection for SEC ALJs violate Article II. Because SEC ALJs solely perform an adjudicative function, and because their powers are recommendatory, these removal restrictions do not interfere with the President's ability to "take Care that the Laws be faithfully executed."

## IV.

I find no constitutional violations or any other errors with the administrative proceedings below. Accordingly, I would deny the petition for review.

---

[111] 561 U.S. at 507 n.10.

[112] 138 S. Ct. at 2049.

[113] *Morrison*, 487 U.S. at 689–90. The majority also cites *Myers v. United States*, 272 U.S. 52, 135 (1926), for the proposition that quasi-judicial executive officers must be removable by the President. But that part of *Myers* is dicta, which is why the Court disregarded it in *Humphrey's Executor v. United States*, 295 U.S. 602, 626–28 (1935).